1  GOETZ FITZPATRICK LLP
   RONALD D. COLEMAN
2  rcoleman@goetzfitz.com
   One Penn Plaza, Suite 4401
3  New York, NY  10119
   Telephone:  212.695.8100
4  Facsimile:  212.629.4013

5  Counsel for Defendants
   JOHN PATRICK FREY AND
6  CHRISTI FREY

7

8  BROWN WHITE & NEWHOUSE LLP
   KENNETH P. WHITE (Bar No. 238052)
9  kwhite@brownwhitelaw.com
   333 South Hope Street, 40th Floor
10 Los Angeles, CA  90071-1406
   Telephone:  213. 613.0500
11 Facsimile:  213.613.0550

12 Local Counsel for Defendants
   JOHN PATRICK FREY AND
13 CHRISTI FREY

14         UNITED STATES DISTRICT COURT

15        CENTRAL DISTRICT OF CALIFORNIA

16 | NADIA NAFFE, an individual,          | Case No.: CV12-08443-GW (MRWx)

17 |          Plaintiff,                  | Judge:    Hon. George H. Wu

18 |      v.

19 | JOHN PATRICK FREY, an individual,    | **SUPPLEMENTAL**
   | CHRISTI FREY, an individual, STEVE   | **DECLARATIONS OF JOHN**
20 | M. COOLEY, an individual, and the    | **PATRICK FREY AND KENNETH**
   | COUNTY OF LOS ANGELES, a             | **P. WHITE IN SUPPORT OF**
21 | municipal entity,                    | **DEFENDANT JOHN PATRICK**
   |                                      | **FREY'S MOTIONS; EXHIBITS**
22 |          Defendants.

23 |                                      | Hearing Date:  February 14, 2013
   |                                      | Time:          8:30 a.m.
24 |                                      | Courtroom:     10

25

26 |                                      | Complaint Filed:  October 2, 2012

27

28

BROWN, WHITE & NEWHOUSE LLP   ATTORNEYS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**EXHIBIT**

**DECLARATION OF JOHN PATRICK FREY**

**DECLARATION OF KENNETH P. WHITE**

Naffe Deposition Transcript, Vol. I .............................................................. DD

Naffe Deposition Transcript, Vol. II ............................................................. EE

Naffe Deposition Transcript, Vol. III ........................................................... FF

PACER Printout of Docket Item 75 with Exhibits ....................................... PP

BROWN, WHITE & NEWHOUSE LLP
A T T O R N E Y S

## SUPPLEMENTAL DECLARATION OF JOHN PATRICK FREY

I, JOHN PATRICK FREY, declare:

1.    I am a defendant in this action and a resident of the County of Los Angeles in the State of California.  I make this Supplemental Declaration in support of (1) my Motion to Dismiss the First Cause of Action Pursuant to FRCP 12(b)(6), but, with respect to that motion, only for the purpose of setting forth judicially noticeable facts or attaching documents referred to and relied upon in Plaintiff's First Amended Complaint; (2) my Motion to Dismiss the Second through Seventh Causes of Action Pursuant to FRCP 12(b)(1); (3) my Motion to Strike the Second Through Sixth Causes of Action Pursuant to California Code of Civil Procedure Section 425.16; and (4) my Motion for an Undertaking Pursuant to Code of Civil Procedure Section 1030.  I have personal knowledge of the following facts and if called upon to testify, would and could do so competently as follows.  However, because this Supplemental Declaration is offered for a limited purpose, it does not include all information I know about the matters referred to herein.

2.    Attached hereto as Exhibits DD, EE, and FF are true and correct copies of the deposition transcripts described in Paragraphs 22-25 of my original declaration submitted in support of these motions.  They are in the same form as when I downloaded them from PACER as described in that declaration, except that they have been redacted to comply with the Local Rules of the Central District of California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on January 28, 2013 in ___RANCHO PALOS VERDES___, California.

_____
JOHN PATRICK FREY

SUPPLEMENTAL DECLARATIONS OF JOHN PATRICK FREY AND KENNETH P. WHITE IN SUPPORT OF MOTIONS

771992.1

BROWN, WHITE & NEWHOUSE^{LLP}   ATTORNEYS

## SUPPLEMENTAL DECLARATION OF KENNETH P. WHITE

I, KENNETH P. WHITE, declare:

1.     I am an attorney licensed to practice law in California, and am a Partner at Brown White & Newhouse LLP, attorneys for Defendant John Patrick Frey.  I make this Supplemental Declaration in support of Defendant's (1) Motion to Dismiss the First Cause of Action Pursuant to FRCP 12(b)(6) (but only to the extent this declaration sets forth judicially noticeable facts or attaches documents referred to and relied upon in Plaintiff's First Amended Complaint); (2) Motion to Dismiss the Second through Seventh Causes of Action Pursuant to FRCP 12(b)(1); (3) Motion to Strike the Second Through Sixth Causes of Action Pursuant to California Code of Civil Procedure Section 425.16; and (4) Motion for an Undertaking Pursuant to Code of Civil Procedure Section 1030.  I have personal knowledge of the following facts and if called upon to testify, would and could do so competently as follows.  However, because this supplemental declaration is submitted for a limited purpose, it does not contain all information I know about the matter.

2.     I previously lodged Exhibits DD, EE, and FF attached hereto pursuant to a Motion to Seal.  Upon the Court's denial of that Motion, my assistant informed me that she had checked the PACER docket for the matter *Naffe v. Republican Party of Florida* and discovered that the status of the three exhibits was no longer marked as "restricted."  Later on January 18, 2013, I logged onto PACER myself and checked the docket for the Florida case.  I discovered that the three deposition transcripts – attached as exhibits to Docket item 75 in that case, as discussed in Mr. Frey's Motions – were no longer restricted, and I was able to download them.  The versions I was able to download on January 18, 2012 appeared identical to the Exhibits DD, EE, and FF hereto, which Mr. Frey downloaded in March 2012.

3.     I checked the docket again as of January 24, 2013, and saw that the transcripts remained available on PACER as of that date.  Attached as Exhibit PP is a true and correct copy of a printout of the page of Exhibits to Docket Item 75 from PACER in that case as of January 24, 2013.

I declare under penalty of perjury under the laws of the State of California that the

1  foregoing is true and correct.  Executed on January 28, 2013 in Los Angeles, California.

2

3                                         _s/Kenneth P. White_
                                          KENNETH P. WHITE
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          3
SUPPLEMENTAL DECLARATIONS OF JOHN PATRICK FREY AND KENNETH P. WHITE IN SUPPORT OF MOTIONS
782044.1

# EXHIBIT DD

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


NADIA NAFFE,

        Plaintiff,

                       CASE NO:
vs.                   8:04-cv-01916-JDW-TGW

REPUBLICAN PARTY OF FLORIDA,
et al.,

        Defendant.
                       /




| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | NADIA NAFFE |
| TAKEN BY: | Counsel for Defendant Republican Party of Florida |
| DATE: | July 29, 2005 |
| TIME: | 10:03 a.m. |
| PLACE: | Ford & Harrison LLP<br>101 East Kennedy Boulevard<br>Suite 900<br>Tampa, Florida |
| REPORTED BY: | Natalie W. Breaux, RPR, CRR<br>Notary Public<br>State of Florida at Large |



RICHARD LEE REPORTING
(813) 229-1588
TAMPA:     email: rlr@richardleereporting.com ST. PETERSBURG:
100 North Tampa Street, Suite 2060    535 Central Avenue
Tampa, Florida  33602     St. Petersburg, Florida  33701

2

APPEARANCES:

JAMES MOTEN THOMPSON, ESQUIRE
Nelson Bisconti & Thompson, LLC
718 West Dr. Martin Luther King Jr. Boulevard
Suite 200
Tampa, Florida 33603-3104
    Appeared for Plaintiff;

EDMUND J. McKENNA, ESQUIRE
Ford & Harrison LLP
101 East Kennedy Boulevard
Suite 900
Tampa, Florida 33602-5133
    - and -
CHRISTINA M. SHEPPARD, ESQUIRE
420 East Jefferson Street
Tallahassee, Florida 32301
    Appeared for Defendant Republican Party of
    Florida;

EDWARD LEE ISLER, ESQUIRE
Ray & Isler, P.C.
1919 Gallows Road
Suite 320
Tysons Corner
Vienna, Virginia 22182
    Appeared for Republican National Committee
    and Bush/Cheney '04.

ALSO PRESENT:

Mel Byrd, Videographer


                    I N D E X
                                        PAGE

Examination by Mr. McKenna                5

3

                                EXHIBITS
NO.                    DESCRIPTION                       PAGE

  1   Amended Complaint for Injunctive Relief
      and Damages and Demand for Jury Trial        14

  2   Plaintiff's Notice of Serving Answers to
      Defendant's First Set of Interrogatories     15

  3   Typewritten chronology beginning November
      7, 2003                                       21

  4   6/22/04 letter to EEOC from Burr & Smith     22

  5   Plaintiff's Notice of Serving Answers to
      Defendant Republican National Committee's
      First Set of Interrogatories                 30

  6   Composite titled "Weekly Report 9/30/03
      to 10/4/03"                                   40

  7   Progress Notes dated 12/9/03                 73

  8   Progress Notes dated 12/10/03                74

  9   2/25/04 e-mail to Naffe from Sheppard       144

 10   Declaration of Nadia K. Naffe               151

4

```
 1              The videotaped deposition, upon oral
 2    examination, of NADIA NAFFE, taken on the 29th day
 3    of July, 2005, taken by Counsel for Defendant
 4    Republican Party of Florida, at the offices of Ford
 5    & Harrison LLP, 101 East Kennedy Boulevard, Suite
 6    900, Tampa, Florida, beginning at 10:03 a.m.,
 7    reported by Natalie W. Breaux, Registered
 8    Professional Reporter, Certified Realtime Reporter,
 9    and Notary Public in and for the State of Florida at
10    Large.
11                        * * * * * *
12              THE VIDEOGRAPHER:  This is the beginning
13    of No. 1.  We are on the record at 10:03 a.m.
14    On July 29th of 2005.  We are located at 101
15    East Kennedy Boulevard in Tampa, Florida.  We
16    are here in the matter of Nadia Naffe versus
17    Republican Party of Florida, et al.
18              Would counsel identify themselves for
19    the record, please.
20              MR. THOMPSON:  Jim Thompson for the
21    plaintiff, Nadia Naffe.
22              MR. McKENNA:  Edmund McKenna for the
23    Republican Party of Florida.
24              MR. ISLER:  And Edward Lee Isler for the
25    Republican National Committee and the
```

8

5

```
 1          Bush/Cheney '04, Inc. campaign.
 2                  MS. SHEPPARD:  And I'm Christina
 3          Sheppard, general counsel of Republican Party
 4          of Florida.
 5                  THE VIDEOGRAPHER:  Would you swear in
 6          the witness, please.
 7                          NADIA NAFFE,
 8          being first duly sworn to testify to the truth, the
 9          whole truth and nothing but the truth, was examined
10           and testified as follows:
11                          EXAMINATION
12          BY MR. McKENNA:
13          Q      Good morning, Ms. Naffe.  As you know, my
14          name is Edmund McKenna and I'm going to be asking
15          you some questions today.  Before we begin, could
16          you please state your full name for the record,
17          please.
18          A      Nadia Naffe.
19          Q      Do you have a middle name?
20          A      Yes.  Kolasha.
21          Q      Could you spell that, please?
22          A      It's K-o-l-a-s-h-a.
23          Q      Have you ever been known by any other
24          names; for example, married names, maiden names, or
25          nicknames?
```

9

6

```
 1          A     Yes, I have a married -- a maiden name.
 2     It's Nadia Kolasha Millhouse.
 3          Q     Any other names?
 4          A     No.
 5          Q     Could I have your social security number,
 6     please?
 7          A     It's ███████.
 8          Q     Have you ever used any other social
 9     security number?
10          A     No.
11          Q     This deposition is being taken pursuant
12     to notice under the Florida -- I'm sorry -- under
13     the Federal Rules of Civil Procedure.  It's going to
14     be used for discovery, cross-examination and all
15     other purposes permitted by law.  Do you understand
16     that, ma'am?
17          A     Yes.
18                MR. McKENNA:  Counsel, I'd request a
19          stipulation that we reserve all objections
20          except to form of the question and
21          responsiveness of the answer until trial or
22          later proceeding.
23                MR. THOMPSON:  That's fine.
24     BY MR. McKENNA:
25          Q     Do you understand what a deposition is,
```

7

```
 1   ma'am?
 2        A    Yes.
 3        Q    Then you understand that I ask questions
 4   and you answer them?
 5        A    Yes.
 6        Q    Your attorney will be able to ask
 7   questions at a later time for you, but today you ask
 8   and I answer.  Do you understand that?
 9        A    I ask and you answer?
10        Q    No.  I ask and you answer.
11        A    I understand.
12        Q    You don't ask and I don't answer
13   questions.  Understand?
14             MR. ISLER:  You said it the other way
15        around.
16             MR. McKENNA:  Okay.  If you say so.
17   BY MR. McKENNA:
18        Q    Do you understand that, ma'am?
19        A    Yes.
20        Q    All right.  However, if you need a break
21   at any time during the day, please let me know; and
22   as soon as we get to a convenient spot, I'll be
23   happy to take a break.  It's not a marathon or an
24   endurance contest.
25        A    Okay.
```

8

```
 1        Q      One of the important things is that --
 2   one of the important rules of a deposition is that
 3   we only speak one at a time.  The court reporter, as
 4   good as she is, can only take down what we speak if
 5   we speak it one at a time.  So please wait until I
 6   completely finish my question -- even though you may
 7   know exactly which I'm asking and the way you're
 8   going to answer -- so that we have a full and
 9   complete record of your sworn testimony today.  Do
10   you understand that, ma'am?
11        A      Yes.
12        Q      Similarly, if you don't understand a
13   question that I ask you, please ask me to clarify it
14   or rephrase it, and I'll be happy to do so.  If you
15   do not do that, we have to assume that you
16   understood the question and your answer is
17   responsive.  Do you understand that, ma'am?
18        A      Yes.
19        Q      Similarly, in order to get an accurate,
20   written transcript, a verbal response is necessary.
21   Therefore, uh-huh's, uh-uh's, shrugging, nodding
22   does not translate very well to the written record.
23   Therefore, at some point today I may say, "I need
24   you to answer verbally, ma'am."  I'm not trying to
25   insult you or demean you in any way.  I'm simply
```

9

```
 1    trying to ensure that we have a complete, accurate
 2    record of your sworn testimony today.  Do you
 3    understand that, ma'am?
 4         A    I understand.
 5         Q    Okay.  Please try not to interrupt my
 6    questions and do not let me interrupt you.  For
 7    example, I may ask you a question, you may start to
 8    answer and stop and be thinking about the rest of
 9    your answer.  I may think that you're finished with
10    your answer and ask you another question.  If you're
11    not finished with your answer, put your hand up,
12    tell me to stop, tell me you haven't finished your
13    answer to the question.  Do you understand that,
14    ma'am?
15         A    I understand.
16         Q    Because otherwise, again, if you don't do
17    that, we'll have to assume that your answer is
18    complete and responsive to the question that was
19    asked.  Agreed?
20         A    I agree, I won't let you interrupt me.
21         Q    Now, you understand this testimony is
22    given under oath?
23         A    Yes.
24         Q    And it has the same force and effect as
25    if it was given in a court of law?
```

10

```
 1        A      I understand that.
 2        Q      And do you understand that it was lying
 3   in a deposition that got former president Bill
 4   Clinton into a lot of hot water?
 5        A      I'm familiar with the situation.
 6        Q      Now, at some point today your attorney
 7   may make an objection for the record.  As you heard,
 8   we've agreed to stipulate that all objections except
 9   to form of the question and responsiveness of the
10   answer will be done at a later time.  So the fact
11   that your attorney makes an objection does not mean
12   you don't have to answer my question.  You still
13   have to answer my question even though your
14   attorney's made an objection for the record.  Do you
15   understand that, ma'am?
16        A      I understand, and I'll answer your
17   questions to the best of my knowledge.
18        Q      You have the right to explain your
19   answer, but I have the right to have the question
20   that I ask answered.  So, for example, if I ask you
21   a yes-or-no question that you can answer yes or no,
22   you should answer it yes or no and then feel free to
23   provide whatever explanation you want after that.
24   Do you understand that, ma'am?
25        A      Sure.  If I can, I will.
```

11

```
1          Q      Is there any reason that you will not be
2    able to answer the questions I'm going to ask you
3    today completely, accurately and truthfully?
4          A      I don't see any reason why I shouldn't.
5          Q      Are you taking any medication that might
6    affect your testimony today?
7          A      I don't think my medicine affects my
8    testimony.
9          Q      What medicine are you taking?
10         A      Ambien and Prozac.
11         Q      Anything else?
12         A      No.
13         Q      What did you do to prepare for your
14   deposition today?
15         A      The only thing I did was read the
16   complaint.
17         Q      How long did you spend preparing for your
18   deposition today?
19         A      About a half hour to an hour.  Me and my
20   attorney talked about some things.
21         Q      Did you speak to anyone else besides your
22   attorney about your deposition here today?
23         A      No.
24         Q      Have you ever been arrested?
25         A      Yes.
```

12

```
 1        Q       When?
 2        A       I was arrested in -- I think it was
 3    2002.  I think it was 2002.
 4        Q       Okay.  Were you arrested more than once
 5    or just once?
 6        A       Just once.
 7        Q       What were you arrested for in 2002?
 8        A       A fight, argument with my boyfriend.
 9        Q       A physical altercation?
10        A       It had become physical.
11        Q       And were you charged?
12        A       Yes.
13        Q       What were you charged with?
14        A       Domestic violence.
15        Q       And what was the result of that case?
16        A       The district attorney's office dropped
17    the charges a week later.
18        Q       Did you hire an attorney?
19        A       No, I did not.
20        Q       Have you ever been convicted of a crime?
21        A       No, I have not.
22        Q       Have you ever had your deposition taken
23    before?
24        A       Yes, I have.
25        Q       How many times?
```

13

```
1          A     Once.
2          Q     When was that?
3          A     I think it was in 2000 or 2001.
4          Q     I'm sorry.  Let me go back for a second.
5    Your arrest, was that here in Hillsborough County?
6          A     Yes.
7          Q     And what was your deposition for the last
8    time?
9          A     I had been in a car accident.
10         Q     Did you retain counsel for that car
11   accident?
12         A     Yes, I did.
13         Q     Who was your counsel?
14         A     Don Greiwe.
15         Q     Can you spell the last name?
16         A     G-r-e-i-w-e.
17         Q     Is he in town?
18         A     Uh-huh.  He sure is.  Yes, he is.
19         Q     And did you file suit in that case?
20         A     Yes.
21         Q     And what was the result of that suit?
22         A     The result was we eventually settled.
23         Q     Did you receive a settlement?
24         A     Yes.
25         Q     Is the settlement confidential?
```

```
 1      A     I don't think it was.
 2      Q     Then how much did you settle for?
 3      A     I don't remember exactly what we settled
 4   for.  I remember what I received.
 5      Q     What did you receive?
 6      A     $3500.
 7      Q     Do you know if your deposition was typed
 8   up?
 9      A     No, I don't remember.
10      Q     Do you have a copy of that deposition?
11      A     No, I do not.  Would it be a problem if I
12   had some coffee?
13      Q     No.
14            THE VIDEOGRAPHER:  Want to take a
15         break?
16            MR. McKENNA:  Sure.
17             (Recess from 10:13 to 10:17 a.m.)
18            MR. McKENNA:  Would you mark that,
19         please.
20             (Exhibit 1 marked for identification.)
21   BY MR. McKENNA:
22      Q     Ma'am, I'm going to hand you what we've
23   marked for purposes of identification as Defendant's
24   Exhibit No. 1.  And my question to you is:  Do you
25   recognize that document?
```

15

```
 1      A     Yes.  This is my complaint.
 2      Q     And did you review that complaint before
 3 it was filed?
 4      A     Yes.
 5      Q     Would you turn to page 5 for me, please.
 6 Paragraph 18e on page 5 says that you were --
 7      A     Wait, I don't -- okay.
 8      Q     Are you with me?
 9      A     Yes.
10      Q     All right.  Paragraph 18e on page 5 says
11 that you were assigned the task of putting together
12 a list of African-Americans who had been appointed
13 to public office by Governor Jeb Bush.  Do you see
14 that, ma'am?
15      A     Yes, I do.
16      Q     Is that a correct statement?
17      A     Yes, it was.
18      Q     Is it no longer a correct statement?
19      A     What do you mean?
20      Q     You said "it was a correct statement."
21 Is it a correct statement now?
22      A     Oh, yes, it's a correct statement.
23            MR. McKENNA:  Would you mark that,
24      please.
25               (Exhibit 2 marked for identification.)
```

16

```
 1    BY MR. McKENNA:
 2         Q     Ma'am, I'm now going to hand you what's
 3    been marked for purposes of identification as
 4    Defendant's Exhibit No. 2.  Do you recognize that
 5    document?
 6         A     Yes, I know what this is.
 7         Q     All right.  The last page of that
 8    document is a verification by you that it's true and
 9    accurate.  Is that correct?
10         A     Yes.
11         Q     If you would turn to the first page of
12    the attachment which has at the very top of the page
13    "Question 8."
14         A     Yes.
15         Q     And it refers to the week of September
16    29, 2003.  Do you see that, ma'am?
17         A     Yes.
18         Q     And that says:  "I receive a package from
19    RPOF containing," among other things -- and I'm
20    paraphrasing -- "a manifest of all of Governor Jeb
21    Bush's black appointees."  Do you see that, ma'am?
22         A     Yes.
23         Q     Which is accurate, ma'am?  The amended
24    complaint, Exhibit 1, or the interrogatories that
25    you've sworn on Exhibit 2?
```

```
 1          A       What do you mean?
 2          Q       Well, they conflict, don't they?
 3          A       No, they don't.
 4          Q       Why not?
 5          A       18e is referring to an assignment, and
 6     the item that you're referring to is a list that I
 7     received in the mail.
 8          Q       Well, 18e says you received a task of
 9     putting together a list of all African-Americans who
10     had been appointed to public office.  The
11     interrogatory responses state that you received a
12     manifest of all of Governor Jeb Bush's black
13     appointees.
14          A       What's your question?
15          Q       Are those not inconsistent?
16          A       No, they're not inconsistent.
17          Q       Why not?
18          A       Because they're talking about two
19     different things.  I got in the mail a manifest that
20     was printed with a lot of appointees.  It was a
21     pretty thick manifest.  I turned that over to your
22     office with your notice to produce.  And from that
23     list I was supposed to make up something that looked
24     more appealing, like a brochure handout.  That was
25     the assignment that 18e is referring to.  You're
```

18

```
 1    talking about two separate things.
 2         Q     And did you complete that assignment?
 3         A     No, I didn't.
 4         Q     Now, ma'am, if you'd turn back to
 5    Paragraph 18 on page 4 of Defendant's Exhibit No.
 6    1.
 7         A     I'm sorry, repeat that, sir.
 8         Q     Page 4, Paragraph 18 of Defendant's
 9    Exhibit 1.
10         A     4 of 18?
11         Q     That's correct.
12         A     Yes.
13         Q     It indicates that Allison Defoor told you
14    that you were to act as liaison to the
15    African-American clubs throughout Florida.  Is that
16    correct?
17         A     That's not exactly what he said.  What he
18    said is in a quote in the complaint.  If you
19    continue to read, it says that he told me to help
20    them with whatever they needed.
21         Q     So he did not tell you to act as liaison
22    with all the African-American clubs throughout
23    Florida.  Is that correct?
24         A     He didn't use that word --
25         Q     Okay.
```

19

```
1         A      -- that you said, liaison.
2         Q      I'm reading it out of the complaint.  So
3    Paragraph 18 is inaccurate?
4         A      No, it's not inaccurate.
5         Q      If you would turn back now to Defendant's
6    Exhibit No. 2, your sworn interrogatory answers.
7    Looking at Question 8, September 23, 2003.
8         A      Uh-huh.
9         Q      Do you see that, ma'am?
10        A      Uh-huh.
11        Q      I need you to answer verbally.
12        A      I'm sorry.  Yes.
13        Q      It states there that Hilda Stringer,
14   deputy director, informed you that Vice Chairman
15   Allison Defoor instructed you to attend the
16   American -- African-American roundtable.  Is that
17   correct?
18        A      She instructed me to attend the
19   conference call with the African-American
20   roundtable, that's correct.
21        Q      Okay.  So that's not referring to the
22   discussion with Mr. Defoor?
23        A      I'm sorry?
24        Q      That's not referring to Paragraph 18 in
25   the complaint referring --
```

23

20

```
1        A      I think what I said in --
2        Q      Let me finish my question, ma'am.  That's
3   not referring to the same conversation as in
4   Paragraph 18 of Defendant's Exhibit 1?
5        A      It seems that what I'm stating in
6   Question 8 is referring to a conversation that
7   happened before the conference call.  You're
8   referring to something that happened during the
9   conference call.  They are two different things.
10       Q      And you do not have in these sworn
11  interrogatory answers this statement that Mr. Defoor
12  allegedly made to you.  Is that correct?
13       A      You mean the quote?
14       Q      Do you have in interrogatory -- in your
15  sworn answer to the interrogatories, Defendant's
16  Exhibit No. 2, any reference to this alleged
17  statement by Mr. Defoor in Paragraph 18 of the
18  complaint, Defendant's Exhibit No. 1?
19       A      No, that statement is not there.  At the
20  end of my questions for Question 8 it says:  "This
21  is not exhaustive - there may be other events not
22  covered by this list" in bold print.
23       Q      And why did you not put that statement in
24  your sworn interrogatory responses?
25       A      My interrogatories to you as a whole are
```

21

```
1    not complete.
2         Q    Why not?
3         A    Well, I just was depressed and had a lot
4    of anxiety about doing the interrogatories, and I
5    did the best I could.  I think we've done an
6    addendum to these as well.
7         Q    Let's not do that.  Let's do this.
8             (Exhibit 3 marked for identification.)
9         Q    I'm going to hand you now what we've
10   marked for purposes of identification as Defendant's
11   Exhibit No. 3.  My question to you, ma'am, is:  Do
12   you recognize that document?
13        A    This looks like some of my notes.
14        Q    Is this a document you provided to the
15   EEOC while you had a charge pending with them
16   against the Republican Party of Florida?
17        A    I don't know.  This looks -- this doesn't
18   say anything about EEOC on it.  This is just blank
19   pieces of paper with no EEOC letterhead or anything
20   on it that would identify it having connection with
21   the EEOC.
22             MR. McKENNA:  Move to strike as
23        nonresponsive.
24   BY MR. McKENNA:
25        Q    Ma'am, did you submit this to the EEOC
```

25

22

```
1    when they were processing your charge of
2    discrimination against Republican Party of
3    Florida?
4         A    I gave the EEOC some notes when I
5    processed my charge.  I don't know if these are
6    specifically the notes.  These look like the notes.
7         Q    Okay.  Did you provide a copy of these
8    notes to your attorney in response to the request
9    for production of documents that was done?
10        A    No.
11        Q    Why not?
12        A    Well, there were a couple reasons.  I
13   didn't have these notes.  These notes are part of
14   another set of notes.
15        Q    You don't have a copy of the documents
16   from the EEOC?
17        A    I'm sure I -- I don't have a copy handy,
18   if that's what you mean.  I gave them a copy.  This
19   is excerpts from notes that I had made from -- for
20   my attorney, and so --
21        Q    Did you receive your file from your prior
22   attorneys Burr & Smith?
23        A    Yes, I did receive file.
24             (Exhibit 4 marked for identification.)
25   BY MR. McKENNA:
```

23

```
 1          Q     I'm going to hand you what's been marked
 2     for purposes of identification as Defendant's
 3     Exhibit 4.  Have you seen that document before?
 4          A     No.
 5          Q     It purports to be a letter from an
 6     attorney at the offices of Burr & Smith to Juanita
 7     McKinnie at the U.S. Equal Employment Opportunity
 8     Commission, does it not?
 9          A     Yes.
10          Q     And it requests a copy of the EEOC's
11     investigatory file pursuant to Section 83 of the
12     EEOC compliance manual, does it not?
13          A     Yes.
14          Q     And if you turn to the third page, there
15     is a photocopy of a check from Burr & Smith's
16     operating account to the Department of Treasury
17     which confirms with -- which conforms to the EEOC's
18     request on page 2 for $22.13 for your file, does it
19     not?
20          A     Yes.
21          Q     And again, ma'am, I ask you:  Do you not
22     have a copy of the EEOC investigatory file in your
23     possession?
24          A     I'm -- I'm not certain if I do.  Your
25     previous question was did I get a case file.  I did
```

24

```
1     get case file, and I did not go through every piece
2     of paper in that file.
3         Q      Did you provide that entire file to your
4     current attorney?
5         A      I'm not certain if I provided the entire
6     file to my current attorney.  I'm not certain.
7              MR. McKENNA:  Well, I'm going to go on
8         today, but obviously it's going to be under
9         protest.  It appears we have not received all
10        of the documents that she has that are
11        responsive to our document request.
12             MR. THOMPSON:  If you're planning on
13        reserving time for asking those questions, I
14        would suggest that you reserve time.  I will
15        certainly entertain the idea that if there are
16        documents that are responsive that weren't
17        provided, that you would have the opportunity
18        to question her on those.  However, I would
19        still insist that we adhere to the time
20        constraints for the rules of civil procedure.
21        A      If I have any documents that I was
22    supposed to provide, I'm happy to provide them.
23    I'll go through -- I just sort of thought everything
24    they provided was privileged, and I just didn't go
25    through it in great detail.
```

25

```
 1        Q     What computer did you use to type up
 2   Defendant's Exhibit 3?
 3        A     Defendant's Exhibit 3.  I don't
 4   remember.
 5        Q     Do you still have a copy of this on your
 6   computer?
 7        A     Well, if I don't remember which computer
 8   I typed it up on, I probably wouldn't be accurately
 9   able to tell you if I had a copy of it either.
10        Q     Did you search your computer for relevant
11   documents in response to the request for production
12   of documents?
13        A     I don't have a computer to search for
14   relevant documents.
15        Q     You currently do not have a computer?
16        A     Yes, I have a computer, but I would have
17   no reason to search my personal computer for
18   relative documents pertaining to the RPOF.
19        Q     Why not?
20        A     I would have no reason to do that.
21        Q     So you've not searched your computer for
22   relevant documents for the request for production of
23   documents.  Is that correct?
24        A     I did not search my personal computer for
25   documents because I did not think that there would
```

29

26

```
 1    be any documents on there pertaining to your
 2    request.
 3        Q     When did you create Defendant's Exhibit
 4    3?
 5        A     I don't remember the exact date.
 6        Q     Is it -- were the dates listed on here
 7    created contemporaneously with the events?
 8        A     What -- I don't understand what you mean,
 9    contem -- you mean at the same time as?
10        Q     Right.
11        A     No.
12        Q     Were they created before or after you
13    filed your EEOC charge?
14        A     Well, if I gave them to the EEOC, then
15    they would probably have had to be created at some
16    point before the charge.  That would make sense.
17        Q     And you filed your charge in March of
18    2003.  Is that correct?
19        A     Yes, that is correct.
20        Q     Did you create this document in February
21    of 2003?
22        A     I told you I don't remember the exact
23    date and I don't remember the exact month.
24        Q     Do you remember whether you created this
25    document, Defendant's Exhibit 3, in January of 2003?
```

```
 1        A     I repeat my previous answer.  I don't
 2   remember the exact date, and that means I don't
 3   remember the exact date.  And I don't want to guess
 4   at it because I don't want to give you the wrong
 5   information.
 6        Q     Do you recall whether or not you would
 7   have created this chronology in December of 2002?
 8        A     I really think we're beating a dead horse
 9   here.  I've answered your question.
10        Q     Ma'am, the question is:  Do you recall
11   whether or not you created the chronology, which is
12   Defendant's Exhibit 3, in December of 2002?
13        A     December of 2002?  I don't believe I was
14   working for the party then, so probably not.
15             MR. THOMPSON:  Can we go off the record
16        very briefly?
17             MR. McKENNA:  Sure.
18             (Recess from 10:35 to 10:35 a.m.)
19   BY MR. McKENNA:
20        Q     Let's try it this way, ma'am.  Do you
21   believe -- do you know whether you created the
22   chronology that's listed as Defendant's Exhibit 3 in
23   the year 2004?
24        A     Mr. McKENNA, I've already stated on the
25   record that I don't remember the date that I made
```

28

```
 1    this document.  And "I don't remember the date"
 2    means I don't remember the date.  And I don't want
 3    to give you a date that isn't the right date.  It's
 4    very important to me that my testimony be accurate,
 5    and so I don't want to guess at things that I don't
 6    know the answers to.
 7         Q    So it's possible that you created this
 8    document in 2003.  Is that correct?
 9         A    Mr. McKenna, I don't remember the date
10    the document was created.
11              MR. McKENNA:  Move to strike as
12         nonresponsive.
13    BY MR. McKENNA:
14         Q    So is it possible that you created the
15    document in 2003?
16         A    I don't know.
17         Q    Since you've been hired by the Republican
18    Party of Florida, how many different computers have
19    you used?
20         A    Gosh, lots.
21         Q    More than five?
22         A    Since I've been hired.  Since I've been
23    hired and I no longer work there, so from --
24         Q    Since you -- since your date of hire with
25    the RPOF through today, how many computers have you
```

29

```
 1   used?
 2        A     Lots.  Many.  I've used many.  I've used
 3   many computers.
 4        Q     More than five?
 5        A     Yes.
 6        Q     More than ten?
 7        A     Probably not.
 8        Q     Okay.  How many of those computers were
 9   in your home?
10        A     Two.
11        Q     And what kind of computers were they?
12        A     My personal computer and my laptop were
13   the two computers in my home.
14        Q     I'm sorry.  Could you say that again?
15        A     My personal computer and my laptop were
16   the two computers that were inside my home.
17        Q     The laptop being the one that was
18   provided to you by the Republican Party of Florida?
19        A     That's in dispute.  I told you yesterday
20   how I got that laptop.
21        Q     Is that the laptop we're talking about?
22        A     That is the laptop that we're talking
23   about.
24        Q     And what kind of a computer do you have
25   in your home?
```

30

```
1        A     It's a Compaq Presario.
2        Q     Did you use that computer to transmit any
3   documents or create any documents for RPOF?
4        A     I'm not sure.  I don't think so.
5        Q     But you did not search that computer to
6   find out.  Is that correct?
7        A     I did not search that computer because I
8   didn't have any recollection of doing that, of
9   creating documents for the RPOF on it.
10        Q     But it's possible there may be documents
11   there.  Correct?
12        A     It's not very likely.
13        Q     But it's possible?
14        A     I don't think that it's possible.
15              (Exhibit 5 marked for identification.)
16        Q     I'm going to hand you what we've marked
17   for purposes of identification as Defendant's
18   Exhibit No. 5.  Do you recognize that document,
19   ma'am?
20        A     Yes, I recognize it.
21        Q     Are those your sworn answers to the
22   interrogatories of the Republican National
23   Committee?
24        A     Yes, it is.
25        Q     Would you turn to the third page for me,
```

34

31

```
 1    please?  It begins "November 19, 2003."
 2         A     The third page?  Yes.  It says -- my
 3    third page says "Interrogatory No. 2."
 4         Q     Try the fifth page.  It begins at the top
 5    "November 19, 2003."
 6         A     Uh-huh.
 7         Q     Are you there, ma'am?
 8         A     Uh-huh.
 9         Q     I need you to answer verbally.
10         A     I'm sorry.  I'm sorry.  Yes.  Yes.
11         Q     Okay.  Under "November 19, 2003" you have
12    a four-line response regarding Mr. Kester, your
13    supervisor.  Is that correct?
14         A     Yes.
15         Q     Now, if you turn to Defendant's Exhibit
16    No. 3 for November 19, 2003, you have a
17    four-paragraph discussion of that day, do you not?
18         A     Yes.
19         Q     Why did you not include the entire
20    discussion in your sworn interrogatory answers?
21         A     Because I was trying to answer the
22    question directly.  And I don't have on what you
23    gave me what the question was.  Question No. 4 is a
24    specific question, and so I'm addressing a specific
25    question.  Exhibit 3 isn't addressing any specific
```

32

```
 1    question.
 2         Q    What is the significance of the response
 3    that you've written on your sworn interrogatories
 4    regarding November 19, 2003?
 5         A    What's the significance?
 6         Q    Yes.
 7         A    I'm sorry.  The -- repeat that, please.
 8         Q    What is the significance to you of the
 9    notation you have under November 19, 2003 in your
10    sworn interrogatory answers to the Republican
11    National Committee?
12         A    I was just answering Question 4.
13         Q    Do you believe that that has something to
14    do with your lawsuit?
15         A    Pardon?
16         Q    Do you believe that that --
17         A    Well, of course it has -- the question
18    has something to do with my lawsuit.  It's a
19    question to an interrogatory in a lawsuit.
20         Q    Okay.  So does it support your
21    allegations in this case?
22         A    Well, I suppose that it would.  It's
23    answering a question that the RNC had in their
24    interrogatories.
25         Q    Do you contend that what happened on
```

33

```
 1    November 19, 2003 was somehow discriminatory or
 2    retaliatory?
 3          A     I think it was discriminatory.
 4          Q     Why?
 5          A     I'm sorry.  Can you repeat the question?
 6          Q     Why.
 7          A     Why what?
 8          Q     Why do you believe it's discriminatory?
 9          A     Well, because -- there is a lot of
10    reasons.  I thought the way that the instruction was
11    given to me, it was given to me in a hostile
12    manner.  I think the assignment in and of itself was
13    very curious and peculiar to me.  And then when I
14    asked about it, the response that I got the next day
15    was even more harassing.
16          Q     Why do you believe it was -- do you
17    contend it was discriminatory based on your race?
18          A     Yes.
19          Q     Why?
20          A     Because it's illegal.
21          Q     What's illegal?
22          A     Race matching is illegal.
23          Q     You contend this is an indication of race
24    matching?
25          A     I believe it was.
```

37

34

```
1          Q     Okay.
2          A     Because this is -- the assignment was
3     something that wouldn't normally be something that I
4     would do.  And that's why I questioned it.
5          Q     Yes.  You questioned your superior's
6     instructions.  Is that correct?
7          A     I questioned their instructions about
8     this particular assignment.
9          Q     And if you turn to Defendant's Exhibit 3,
10    do you have any indication in the November 19, 2003
11    that there was any race matching going on in that
12    entry?
13         A     Pardon?
14         Q     In the Defendant's Exhibit No. 3 under
15    "November 19, 2003," your entry -- do you see that,
16    ma'am?
17         A     I'm sorry.  Exhibit 3?
18         Q     November 19, 2003 entry.
19         A     Uh-huh.  I'm sorry.  Yes.  Yes.
20         Q     Are you there?
21         A     I'm here.
22         Q     All right.  Is there any indication of
23    race matching in that entry?
24         A     What do you call an indication?
25         Q     I'm asking you the questions, ma'am.  We
```

35
```
 1    went through this.  Is there any indication to you
 2    in the November 19, 2003 entry of some sort of
 3    unlawful race matching?
 4                MR. THOMPSON:  For the record, is it
 5         your position that she's not allowed to ask
 6         you a question to ask what your question
 7         means?
 8                MR. McKENNA:  No, she can ask -- I've
 9         asked about --
10                MR. THOMPSON:  That's what the question
11         was.
12                MR. McKENNA:  No.  Well, it wasn't, but
13         that's fine.
14    BY MR. McKENNA:
15         Q    Do you understand the question, ma'am?
16         A    No, I don't.
17         Q    Okay.  You said that in response to the
18    November 19, 2003 responses to the Republican
19    National Committee that that entry indicates race
20    matching.  Correct?
21         A    I thought that the -- yes.  And I said
22    that I thought it was a hostile situation and I
23    thought it was discriminatory.
24         Q    Okay.  Now I'm asking you:  On
25    Defendant's Exhibit No. 3, is there any indication
```

36

```
 1   in there of any what you contend to be unlawful race
 2   matching?
 3        A    Yes.  The --
 4        Q    Where?
 5        A    The situation in and of itself.
 6        Q    Okay.
 7        A    The entire situation.
 8        Q    Show me in Defendant's Exhibit 3 where
 9   you refer to some sort of unlawful race matching.
10        A    I don't refer to any unlawful race
11   matching.  The reason why I wrote this down, I made
12   this entry, was because I thought that it was
13   illegal and I thought that it was race matching.
14        Q    But you didn't tell --
15        A    That's why it's significant.  That's why
16   it's there.
17        Q    But in Defendant's Exhibit 3, the notes
18   you provided to the EEOC don't talk anything about
19   race matching, does it?
20        A    I didn't say those words "race matching."
21        Q    You didn't give any indication whatsoever
22   to the EEOC that this situation on November 19 you
23   thought was race matching, did you?
24        A    That's not true.  I had conversations
25   with the EEOC about this.
```

37

```
 1          Q     Ma'am, I'm talking about Defendant's
 2    Exhibit 3.
 3          A     That's not what your last question was.
 4    You said did I give any indication to the EEOC; and
 5    I did.
 6          Q     In Defendant's Exhibit No. 3 you gave no
 7    indication of any sort of unlawful race matching.
 8    Correct?
 9          A     I didn't use those words.
10          Q     In --
11          A     But I thought that the situation was
12    unlawful, and that's why I sent an e-mail to the
13    office questioning why I was given this assignment
14    in the first place.
15          Q     Ma'am, I'm talking about Defendant's
16    Exhibit 3, the words you have there.
17                MR. THOMPSON:  I'm going to object to --
18          Q     Would you show me, please, where it
19    indicates any indication whatsoever of race
20    matching.
21                MR. THOMPSON:  I'm going to object to
22          form.
23          Q     Okay.  Do you understand the question?
24          A     I've answered the question.
25          Q     No, ma'am.  I'm asking you to show me in
```

38

```
 1    Defendant's Exhibit 3 -- quote me the language --
 2    that suggests that there is unlawful race matching
 3    going on.
 4              MR. THOMPSON:  Object to form.
 5         A    I asked -- I asked why I was given the
 6    assignment.  I asked why I was instructed to blow
 7    off other things that I was supposed to do for this
 8    particular assignment, and I questioned it.  And
 9    that was my questioning, the race matching.  I
10    didn't have to say the words "race matching."  I
11    explained the situation.
12         Q    In the Defendant's Exhibit No. 3, you
13    can't give me any language that suggests any
14    unlawful race matching in the November 19, 2003
15    entry, can you?
16         A    The whole situation --
17              MR. THOMPSON:  Objection.
18         A    -- is race matching.  I don't have to use
19    those specific words.
20         Q    Are you refusing to answer my question,
21    ma'am?
22         A    I did answer your question.  No, I'm not
23    refusing to answer any questions.  That's why I came
24    here, to answer your questions.
25         Q    Would you quote for me the language in
```

42

39

```
 1   the November 19, 2003 entry that you gave to the
 2   EEOC that suggests there was some sort of unlawful
 3   race matching.
 4            MR. THOMPSON:  Object to the form.
 5       A    Am I still -- am I going to answer that
 6   question?
 7       Q    Are you?  I don't know.  Are you?
 8       A    Well, could you repeat it, please?
 9            MR. McKENNA:  Would you read back the
10       question, please.
11            (The reporter read as requested.)
12       A    I'll read the last paragraph.  What I had
13   in my mind when I wrote this paragraph, "That
14   evening, I sent Mr. Kester an email asking him why I
15   was required to drop everything at the last minute
16   and gather this information and why wasn't this the
17   responsibility of the Chairman's assistant?  In any
18   other situation the Chairman's assistant would have
19   confirmed" her "itinerary travel plans, but now, for
20   some reason, I was expected to do this."  And I
21   didn't understand why I was expected to do it.
22            And the only thing that I could figure in
23   my head was probably because these folks were
24   black.  And I asked why I was given this assignment,
25   and that's why this entry is here.
```

40

```
 1          Q    But you didn't tell the EEOC that these
 2     folks were black, did you?
 3          A    Pardon?
 4          Q    You didn't tell the EEOC that these folks
 5     were black in Defendant's Exhibit No. 3, did you?
 6          A    Not in this exhibit.  I had several
 7     communications with the EEOC.  I had several
 8     meetings with them on the phone and in person where
 9     we talked about specific things.  We had a very long
10     initial interview where we talked about several
11     things.  Can I go to the bathroom?
12          Q    Sure.
13               (Recess from 10:52 to 11:00 a.m.)
14               (Exhibit 6 marked for identification.)
15     BY MR. McKENNA:
16          Q    Ma'am, I'm going to hand you what's been
17     marked for the record as Defendant's Exhibit No. 6.
18     Do you recognize that document?
19          A    Yes.  This is my weekly reports.
20          Q    Would you turn to the second page for me,
21     please.  Do you see where you have a listing there
22     for October 6th of calls made and received?
23          A    Yes.
24          Q    And one of the people you have listed is
25     Terry Kester.  Is that correct?
```

41

```
 1       A    Yes.
 2       Q    Now, if you turn to November 19 for me.
 3       A    Turn to November 19?
 4       Q    Yes.
 5       A    In the same document you mean?
 6       Q    In the same document, November 19.
 7       A    Okay.
 8       Q    Defendant's Exhibit No. 6.  Are you there
 9  yet?
10       A    I'm on October 19.
11       Q    No.  November 19.
12       A    Oh.
13       Q    In that -- in Defendant's Exhibit No. 6,
14  your entry for November 19.
15       A    Okay.  Hold on a second.  Yes.
16       Q    Looks like this.
17       A    Yes.  I have it.
18       Q    There is no indication of a call made or
19  received from Terry Kester, is there?
20       A    No, there isn't.  Now, I didn't write
21  down in my weekly report every single call made and
22  received.  I tried to write down most of them,
23  because when I was on the road I didn't -- it was
24  hard to keep up with who I talked to.
25       Q    You tried to write down the important
```

42

```
1    ones?
2         A    No.  I just -- I wrote this down
3    sometimes for my own knowledge so I could remember
4    if I hadn't talked to one of my county people in a
5    week or so that I needed to talk to them.  But I
6    didn't write down every single call that I made and
7    received, but I tried to write down many of them.
8    It was something that's sort of hard to keep up
9    with.
10              And later on, as you look through my
11   weekly reports, I actually stopped doing that
12   because it was too hard to keep accurate track of
13   who I actually talked to and didn't talk to.
14        Q    Turning back now to Defendant's Exhibit
15   No. 5, your sworn interrogatory answers to the
16   Republican National Committee, if you'd look at the
17   November 20, two thousand --
18        A    Hold on.  You're just going a little too
19   fast.  Okay, I'm on Exhibit 5.
20        Q    Okay.  The November 20, 2003 entry.
21        A    Yes.
22        Q    All right.  Refers to a -- it says that
23   your supervisor instructed you to call at 11 a.m.
24   You called Kester and Sheppard and explained that
25   you were confused.  Do you see that, ma'am?
```

43

```
 1        A     Yes.
 2        Q     What were you confused about?
 3        A     I spoke to them regarding this assignment
 4   on the 19th and my confusion as to why I was given
 5   the assignment.
 6        Q     That's not what it says here, ma'am.  It
 7   says you were confused about his instructions.  Do
 8   you see that, ma'am?
 9        A     Those were the instructions that I'm
10   referring to.
11        Q     And how were the instructions confusing?
12        A     Well, they were confusing to me because I
13   didn't understand why I was given the assignment.
14   They were confusing to me.
15        Q     But the instructions to do the assignment
16   were not confusing, were they?
17        A     The instructions to do what assignment?
18        Q     The assignment on November 19.
19        A     The instructions to do the assignment
20   were confusing.  Not the assignment itself, but the
21   context in which the assignment was given was
22   confusing.
23        Q     You were told to locate an event
24   itinerary and invitation.  Right?
25        A     For a black republican club, yes.
```

47

44

```
 1        Q     Okay.  Is that confusing?
 2        A     Pardon?
 3        Q     How is that confusing?
 4        A     Well, I'm a field director.  I mean, I
 5   don't walk around with, you know, itineraries and
 6   invitations to an event.  That's not really my
 7   role.  And that's sort of what was -- and I had
 8   never been asked to do that before, and so that's
 9   what was sort of confusing.
10              And when I talked to them on the 20th, I
11   was asking why was I responsible to do this task.
12   And that's what the confusion was about.
13        Q     So you were questioning your supervisor's
14   instructions.  Is that correct?
15        A     No, I was not questioning their
16   instructions.  I was questioning that assignment.
17        Q     It says here:  "When I asked Kester why I
18   was given this assignment he got upset."  So you
19   asked him why you were given the assignment?
20        A     I asked him why was I getting invitations
21   for this black republican club, was what I didn't
22   understand.  And I was just asking for
23   clarification.  I wasn't -- I wasn't challenging him
24   or anything.
25        Q     And he was angry.  And in an aggressive
```

45

```
 1    and hostile manner he said, "Let me make this clear
 2    to you, you report to me and Christina.  Do you
 3    understand that?"
 4         A     He said that and he said that again and
 5    again.  He said it -- that -- those words in
 6    different variations.
 7         Q     Do you consider that to be a correct and
 8    complete discussion of what occurred on November 20,
 9    2003?
10         A     That is a summary of what happened.  And
11    again, in my interrogatories it says that this is
12    not exhaustive.
13         Q     And it's not a complete answer, is it?
14         A     My answer to you is complete,
15    Mr. McKenna.
16         Q     All right.  If you would turn back to
17    Defendant's Exhibit 3 to the November 22 -- I'm
18    sorry -- the November 20th, on the first page, the
19    entry.
20         A     I'm sorry.  What was -- the 20th?
21         Q     The November 20th entry on Defendant's
22    Exhibit No. 3.
23         A     I'm there.
24         Q     Are you there?
25         A     Yes, sir, I'm there.
```

46

```
1           Q      That's a far more detailed account of
2    what occurred on the 20th, is it not?
3           A      There are more details.
4           Q      Far more details?
5           A      That's your opinion.
6           Q      It's not your opinion?
7           A      I answered -- what is your question?
8           Q      Is it not your opinion that the entry in
9    Defendant's Exhibit 3 is a far more detailed account
10   of what occurred on November 20th than what is in
11   your answers to the interrogatories of the
12   Republican National Committee?
13                 MR. THOMPSON:  Object to form.
14          A      I'm not here to give opinions.
15          Q      Ma'am, you're here to answer questions.
16   Are you refusing to answer the question?
17          A      No.  I don't have an opinion.
18          Q      You don't have an opinion.
19          A      I answered.  If you're referring to the
20   RNC's interrogatories, they asked a specific
21   question.  Exhibit 3 isn't referring to any specific
22   questions.  So you're comparing apples to oranges.
23          Q      In your response to the interrogatory --
24   I'm sorry.  In your document to the EEOC,
25   Defendant's Exhibit No. 3, you talk about Carol
```

47

```
1    Carter.  Is that correct?
2         A     There is some references to Carol Carter
3    in here.
4         Q     And you said that you included her on an
5    e-mail that you sent.  Is that right?
6         A     Yes, I've -- I was told that I did do
7    that.
8         Q     Did you not do that?
9         A     I was told by Kester and Sheppard that I
10   did.
11        Q     My question is:  Did you in fact do it?
12        A     Without seeing the e-mail, I couldn't be
13   sure.  But I -- I think I did.  It was Kester and
14   Sheppard who brought it to my attention, and that's
15   why I wrote it down.
16        Q     And Ms. Carter is not an employee of the
17   Republican Party of Florida.  Is that correct?
18        A     She is not an employee, but she gets paid
19   by the Republican Party of Florida.
20        Q     She is not -- the question, ma'am, is:
21   she's not an employee of the Republican Party of
22   Florida.  Correct?
23        A     No, she is not.
24              MR. THOMPSON:  Object; it's asked and
25        answered.
```

48

```
 1              MR. McKENNA:  I don't think so.  I got
 2      it now.
 3  BY MR. McKENNA:
 4        Q     And so you were involving someone who was
 5  not an employee of the Republican Party of Florida
 6  in this issue.  Is that correct?
 7        A     No, that's not true.  It was the chairman
 8  that involved her.  Because when this discussion was
 9  going on the day of the 19th along the travel to
10  Sarasota County, Ms. Carter was in the car with the
11  chairman, and it was the chairman who involved her
12  in the conversation.  It was the chairman who told
13  Ms. Carter about an ongoing employee situation with
14  her assistant Suzann, not me.
15        Q     So when you received this telephone call
16  from Terry Kester, Carol Carter and the chairman
17  were in the car with you?
18        A     Yes.  He was -- I was staffing her.  And
19  Carol Carter and the chairman were both in the car
20  when he asked me to do this.  So the chairman
21  overheard this conversation, and she too was curious
22  why Suzann wasn't getting this information.
23        Q     Are you finished?
24        A     For -- yeah, for the moment.
25        Q     Now, you state in the Defendant's Exhibit
```

49

```
 1    3 that he said three times, and raised his voice in
 2    magnitude each time, "You report to me and
 3    Christina.  We are your direct supervisors.  Do you
 4    understand me?"
 5         A    Yes.  He just kept saying it, like he was
 6    trying to browbeat me or something, as if I didn't
 7    hear him the first time.  And it was very demeaning
 8    and hurtful.
 9         Q    And do I understand your testimony to be
10    that your contention is that the chairman instructed
11    you to keep Carol Carter involved in the -- in this
12    issue?
13         A    That -- my testimony is, is that it was
14    the chairman who involved Carol Carter in the issue
15    by discussing an internal party matter with her.
16         Q    Did she instruct you to copy her on the
17    e-mail?
18         A    No, she didn't.  She instructed me to
19    copy her on the e-mail.
20         Q    So you took it upon yourself to copy
21    Ms. Carter?
22         A    Copying Ms. Carter was a mistake.  If she
23    wouldn't have been in the car I probably wouldn't
24    have ever even done that.
25         Q    Okay.  Who was the assistant to the
```

53

50

1   chairman at that time?
2       A    Suzann Guimond.
3       Q    And were there not ongoing problems with
4   Ms. Guimond?
5       A    I was told -- the chairman told me that
6   there was some issues, and she talked -- when she
7   was in the car with me and Carol, she was talking
8   about some problems.
9       Q    And did she end up getting terminated?
10      A    Suzann Guimond?
11      Q    Yes.
12      A    I don't know.  I -- if she did, I wasn't
13  working there when that happened.
14      Q    So you were confused and concerned about
15  helping out the chairman with a -- what you
16  considered to be a menial task.  Is that accurate?
17      A    No, I didn't think that it was a menial
18  task.  But it was something that I was curious about
19  because I had never done it before.  And certainly
20  for no other club had I ever done anything like that
21  before.  And I didn't think that I would get so
22  harshly rebuked for asking the question why I was
23  given the assignment in the first place.
24      Q    Okay.  If you would turn back for me to
25  Defendant's Exhibit No. 2 and if you would turn to

51

```
 1    your entry attached to that document that references
 2    November 22, 2003.
 3         A    Of -- I'm sorry, wait.  You said get
 4    Exhibit No. 2.
 5         Q    Right.
 6         A    And what else do you want me to get?
 7         Q    The entry for November 22, 2003.
 8         A    The entry for November two thousand --
 9    from what exhibit?
10         Q    From Exhibit No. 2?
11         A    I've got Exhibit No. 2.
12         Q    The entry for November 22 --
13         A    November 22.
14         Q    -- 2003.
15         A    Yes.
16         Q    All right.  It says here -- and I'm
17    paraphrasing -- "Kester treated me in a hostile and
18    distant manner while at a Black Republican
19    function.  After the function, Mr. Kester made
20    racially stereotypical remarks about the speaker,
21    Representative Jennifer Carroll, a Black woman.
22    Kester said he was 'surprised she was so good,' and
23    'lucky for her she came from a rich Black family or
24    she would never have been able to get into the
25    Florida House."  Do you see that, ma'am?
```

52

```
1        A     Yes.
2               MR. THOMPSON:  Object to the form.
3               MR. McKENNA:  What's the objection?
4               MR. THOMPSON:  The paraphrasing part.
5        It speaks for itself.
6   BY MR. McKENNA:
7        Q     Now, would you turn to your -- I knew
8   this was going to happen.  My whole thing is falling
9   apart -- Defendant's Exhibit No. 3, and would you
10  turn to your November 22, 2003 entry?
11       A     Yes.
12       Q     All right.  Is there any reference in
13  there about racially stereotypical remarks by
14  Mr. Kester?
15              MR. THOMPSON:  Object to form.
16       Q     Ma'am, don't write on the exhibits,
17  please.
18       A     Sorry.  I just wanted to better answer
19  your question directly.  I felt as though Kester --
20  I felt as though he was looking for things to start
21  an argument about.  I felt nervous the whole time
22  while in the car with Kester.  I could sense the
23  hostility in the air.  I felt as though any little
24  thing could set him off.
25       Q     Is there anything in there about racially
```

56

53

```
1   stereotypical remarks?
2              MR. THOMPSON:  Object to form.
3      A    Not in the words that you just used.  But
4   these notes aren't complete either.  It's just an
5   excerpt, a glimpse, into some of the things that
6   happened.
7      Q    Did you tell in your -- in Defendant's
8   Exhibit No. 3 did you tell the EEOC anything about
9   any comments allegedly made by Mr. Kester with
10  respect to Jennifer Parsons?
11     A    I don't know who Jennifer Parsons is.
12     Q    Jennifer Carroll.  Excuse me.
13             MR. THOMPSON:  I'm going to object to
14  form.
15     A    What was your question again?
16     Q    The question was, is did you tell the
17  EEOC in Defendant's Exhibit 3 anything about any
18  alleged statements by Mr. Kester about Jennifer
19  Carroll?
20             MR. THOMPSON:  Object to form.
21             MR. McKENNA:  What's wrong with it?
22             MR. THOMPSON:  The document speaks for
23  itself.
24             MR. McKENNA.  Okay.
25     A    Not in Exhibit 3, but we had
```

57

54

1    conversations about his stereotypical remarks.  And
2    I'll repeat my previous answer that these notes are
3    not complete.  They're just a glimpse into some of
4    the things that happened.
5         Q     You provided Defendant's Exhibit 3 to the
6    EEOC as proof of your allegations, did you not?
7         A     No.  Proof of my allegations were the
8    charge in and of itself.  This was just a glimpse
9    into what happened.  This was just supporting
10   documentation.  It wasn't -- I wasn't basing my case
11   off those notes.
12        Q     You didn't think it was important to tell
13   the EEOC in this written document about these
14   alleged racially stereotypical remarks?
15             MR. THOMPSON:  Object to form.
16        A     Well, that's why we had an extensive
17   interview, so we could talk about the remarks and
18   talk about how it made me feel.  And there is no
19   requirement to give the EEOC notes or anything else
20   when you file a charge.  All you have to do is go
21   and file a charge.  And I'm not completely certain
22   when I gave the EEOC these notes.
23        Q     Well, you gave them before you did the
24   interrogatory responses, didn't you?
25        A     I made several trips up there when I

55

```
 1    filed the charge, so I'm saying I don't -- I don't
 2    remember.
 3          Q      But they had to be before you did the
 4    interrogatory responses.  Right?
 5          A      Yes.
 6          Q      Okay.
 7          A      That would be correct.
 8          Q      And your memory of the events was better
 9    back when you filed the charge than it is today,
10    isn't it?
11          A      There is things that happened that are
12    permanently seared in my mind.  It was a while ago.
13    I can't really --
14          Q      Well, in March of 2004, you certainly had
15    a better memory of what happened than you have
16    today?
17          A      That's your opinion.
18                 MR. THOMPSON:  Object to form.
19          Q      I'm asking you a question.  Isn't that
20    true?
21          A      Maybe.
22          Q      Okay.  Is your mind like a fine wine that
23    gets better with age?
24                 MR. THOMPSON:  Object to form.
25          A      I don't think my mind is like a fine
```

56

```
 1    wine, no.
 2         Q     So your memory was better at the time
 3    than it is today.  Correct?
 4               MR. THOMPSON:  Object to form.
 5         A     That's an opinion.
 6         Q     And what's your opinion?
 7         A     I don't really have an opinion about
 8    that, Mr. McKenna.
 9         Q     Okay.  If you would turn back now for me
10    to the interrogatory responses to the Republican
11    National Committee.
12         A     Which exhibit was that?  Was that 2?
13         Q     I'm looking for it.  No, that's --
14               MR. THOMPSON:  It's Exhibit 5.
15         Q     5.  I can't even find it.  Here it is.
16    And if you would turn to the December 2003 entry in
17    Defendant's Exhibit 5.
18         A     I'm sorry.  What was the date again?
19         Q     December 2003.
20         A     December 2003.  I'm looking there.
21         Q     Do you see it?
22         A     Yes.  You've got it highlighted.
23         Q     Good.  Do you have a -- do you recall
24    that?
25         A     Yes, I recall the situation.
```

57

```
 1          Q      And it states that -- and I'm
 2    paraphrasing -- "Sheppard emails me about a white
 3    paper that Johnny Hunter's Black Republican club
 4    wrote."  Do you know who Johnny Hunter is?
 5          A      Yes, I know him very well.
 6          Q      He's related to you, is he not?
 7          A      I don't know that for a fact.
 8          Q      Have you not told people that you are
 9    related?
10          A      He thinks that he's related to me, but I
11    don't think that -- it may be possible.  But I'm not
12    certain that it is.
13          Q      Are you -- do you consider yourself
14    friends?
15          A      He certainly has done a lot of nice
16    things for me.
17          Q      Do you consider yourself friends?
18          A      "Friend" is a pretty strong word.  I have
19    a handful of friends.  I could probably count them
20    on one hand.  He's someone who's been very, very
21    kind who's done some very kind things for me in the
22    past.
23          Q      Did you know him prior to your employment
24    with the Republican Party of Florida?
25          A      No, I did not.
```

                                        58
```
 1        Q      Okay.
 2        A      I met him as it relates to my employment
 3   with the Republican Party of Florida.
 4        Q      Now, would you turn to Defendant's
 5   Exhibit 3 and confirm for me that there is no
 6   reference to a white paper that Johnny Hunter's
 7   Black Republican wrote in that document.
 8        A      I'm sorry?  3?
 9        Q      Yes.
10               MR. THOMPSON:  Object to form.
11        A      Okay.  And what was your question again?
12        Q      Would you confirm for me that there is no
13   reference to a white paper that Johnny Hunter's club
14   wrote in Defendant's Exhibit 3?
15               MR. THOMPSON:  Object to form.
16        A      There is not a reference in Exhibit 3
17   regarding the white paper because Exhibit 3 does not
18   relate to any specific question.  And Exhibit 5 is
19   questions from an interrogatory.
20        Q      So it's your testimony that there is no
21   reference to the white paper in Defendant's Exhibit
22   3.  Is that correct?
23               MR. THOMPSON:  Object to form.
24        A      No, there isn't a reference there.  And
25   as I told you before, that this is not in any means
```

Case 0:12-cv-01864-JDW-TGW    Document 75-2    Filed 00/28/05    Page 69 of 466 PageID 424
#:1013

59
1    a complete list of everything that happened.
2         Q    Now, if you turn back to Defendant's
3    Exhibit No. 5 for me, the interrogatory responses to
4    the Republican National Committee.
5         A    Interrogatory No. 5?
6         Q    No.  Exhibit No. 5.
7         A    Exhibit No. 5.  Okay, I'm there.
8         Q    There is an entry under Interrogatory No.
9    6 for December 1, 2003?
10        A    I'm sorry.  What's the date again?
11        Q    December 1, 2003.
12        A    December 1.
13        Q    Interrogatory No. 6.
14        A    Interrogatory No. 6.  December 1.
15        Q    Do you see that, ma'am?
16        A    Uh-huh.
17        Q    I need you to answer verbally.
18        A    Yes.
19        Q    Thank you.  And again I'm paraphrasing,
20   even though your lawyer doesn't like it.  It says:
21   "During a planned trip to Naples, Kester issues
22   confusing and contradictory instructions.  He calls"
23   you "late in the evening, and instructs me to turn
24   around and return to Tampa.  Kester" stated "that
25   Chairman Jordan needed my assistance in Tampa the

60

```
 1    following day.  However, when I arrived the
 2    following day, the Chairman was surprised to see
 3    me.  She said she didn't need me to take her to the
 4    airport.  She said that Karl Rove was taking her."
 5    Do you see that, ma'am?
 6         A    Yes.
 7         Q    Okay.  And --
 8         A    That's No. 5, Interrogatory 6.  Right?
 9         Q    Correct.  That's what it says.  Right?
10    More or less.
11         A    Correct.
12         Q    All right.  Now, if you turn back to
13    Exhibit 3, your December 1, 2003 entry refers to
14    that same telephone call.  Is that correct?
15         A    It refers to what happened that day.
16         Q    It refers to the call from Mr. Kester
17    that the chairman needed a ride that morning to the
18    airport.  Do you see that, ma'am?
19              MR. THOMPSON:  I'm going to object to
20         form.
21         Q    Do you see it?
22         A    I see an entry for December 1, 2003.  I
23    don't think it's referring to what you think it's
24    referring to.
25         Q    Is it not referring to the same call that
```

61
```
 1    was made by Mr. Kester to you that's referenced in
 2    the December 1, 2003 notation in Defendant's Exhibit
 3    5?
 4         A     It talks about a call, but that's not the
 5    whole thing.
 6         Q     Is it the same call?
 7         A     It is the same call.
 8         Q     Okay.  It's the same call.  Now, under
 9    December 2, 2003, in Defendant's Exhibit 3, you
10    state that you did in fact drive the chairman to the
11    airport, don't you?
12         A     Yes, I did drive her to the airport
13    because she said, "Well, since you're here, you
14    might as -- you know, you might as well."  But she
15    said that she didn't need a ride to the airport.
16    She said that she was going to drive along with Karl
17    Rove, so --
18         Q     Then what -- go ahead.
19         A     And so I drove her up the road to the
20    airport.
21         Q     And in your Exhibit 3, however, you state
22    that "it seemed apparent once" we "had arrived that
23    Molly Barber, had expected to drive the Chairman to
24    the airport with herself and Ann Herburger.  (Molly
25    Barber, Ann Herburger, and Al Austin)."  Do you see
```

62

```
 1   that, ma'am?
 2        A    I'm sorry.  Where were the -- which one
 3   are we on again?
 4        Q    Defendant's Exhibit 3, the December 2,
 5   2003 entry.
 6        A    Yes.
 7        Q    So it completely contradicts what you
 8   stated in your interrogatories, does it not?
 9        A    Well, they were all in the same
10   entourage.
11        Q    And you say nothing about Mr. Rove in
12   your document that you submitted to the EEOC.
13   Correct?
14             MR. THOMPSON:  I'm going to object to
15        form.
16        A    Mr. Rove's name is not specifically
17   mentioned in Exhibit 3, but it doesn't have to be.
18   I answered the question that was asked in the RNC's
19   interrogatory in Exhibit 5, and the question doesn't
20   require me to answer each and every person who might
21   have been present in the car.
22             The question was related to a specific
23   instance.  The question was about, I think,
24   confusing or -- was it Interrogatory 6?  I think
25   it's confusing and contradictory.  No, it's
```

63

```
 1   disciplining me more frequently than other
 2   non-African-American field directors.
 3        Q    So your testimony is that Karl Rove,
 4   Molly Barber, Ann Herburger, Al Austin and the
 5   chairman all rode -- all were going to ride to the
 6   airport together?
 7        A    They were in the same entourage of cars.
 8        Q    And you state in the interrogatory
 9   response in Defendant's Exhibit No. 5 that,
10   "However, when I arrived the following day, the
11   Chairman was surprised to see me.  She said she
12   didn't need me to take her to the airport.  She said
13   that Karl Rove was taking her."
14             And it's now your testimony, ma'am, that
15   that's not true; that you did in fact take her to
16   the airport?
17        A    She said that Karl Rove was going to take
18   her, but since I was already there, I went ahead and
19   drove her there because I was already there.  But
20   her intent was to go with someone else.
21        Q    Now, also in your December 2, 2003 you've
22   mentioned a regularly scheduled conference call at
23   9 a.m. every Tuesday morning.  Do you see that,
24   ma'am?
25        A    Yes.
```

67

64

```
 1        Q     And you said --
 2        A     I'm sorry.  Which one are we talking
 3   about again?
 4        Q     December 2, 2003.
 5        A     Which exhibit are we talking about?
 6        Q     Exhibit No. 3.
 7        A     Exhibit No. 3, December -- what's the
 8   date, please?
 9        Q     2, 2003.
10        A     Okay.
11        Q     It says:  "We have a regularly scheduled
12   conference call at 9 a.m. every Tuesday morning."
13   Do you see that, ma'am?
14        A     Yes.
15        Q     And it says you "called into the
16   conference call and Mr. Kester answers, then hangs
17   up in my face" and "I call back and he giggles."  Do
18   you see that, ma'am?  Do you see that, ma'am?
19        A     I'm looking for it.  I see that.
20        Q     Okay.  And is it your sworn testimony
21   here today that when you called in on December 2,
22   2003, Mr. Kester answered, hung up and then giggled
23   when you called back?
24        A     I was disconnected from that call in a
25   very strange way.
```

68

65

1       Q    Ma'am, I'm asking a very simple question;
2  and that is:  Is it your sworn testimony today that
3  when you called into the conference call, Mr. Kester
4  answered, then hangs up in your face, you called
5  back and he giggled?  Did that happen?
6       A    That's my recollection of what happened.
7  I got disconnected from the call.  And when I got
8  back on the call there was laughter.
9       Q    So he did not hang up in your face?
10      A    Terry had control of who -- how the --
11  who got into the conference call.
12      Q    Did Mr. Kester hang up in your face?
13      A    I've already answered your question.
14      Q    I don't believe you have, ma'am, so I'm
15  going to ask it again.  Did Mr. Kester hang up in
16  your face?
17      A    My recollection of what happened:  That I
18  got disconnected from the call in a very strange
19  way, and I felt like he had hung up in my face.
20      Q    And when you called back, Mr. Kester
21  giggled.  Is that your testimony?
22      A    When I called back, there was laughter.
23      Q    So he -- there was no giggles.  There was
24  laughter?
25      A    Giggles, laughter, it's -- it's the same

69

66

```
1    thing.
2         Q     And who laughed or giggled?
3         A     I heard Terry laughing.  I heard Terry
4    giggling.
5         Q     Now -- we're not finished with that,
6    ma'am, so you might want to put it back.
7         A     Okay.
8         Q     Now, you state, as it goes on, "It was
9    obvious that several other members of our
10   organization who were present at the event could
11   have driven the Chairman to the airport."  Do you
12   see that, ma'am?
13        A     Yes.
14        Q     And was there anybody besides the ones
15   that you had listed there who were present who could
16   have driven the chairman to the airport?
17        A     Yes.  Multiple people.
18        Q     Who?
19        A     I don't remember every single person that
20   was there.  I'd have to think about it.  That was
21   just an observation.
22        Q     Now, you then go on to say in the next
23   paragraph that "I missed hearing valuable
24   information that was discussed on the conference
25   call."  Do you see that, ma'am?
```

67

```
1       A    Yes.
2       Q    But you said earlier that you called in
3  on the conference call?
4       A    Yes.  I called in -- what happened was I
5  was -- while the chairman was in her event, I called
6  in to part of the conference call, and then I got
7  disconnected and I called back, and then I had to
8  get off of it because she was coming out of this
9  event that she was in and I wanted to be there when
10 she came out if she -- because that's why I was
11 there, to give her a ride.
12      Q    And that is your responsibility as a
13 field director, is it not, to staff the chairman
14 when she is in your area?
15      A    I guess.  It wasn't on the -- it wasn't
16 part of the assignments I remember getting when I
17 got hired.  But I guess.  I always -- I always did
18 it, and so --
19      Q    You did it on a regular basis?
20      A    Yeah, it was -- it was regular.
21      Q    So anytime that --
22      A    Up until the point that she got a
23 permanent staff member to do that for her.
24      Q    Up until that time, anytime she would fly
25 into Tampa you would pick her up.  Is that correct?
```

68

```
 1        A     Uh-huh.
 2        Q     I need you to answer verbally.
 3        A     Yes.  Yes.  Sorry.
 4        Q     Okay.  If you would turn for me, please,
 5   to Defendant's Exhibit No. 2.  Do you see the entry
 6   for December 6?
 7        A     I have it right here.
 8        Q     And you have "2004"?
 9        A     December 6.
10        Q     And it says "2004."  That should be
11   2003.  Isn't that correct?
12        A     I'm sorry?  We're on Exhibit 2.
13        Q     December -- right, December 6, 2004 --
14        A     Yes, it --
15        Q     -- is what it says?
16        A     That should be 2003.
17        Q     All right.  You referred to a fact that
18   Al Higginbotham was asking for a voter ID list for
19   Hillsborough County.  Is that correct?
20        A     Right.
21        Q     Okay.  Now, if you turn back to
22   Defendant's Exhibit No. 3, and there is an entry
23   for -- also for December 6, 2004 which you've
24   scratched out to be 2003.  Do you see that, ma'am?
25        A     I didn't scratch anything out.
```

72

69

```
 1        Q      Well, somebody did, didn't they?
 2        A      I guess so.  But you're assuming that I
 3   did it, and I didn't do it.
 4        Q      Okay.  And again, though, that's
 5   incorrect.  That should be -- it should be as
 6   written, December 6, 2003.  Right?
 7        A      Yes, it should be -- it should be 2003.
 8        Q      And you copied that document from here
 9   and put it into your interrogatory responses, didn't
10   you?
11        A      No, I didn't copy -- what do you mean
12   again?
13        Q      You blocked and copied it with a -- with
14   some sort of a computer.  That's why they both say
15   December 6, 2004.  Right?
16               MR. THOMPSON:  Object to form.
17        A      No, I didn't cut and paste anything.
18        Q      Just -- it's just a coincidence that they
19   both say December 6, 2004?
20               MR. THOMPSON:  Object to form.
21        A      No.  I just made the same mistake.  I
22   don't know.  Because December 9, 2003, that's
23   correct, and that was wrong on here.  Then December
24   10, it looks like I just made that mistake on one
25   interrogatory answer.  It was just a clerical error,
```

73

70

```
 1    I think.
 2         Q     Now, if you look at your entry for
 3    December 9, 2003 in Exhibit No. 2, it says:  "I
 4    inquire about the voter ID list for Hillsborough
 5    County and Kester says he's mailing it out on" that
 6    "day."  Do you see that, ma'am?
 7         A     On which exhibit now?
 8         Q     No. 2.
 9         A     Yes.
10         Q     And if you go back to Exhibit No. 3, the
11    December 9, 2003 entry doesn't say that he would
12    send it out this day, does it?
13         A     No.  But that's -- that's what I was
14    referring to.  He said that he would send it out.
15         Q     Right.
16         A     And my understanding was, is that it
17    would go out that day.
18         Q     Okay.
19         A     And I didn't write those specific words,
20    but that's what I meant when I wrote it.
21         Q     Okay.  And did Mr. Kester say he was
22    sending it out or that it would go out that day?
23         A     I don't remember his exact words, but the
24    inference of the conversation was that he would send
25    it out that day.  I thought it was going out that
```

74

71

```
 1    day.
 2                MR. McKENNA:  Okay.  Why don't we take a
 3        break.
 4                (Recess from 11:43 a.m. to 12:57 p.m.)
 5    BY MR. McKENNA:
 6        Q     Ma'am, you understand you're still under
 7    oath?
 8        A     Yes, sir, I do.
 9        Q     Now, this discussion we were talking
10    about before we broke for lunch regarding the voter
11    ID list for Hillsborough County, can you tell me
12    what the significance is of that to your case?
13        A     That was some work that Kester said that
14    he would print off -- have printed off at the office
15    and send to -- I think it was either me or the
16    county, Hillsborough County, and he never did that.
17    And when I asked him about it, it was
18    confrontational and it was difficult for some reason
19    for that request to be completed.
20        Q     Well, it was over the holidays, wasn't
21    it?
22        A     Yes, it was.  But that wasn't -- didn't
23    seem to be the issue, that the fact that it was the
24    holidays.
25        Q     Mr. Kester didn't tell you that the
```

```
 1   holidays was delaying it?
 2         A     I don't recall that being the thing.  I
 3   remember him saying that it had been sent out and
 4   then there was no way to track it once it had been
 5   sent out.  And I remember asking about it over and
 6   over again.
 7         Q     And you finally did receive it on January
 8   5th.  Correct?
 9         A     I believe so.
10         Q     So --
11         A     I'm not exactly -- I believe I did.
12         Q     Now, on Defendant's Exhibit No. 5, your
13   sworn interrogatory responses to the Republican
14   National Committee, there is under --
15         A     Wait, wait.  No. 5?
16         Q     Under Interrogatory No. 6 there is an
17   entry for December 10, 2003?
18         A     Uh-huh.
19         Q     I need you to answer verbally, ma'am.
20         A     I'm sorry.  Yes, there is an entry for --
21   it says:  "On or about December 10, 2003."
22         Q     And it contends you were having --
23   diagnosed with mononucleosis and ordered bed rest.
24   Is that correct?
25         A     That's correct.
```

```
                                        73
1         Q      Is that a true statement, ma'am?
2         A      Yes, it is true.
3                MR. McKENNA:  Would you mark that,
4      please.
5                (Exhibit 7 marked for identification.)
6    BY MR. McKENNA:
7         Q      I'm going to hand you, ma'am, what we've
8    marked for purposes of identification as Defendant's
9    Exhibit No. 7.  Do you recognize that, ma'am, as the
10   doctor's progress notes from -- for you from
11   December 9, 2003?
12        A      I've never seen this document before.
13        Q      That's not my question, ma'am.  My
14   question is:  Do you recognize it as a doctor's
15   progress notes for you for December 9, 2003?
16        A      That's what it appears to be, yes.
17        Q      Okay.  And is there anywhere in here
18   where the doctor prescribes bed rest?
19        A      Well, I can't really read the
20   handwriting.  This doesn't appear to be a diagnosis.
21        Q      Do you see the very bottom where it says
22   "Medications/Treatment"?
23        A      Medications/Treatment.  Medications/
24   Treatment?  Where are you talking about?
25        Q      Where it says "Medications" --
```

74

```
 1        A      Yeah, yeah, yeah, I see that --
 2        Q      -- "/Treatment"?
 3        A      -- over to the right.
 4        Q      Under "Procedure" it says return to work
 5   December 12, two thousand -- I think it says five,
 6   but I suspect it means four?
 7        A      There is "RTW 12 December 05."
 8        Q      It was a return to work for December 12th
 9   for you.  Correct?
10        A      That's what that says.
11        Q      And that's what the doctor told you,
12   didn't he?
13        A      No.  She said that she was going to give
14   me a slip for two days and that I'd have to come
15   back and that it would probably be longer than
16   that.  And she said that there was no way to treat
17   mono, although they could give me something for --
18   they gave me something for some pain that I was
19   having.
20               MR. McKENNA:  Mark that, please.
21               (Exhibit 8 marked for identification.)
22        A      And she said that she would continue to
23   issue my -- my -- to communicate with her about how
24   I was progressing and that she would continue to
25   issue my sick notes.
```

75

```
 1          Q     I'm going to hand you, ma'am, what we've
 2     marked for purposes of identification as Defendant's
 3     Exhibit No. 8.  Do you recognize that as progress
 4     notes from your doctor for December 10, 2003?
 5     Ma'am?
 6          A     It's progress notes from -- what appears
 7     to be a doctor's office.
 8          Q     For you.  Correct?
 9          A     Yes.
10          Q     For December 10, 2003.  Correct?
11          A     Yes.
12          Q     All right.  And down at the bottom under
13     "Medications/Treatments" it doesn't indicate bed
14     rest but it does say "no contact sports for six to
15     eight weeks," does it not?
16          A     It says "RTW 15 December."
17          Q     Ma'am, the question was, is it doesn't
18     say bed rest and it does say "no contact sports for
19     six to eight weeks."  Correct?
20                MR. THOMPSON:  Object to form.
21          A     It doesn't specifically say bed rest, but
22     it says -- as you indicated, "RTW" means return to
23     work, or you're assuming that it does.  It says "15
24     December."
25          Q     And it says "no contact sports for six to
```

76

```
 1    eight weeks," does it not?
 2             MR. THOMPSON:  Object to form.
 3        A     Yes, it says that.  It says, "5 no
 4    contact sports times X 6 to 8W," is what it says.
 5    These notes are dated for two different dates, and I
 6    don't remember seeing a doctor on both of these
 7    days.
 8        Q     And the -- and the 12/10 progress notes,
 9    Defendant's Exhibit 8, indicate that your blood work
10    indicated you were negative for hepatitis.  Is that
11    right?
12        A     What date again?
13        Q     12/10/2003, Defendant's Exhibit 8.
14             MR. THOMPSON:  Object to form.
15        A     Where do you see negative for hepatitis?
16        Q     Do you see that, ma'am, or not?
17        A     Well, if you could tell me where
18    exactly.  The handwriting is bad, and I'm just
19    asking -- it may be there.  I'm just asking where is
20    it.
21        Q     So you don't see it?
22             MR. THOMPSON:  Object to form.
23        A     I see hepatosplenomegaly under "Physical
24    Exam" when it says "Abdomen:  Soft, 0 hep" -- that's
25    the closest thing to me that looks about -- looks
```

80

77

```
 1    like it might have been trying to say hepatitis.
 2    But I don't know that that's what that means because
 3    I'm not a doctor.  But I don't really see anything
 4    here that I can decipher in this handwriting.
 5         Q     Did the doctor tell you you were negative
 6    for hepatitis?
 7         A     Yes, I remember hearing that.
 8         Q     If you would turn to Defendant's Exhibit
 9    5 for me, there is a -- some entries under
10    Interrogatory No. 7.  And are you there?
11         A     Yes, I'm here.
12         Q     Under January 8, 2004, do you see that
13    entry?
14         A     Yes.
15         Q     It says -- and I'm paraphrasing --
16    "Kester instructs" you "to produce a budget for the
17    Black Republicans.  Kester said, 'Nadia you should
18    help them write the budget because you understand
19    your people.'"  Do you see that, ma'am?
20         A     Yes, I do.
21         Q     If you'd turn to Defendant's Exhibit 3
22    for me, page 5, there is an entry for January 8,
23    2004.  Do you see that, ma'am?
24         A     Yes.
25         Q     Okay.  It doesn't say anything about
```

78

```
 1    preparing a budget or any sort of a racial comment,
 2    does it?
 3                MR. THOMPSON:  Object to form.
 4          A     Okay.  What was your question again,
 5    Mr. McKenna?
 6                MR. McKENNA:  Read the question back,
 7          please.
 8                (The reporter read as requested.)
 9          A     Well, the question that I was answering
10    in Interrogatory No. 7 doesn't have anything to do
11    with the latter part of your question.  I was giving
12    a summary in Exhibit 3 and I was answering one of
13    the RNC's specific questions, and that's when I
14    remembered that specific instance happening; it was
15    on the night of that dinner.  So I was answering
16    their specific -- they're asking a specific question
17    here for Interrogatory No. 7.  There -- this is just
18    a summary of what happened.
19                And as I told you before, that this
20    Exhibit No. 3 was never intended to be inclusive of
21    every single fact that happened.  It was just a
22    glimpse, just excerpts, you know, a glimpse of what
23    happened.  And my charge is specific enough to stand
24    alone, and -- well, that's my answer, sir.
25                MR. McKENNA:  Move to strike as
```

79

```
 1        nonresponsive.
 2   BY MR. McKENNA:
 3        Q     The question is, ma'am:  Is there any
 4   reference in Exhibit 3 under the January 8, 2004 to
 5   writing a budget or any sort of an alleged statement
 6   by Mr. Kester along the lines of "Nadia, you should
 7   help write them -- you should help them write the
 8   budget because you understand your people"?
 9              MR. THOMPSON:  Object to form.
10              MR. McKENNA:  You object to my voice,
11        actually.
12        A     The specific language that you're talking
13   about is not in those specific words that you just
14   used.  And I'll just repeat again that Exhibit 3
15   isn't relating to a specific question as
16   Interrogatory 7 is, and you're really comparing
17   apples to oranges.  And I'm not -- I wasn't required
18   to give every single bit of information in Exhibit
19   3.  Just a brief summary of some of the things that
20   happened that evening.
21              And Interrogatory 7 addresses a different
22   issue.  It's -- I mean, it's a specific question
23   that I was trying to answer, sir.
24        Q     Are you finished?
25        A     Yes, sir.
```

                                                        80
1          Q     Okay.  Also in the January 8 entry in
2    Defendant's Exhibit 3 you reference Mr. Kester's
3    unwillingness to send notices to the members of the
4    Black Republican Clubs.  Do you see that, ma'am?
5          A     In Exhibit 3, sir?
6          Q     Yes.
7          A     Yes.
8          Q     And, in fact, that was consistent with
9    all of the clubs, wasn't it?
10         A     Maybe.  I don't know.
11         Q     Wasn't it common practice only to send
12   notices to the club chairmans and let them
13   distribute it to their club members?
14         A     I have no knowledge of that.
15         Q     Okay.  Now, the entry on January 8 in
16   Exhibit 3 also references the Constitution.  Do you
17   see that, ma'am?
18         A     I'm sorry?  We're on Exhibit 3?
19         Q     Yes.
20         A     Uh-huh.  Yes.
21         Q     And that's what you referred to
22   yesterday, that you -- in court, and you said it
23   took you about five minutes to draft.  Is that
24   right?
25         A     Oh, no, I never -- I never spoke in

81

```
 1    finite terms like that.  That wasn't -- no, I never
 2    said that.
 3         Q     You didn't say that it was --
 4         A     I don't remember ever saying five
 5    minutes.
 6         Q     You didn't say that you received it from
 7    an e-mail from Christina Sheppard, you made some
 8    changes to it and shot it right back to her, or
 9    words to those effect?
10         A     I said something --
11              MR. THOMPSON:  I'm going to object to
12         form.  You can answer.
13         A     I said something similar to that.  But
14    without looking at the court record, I can't
15    regurgitate my exact words.  But you were there, you
16    know what I said.
17              But your previous statement "five
18    minutes," that is totally inaccurate.  I never
19    remember saying anything about five minutes.  I
20    remember you asking me how long it took, and I think
21    I told you that I didn't know.
22         Q     It took less than a day, though.  Right?
23         A     I don't know exactly how long it took,
24    sir.  And I told you that -- I told you that in
25    court.
```

82

```
 1        Q     Did it take more than a day?
 2        A     Mr. McKenna, "I don't know" means I don't
 3   know, and I don't want to give you inaccurate
 4   information.  I don't want to just guess at
 5   something when I really don't know the answer, sir.
 6        Q     Did it take more than a week?
 7        A     I don't remember how long it took.
 8        Q     Did it take more than a month?
 9        A     I'm not certain.
10        Q     Did it take more than two months?
11        A     Mr. McKenna, "I'm not certain" means I'm
12   not certain.
13        Q     If I could direct your attention to
14   Defendant's Exhibit No. 6, there is an entry for
15   January 8th.  If you could find that, please.
16        A     Yes.
17        Q     All right.  If you turn to the next page
18   it has "Wednesday," "Thursday," "Friday."  Do you
19   see that, ma'am?
20        A     Wednesday, Thursday, Friday.  Okay.
21   "Wednesday," "Thursday," "Friday."
22        Q     And Wednesday says "Work on Federation
23   Constitution all day"?
24              MR. THOMPSON:  I'm going to object to
25        form.
```

83

```
 1        Q     Okay.
 2        A     I'm sorry.  What was the day again, sir?
 3        Q     Wednesday.
 4        A     Wednesday.  October 15th?
 5        Q     No, ma'am.  January 8.  Go to the page
 6   that has January 8 on it.  Do you see that, ma'am,
 7   "January 8, Thursday"?
 8        A     Yes.
 9        Q     All right.  Now turn the page.
10        A     Okay.
11        Q     Okay.  Now, it says "Wednesday,"
12   "Thursday," "Friday," "Saturday."  Right?
13        A     Uh-huh.
14        Q     I need you to answer verbally, ma'am.  I
15   need you to answer verbally.
16        A     I'm sorry.  What was your question?
17        Q     Do you see where it says --
18        A     Yes, I see --
19        Q     -- "Wednesday," "Thursday," "Friday,"
20   "Saturday"?
21        A     -- the page numbered No. 3.  It says:
22   "Wednesday," "Thursday," "Friday."
23        Q     Right.  And it says "Wednesday"; "Work on
24   Federation Constitution all day."
25        A     Yes, it says that.
```

84

```
1           Q     Correct?
2           A     Correct.
3           Q     Thursday it says:  "Work on Federation
4     Constitution all day."  Correct?
5           A     Correct.
6           Q     And Friday it says:  "Work on Federation
7     Constitution all day."  Correct?
8           A     Correct.
9           Q     Is that -- are those true statements?
10          A     Well, that's -- what you're referring to
11    is the week ahead, and I'm not certain that just
12    because I planned to do something the week ahead, it
13    not necessarily means that that happened like that.
14          Q     You anticipated that it would take three
15    days to do the Federation Constitution?
16          A     No, I didn't necessarily anticipate that
17    it would take three days.  But I guess I was
18    planning on working from home, and so maybe I just
19    planned mental time on those three days.  But I
20    don't know that it necessarily took three days,
21    because this isn't -- this isn't exactly -- this
22    says -- the previous page No. 2 says the week
23    ahead.  That's just a plan for the week.  It's not
24    necessarily exactly how my week might have turned
25    out.
```

85

```
 1          Q     So you anticipated that it would require
 2    multiple days to draft the Federation Constitution.
 3    Is that right?
 4          A     No, sir, I didn't necessarily anticipate
 5    that.  I was just planning a little bit of time for
 6    it.
 7          Q     So when you worked on it, you would have
 8    to save it and then come back to it.  Correct?
 9          A     Not necessarily.  I generally left my
10    computer on all the time.
11          Q     So you never saved documents?
12          A     I didn't say that.  You said that.
13          Q     That's my question.  Do you save
14    documents?
15          A     Occasionally, yes.
16          Q     Okay.  So there is a potential then that
17    whatever computer you used there are saved versions
18    of the Federation Constitution on it.  Right?
19          A     I can't assume that without knowing for
20    sure.
21          Q     Without knowing for sure what?
22          A     You asked me -- what was your question
23    again?
24          Q     I said it's possible that there are saved
25    versions of the Federation Constitution on whatever
```

86

```
 1    computer you used to draft them.  Correct?
 2         A    I'm not certain.
 3         Q    Okay.
 4         A    As -- I think we talked about this
 5    yesterday.  I told you a lot of this stuff I did was
 6    just e-mailed back and forth.
 7         Q    Now, if you would turn to the
 8    interrogatory responses, Exhibit No. 5, for me --
 9    same page that we were just looking at -- there is
10    now an entry for January 9, 2004 that I want to talk
11    about.  Do you see that?
12         A    Exhibit No. 3 you said?
13         Q    No.  I said Exhibit No. 5, ma'am.
14         A    Okay.
15         Q    Same page that we were looking at just
16    before.
17         A    Interrogatory number which one?
18         Q    7.
19         A    Okay.
20         Q    There is January 9, 2004?
21         A    Yes.
22         Q    If you turn to Defendant's Exhibit 3,
23    there is also an entry for January 9, 2004.  Is that
24    correct?
25         A    Yes, there is.
```

87

```
1        Q     Now, in Exhibit 5 you state -- and I'm
2   paraphrasing, even though your lawyer doesn't like
3   that -- "I called Terry to discuss a template for
4   the budget I sent him.  I never created a budget
5   before and I made it in a Word document.  Terry
6   laughed at me.  He said, 'everybody knows budgets
7   are made in Excel - stupid.'  Terry said I was
8   probably 'just too ignorant to know any better.'"
9   Do you see that, ma'am?
10       A     Yes, I do.  Yes, I do.
11       Q     In Exhibit 3 that whole discussion is not
12  mentioned at all.  Is that correct?
13             MR. THOMPSON:  I'm going to object to
14       form.
15       A     What was your question again, sir?
16             MR. McKENNA:  Read the question back,
17       please.
18             (The reporter read as requested.)
19       A     Relating Interrogatory No. 7 with January
20  9th, I'm at -- again, I'm answering a specific
21  question that the RNC asked.  I was never required
22  to list every single incident.  I was just giving a
23  summary in what you're calling Exhibit 3 of some of
24  the incidents.  So every single thing is not going
25  to be here.
```

88

```
 1      Q      And it's not there.  Correct?
 2             MR. THOMPSON:  Object to form.
 3      A      The specific words and language that
 4  you're talking about is not there, sir.
 5      Q      The incident is not there either.  Right?
 6             MR. THOMPSON:  Object to form.
 7      A      Again --
 8      Q      Ma'am, it's a simple question.  It's yes
 9  or no.  Is it there or not?
10      A      It's not a yes-or-no question, and I've
11  --
12      Q      Is there a discussion on your January 9,
13  2004 entry regarding a budget in Defendant's Exhibit
14  3?
15             MR. THOMPSON:  Object to form.
16      A      My January 9, 2004 statement in Exhibit 3
17  is not related to any specific question on any
18  interrogatory.
19             MR. McKENNA:  Move to strike as
20      nonresponsive.
21  BY MR. McKENNA:
22      Q      In Defendant's Exhibit 3, the January 29,
23  2004 entry, does it refer to a budget at all?
24             MR. THOMPSON:  Object to form.
25      A      I just told you two questions ago when
```

92

89

```
1    you asked me that question, Mr. McKenna, that the
2    specific words and the specific language that you're
3    looking for isn't there like that.
4         Q     And the incident is not discussed in
5    there.  Correct?
6              MR. THOMPSON:  Object to form.
7         A     You're comparing apples to oranges.
8    You're talking about two different things.  This --
9    these are interrogatories in a lawsuit, and this is
10   not.  And again --
11             MR. McKENNA:  I'm going to certify that
12        as failure to answer, and I'm going to seek --
13        A     I am happy to answer any of your
14   questions, but you don't want to hear my answers.
15        Q     Now -- so Interrogatory No. 7 asks you
16   for racially insensitive and stereotypical remarks.
17   Is that right?
18        A     Interrogatory No. 7 I believe said a lot
19   more than that.  I just -- I just for my own purpose
20   just pulled out -- each question had like eight
21   parts, and I just tried to identify the questions as
22   I could understand them.
23        Q     Okay.  And you did not mention that
24   racially insensitive and stereotypical remark to the
25   EEOC in Exhibit 3.  Right?
```

90

```
 1              MR. THOMPSON:  Object to form.
 2      A     I had several conversations with the EEOC
 3  and interviews about what happened during my
 4  employment, and -- and I discussed it with them.  I
 5  wasn't required to write everything down on Exhibit
 6  3.
 7              MR. McKENNA:  Okay.  Jim, just so we're
 8          clear, I'm going to file a motion to compel on
 9          this as nonresponsive answers.  If you want to
10          take a break and talk to your client to try to
11          avoid that, that's up to you.
12              MR. THOMPSON:  My form objection is the
13          document speaks for itself.
14              MR. McKENNA:  Well, I understand.
15              MR. THOMPSON:  You don't even need to be
16          asking a question on a document that speaks
17          for itself.
18              MR. McKENNA:  Well, I'm entitled to.
19      A     And I don't mind you asking the
20  questions.  I'm happy to answer them.
21              MR. McKENNA:  We'll go on then.
22              MR. THOMPSON:  If you want, I can ask a
23          question.
24              MR. McKENNA:  No.
25              MR. THOMPSON:  Okay.
```

91

```
 1              MR. McKENNA:  I've said my piece.  We'll
 2         take a break and have a discussion.
 3              MR. THOMPSON:  I could have handled the
 4         whole situation with just one question.  But
 5         if you don't want to, then we'll just go
 6         forward.
 7    BY MR. McKENNA:
 8         Q    If you would now look to Defendant's
 9    Exhibit No. 5, the entry for January 14, 2004.
10         A    Yes.
11         Q    It references "derogatory and demeaning
12    remarks about Johnny Hunter being sentenced to 100
13    years in prison for trafficking heroin."  Do you see
14    that, ma'am?
15         A    Yes.
16         Q    Turning to Exhibit 3, your January 14,
17    2004 entry does not reference any derogatory and
18    demeaning remarks about Johnny Hunter being
19    sentenced to a hundred years in prison for
20    trafficking heroin, does it?
21              MR. THOMPSON:  Object to form.
22         A    Let me just read over this real quick.
23    Okay.  May you -- would you please repeat the
24    question again, sir?
25              MR. McKENNA:  Please read back the
```

95

92

```
 1          question.
 2                  (The reporter read as requested.)
 3          A     Yes, it does.  My -- the entry on January
 4     14, 2004 in Exhibit 3 references a very upsetting
 5     call.  And to speak to that very upsetting call,
 6     that was some of the things that Kester was saying
 7     regarding that very upsetting call.  And I did not
 8     go into detail about every single thing that he
 9     said.  I stated in Exhibit 3 some of the things that
10     he said.
11                  But in Interrogatory No. 7, the RNC asked
12     me to specifically address stereotypical remarks,
13     and that was one of the ones that I remembered that
14     was spoken about, and so that's why I listed it
15     under Interrogatory No. 7.
16          Q     And one of the details you did not go
17     into was the detail about the comment regarding
18     being sentenced to prison for a hundred years for
19     trafficking in heroin.  Correct?
20          A     That I didn't include it where, sir?
21          Q     In Exhibit 3.
22          MR. THOMPSON:  Object to form.
23          A     I didn't specifically talk about Kester's
24     comment about his prison experience.  But I did
25     speak about -- I told Mr. Kester that I didn't think
```

93

1    it was appropriate for me to be privy to a situation
2    like this.  And I was -- in my mind, you know, I was
3    including in that statement everything that he had
4    said.
5              And again, I think, you know,
6    Interrogatory No. 7 is addressing a specific
7    question, whereas Exhibit 3 is not.  And it's just a
8    glimpse, a summary of not everything by no means,
9    but -- I wasn't trying to write a book, but some
10   things.
11             Before you take your -- ask your next
12   question, do you mind if I take a short break,
13   please, sir?
14        Q    Sure.
15        A    Thank you.
16             (Recess from 1:32 to 1:44 p.m.)
17   BY MR. McKENNA:
18        Q    Do you understand, ma'am, you're still
19   under oath?
20        A    Yes, sir, I do.
21             MR. McKENNA:  Do you want to do a
22   stipulation on the standing objection on
23   the -- my comparisons?
24             MR. THOMPSON:  Yeah.  As far as the one
25   objection having to do with the document

94

```
 1          speaks for itself, yeah, that would probably
 2          be good.  If you could allow me to have a
 3          standing objection, I won't have to -- I still
 4          may object to form on other grounds sometimes,
 5          but that would be it.
 6               MR. McKENNA:  Fine with me.
 7     BY MR. McKENNA:
 8          Q     Now looking at Exhibit No. 3, your entry
 9     for January 14.
10          A     Yes, sir, I'm there with you.
11          Q     All right.  In the last paragraph it
12     says:  "I felt I was being placed in the middle of
13     African American issues solely because of my race.
14     Specifically, I was requested to speak with
15     Mr. Johnny Hunter about expense reimbursement even
16     though I do not work in the finance department and
17     have no control over what expenses are reimbursed or
18     not reimbursed."  Do you see that, ma'am?
19          A     Yes, sir, I see that statement.
20          Q     Why do you feel that was solely because
21     of your race?
22          A     I think that statement speaks for
23     itself.  I certainly don't recall getting in the
24     middle of anybody else's finances, and it sort of
25     seemed like a situation that was unrelated to me and
```

95

```
 1    what I do as far as grass roots, this expense issue,
 2    and I had no ultimate control over the matter.  And
 3    I really sort of felt like Terry just didn't want to
 4    deal with this guy because he was black, and I had
 5    some feelings about that.  And -- but my answer to
 6    your question is I think the statement speaks for
 7    itself.
 8         Q    Why do you think Terry Kester didn't want
 9    to deal with Johnny Hunter because he was black?
10         A    He just seemed uncomfortable dealing with
11    him.  You'd have to ask Kester that question,
12    because I don't know what's in his mind.
13         Q    Can you give me any reason while we sit
14    here today why you believe Mr. Kester did not want
15    to deal with Johnny Hunter because he was black?
16         A    He didn't seem to have a problem dealing
17    with people who weren't black, and he seemed to have
18    a lot of problem dealing with this gentleman and
19    situations going around -- revolving around this
20    gentleman and this circumstance and situation.  And
21    I didn't -- and there wasn't any reason why, I could
22    see, other than a race issue.  And --
23         Q    Are you finished?
24         A    No.  I had a thought, and it just -- it
25    just -- it just went away.  Oh.  What I was going to
```

96

```
 1    say was it just seemed to me that Kester was very
 2    uncomfortable dealing with these type of issues.
 3         Q     Are you finished?
 4         A     Yes, sir, I'm finished.
 5         Q     Okay.  It was your job to deal with the
 6    Republican clubs within your geographic region.  Is
 7    that correct?
 8         A     Well, that -- I want to say yes or no,
 9    but I can't really say yes or no because it's not
10    really a yes-or-no question.  Yes, I did deal with
11    clubs in my geographic region, never really for the
12    purposes that I dealt with these black clubs.  I
13    dealt with them as a way to get volunteers and
14    things like that.  I never got involved with
15    anything even remotely related to any of them
16    getting expenses or itineraries for any of their
17    events or anything remotely like that that I
18    recall.  It was usually just these black clubs.
19              And generally I would work with the
20    County and with the clubs to the extent that they
21    were somehow involved in the grass roots and the
22    volunteer -- the volunteering with the County's
23    executive committee.  But clubs specifically, it was
24    a very small part, clubs in general.
25         Q     And the grass roots, as you refer to it,
```

97

```
 1    refers to building up the Republican Party's
 2    political base?  Let me strike that.  I'll do it
 3    this way.
 4               What do you mean by grass roots?
 5        A    Grass roots, I -- I can't really define
 6    grass roots.  That was a word that was always used
 7    around the office.  But I believe the meaning is, is
 8    the people who actually go out and do the -- the
 9    people who are doing the voting or the people who
10    are close to doing the voting.
11               That doesn't really make any sense.  I
12    think that you should ask the RNC or -- to
13    specifically define grass roots.
14        Q    So you'll accept whatever definition the
15    Republican Party --
16        A    No, I won't.  But I can't -- I can't at
17    this time -- I can't at this time give you a formal
18    definition for it, if that's what you're asking for.
19        Q    What does it involve?
20        A    It -- I'm sorry.  Repeat the question.
21        Q    What does grass roots involve?
22        A    Generally speaking?
23        Q    Yes.
24        A    In what context?
25        Q    In the context of your job.
```

98

```
 1          A       In the context of my job, I worked with
 2     the counties in my territory on different voter
 3     registration and voter identification projects.  I
 4     recruited volunteers, I -- I worked on other
 5     projects related to voter identification and voter
 6     registration.  You mentioned before that I would
 7     occasionally staff the chairman in her travel, and I
 8     guess I did other things too.
 9          Q       Did you work with the Belleair Women's
10     Republican Club?
11          A       I vaguely remember that name.
12          Q       Did you work with the Cape Coral
13     Republican Club?
14          A       Cape Coral Republican Club.  I vaguely
15     remember that name, and I remember going to one of
16     their meetings.
17          Q       And working with the Belleair Women's
18     Republican Club and Cape Coral Republican Club,
19     would that be considered grass roots?
20          A       Maybe.
21          Q       To you?
22          A       Maybe.
23          Q       Maybe.  Did you work with the Central
24     Florida Republican Youth Coalition?
25          A       Central Florida Republican Youth
```

99

```
 1    Coalition.  I'm drawing a blank with that one.
 2         Q    If I were to tell you that there was
 3    documentation that you provided regarding the
 4    Central Florida Republican Youth Coalition, will
 5    that change your mind?
 6         A    Maybe if you pointed it out to me, it
 7    might refresh my recollection of it.
 8         Q    Did you work with the Central Pinellas
 9    Republican Club?
10         A    I'm drawing a blank on that one.
11         Q    How about the Charlotte County Republican
12    Executive Committee?
13         A    That is a County REC executive
14    committee.  Sure.
15         Q    So you worked with them?
16         A    Well, that's the County.  That is --
17         Q    Yes or no, ma'am.  Did you work with
18    them?
19         A    Just repeat the question.
20         Q    Did you work with the Charlotte County
21    Republican Executive Committee?
22         A    Yes, I -- I -- I did attend their -- some
23    of their monthly executive committee meetings, and I
24    was assigned to do voter identification and voter
25    registration projects with that county and other
```

103

100

```
1    counties like them in my territory.
2         Q     Did you work with the Charlotte Federated
3    Republican Women's Club?
4         A     I attended one or more of their meetings.
5         Q     So that's a yes?
6         A     When you say "work with Somebody," I
7    don't really consider -- if you just go to a meeting
8    and sit through the meeting and maybe meet some
9    people and -- I don't really consider that -- I
10   don't know -- what is your definition of "working
11   with"?  Because if your definition of "working with"
12   is the same as going to a meeting -- I'm just not
13   certain what you're asking.  I'm confused about the
14   question.  Could you please clarify the question?
15        Q     Did you go to the Charlotte
16   Federated Women's -- Charlotte Federated Republican
17   Women's club as part of your job?
18        A     I remember going there, but I was going
19   there because I had to go there because I was
20   staffing the chairman, and --
21        Q     So it was part of your job?
22        A     It was part of staffing the chairman; and
23   I had to go where she went.
24        Q     Okay.  Did you go to, support, work with,
25   have any contact with, the East Manatee Republican
```

101
```
 1   Club during your employment with Republican Party of
 2   Florida?
 3        A     East Manatee Republican Club.  That club
 4   sounds familiar, but I had a lot of clubs in Manatee
 5   County, so I'm not certain about that one.  If it's
 6   the one that the County chairman was the president
 7   of the club, then yes.  Because that was a major
 8   source -- everyone -- a lot of the people on the
 9   executive committee went to that club, and so that
10   club was a source of volunteers.
11        Q     Did you go to, support, work with, have
12   any contact with the Florida Federation of
13   Republican Women as a result of your employment with
14   the Republican Party of Florida?
15        A     Did I have any -- I'm sorry.  Repeat the
16   question one more time.
17             MR. McKENNA:  Would you read it back,
18        please.
19             (The reporter read as requested.)
20        A     Yeah, I did.  I remember going to a
21   Republican Women's Federation meeting when I was
22   staffing the chairman.  I remember taking her to
23   their -- they had an annual convention, so I
24   remember going to that.
25        Q     Did you go to, support, work with, have
```

102

```
1    any contact with the Fort Myers Republican Women's
2    Club as a result of your employment with the
3    Republican Party of Florida?
4         A    I remember going to the Fort Myers
5    Women's Republican Club to take the chairman there
6    because I was staffing her and she was speaking at
7    their luncheon, I believe.  And so I think we
8    attended two women's meetings in Fort Myers during
9    her visit to one of my counties.
10        Q    Okay.  Same question for the Glades
11   County Republican Executive Committee.
12        A    Glades County Executive Committee.  Yes,
13   I went to Glades County Republican Executive
14   Committee meetings, and I remember talking to them
15   about voter identification, voter registration.
16        Q    How about the Greater -- same question
17   for the Greater Brandon Republican Club?
18        A    Greater Brandon Republican Club.  I am
19   drawing a blank on that one.
20        Q    Same question for the Greater Pinellas
21   Young Republicans.
22        A    Greater Pinellas Young Republicans.  I'm
23   drawing a blank on them too.
24        Q    How about -- the same question for the
25   Greater Sun City Center Republican Club.
```

103
```
 1          A      Greater Sun City.  I don't specifically
 2   remember them --
 3          Q      Same question --
 4          A      -- offhand.
 5          Q      Same question for Gulf Beaches Republican
 6   Women's Federation.
 7          A      I don't remember that club specifically
 8   offhand.
 9          Q      Same question for Highlands Republican
10   Women's Club Federated.
11          A      I vaguely remember this club.  I vaguely
12   remember this club.  I remember they were really
13   good about keeping me updated about what they were
14   doing and sending me information.  I don't
15   specifically remember going to their meetings,
16   though.
17          Q      How about the Hillsborough County
18   Republican Party?  Same question.
19          A      I don't think there is any Hillsborough
20   County Republican Party.  There is a Hillsborough
21   County Republican Executive Committee, I think is
22   their formal name.  And if that's what you're
23   referring to, yes, I did go to their executive
24   committee meetings.
25          Q      How about the Hillsborough County Young
```

104

```
1  Republicans Club?
2        A    I never -- I think I went to a -- I might
3  have gone to one of their events.  That -- I
4  remember something vaguely about that.
5        Q    How about -- the same question for the
6  Hillsborough County Women's Republican Club
7  Federated?
8        A    Hillsborough County Women's Republican
9  Club Federated.  I vaguely remember that club but
10 not anything specific about that club.
11       Q    Same question for the Hardee County
12 Executive Committee.
13       A    Hardee County Executive Committee.  I did
14 communicate with them, as I did all my counties.
15            And I just want to note for the record
16 that you're intermingling clubs and county executive
17 committees, and they're really two different things.
18       Q    Same question for the Lake County
19 Republican Party.
20       A    Who?
21       Q    Lake County Republican Party.
22       A    Lake County?  That's not in my
23 territory.  I don't think I -- I don't think I -- I
24 don't have any recollection of communicating with
25 them.
```

108

105

```
 1          Q     How about the Lee County Republican
 2    Executive Committee?
 3          A     Yes, that's one of my counties.  I did
 4    communicate with, as I did with all my counties,
 5    their county leadership.
 6          Q     How about the Lee County Republican
 7    Women?
 8          A     Lee County Republican Women, that club
 9    stands out to me because my state committee woman
10    was involved with that club or in the leadership of
11    that club, and I remember taking Chairman Jordan to
12    their club meeting when I was staffing her.
13          Q     How about the Log Cabin Republicans of
14    Tampa Bay?
15          A     I am familiar with the Log Cabin
16    Republican Club.
17          Q     The question was, is:  Did you have a
18    connection with them as a result of your employment
19    with Republican Party of Florida?
20          A     No.  I was involved with that club for a
21    long time.  I think that that started at some point
22    when I was in college.  I'm not certain exactly
23    when, but I would go to their club meetings before I
24    ever became employed by RPOF.
25          Q     How about the Manasota Republican Women's
```

106

```
1    Club Federated?
2         A     Manasota -- that club sounds familiar,
3    but I don't specifically remember doing anything
4    specific with them.
5         Q     How about the Mid-Charlotte County
6    Republican Club?
7         A     That -- that club sounds familiar.  And
8    -- I'm trying to remember if I did any -- if I did
9    anything with them.  And I may have, but I'm not
10   certain, but that -- the name sounds familiar.
11        Q     How about the National Republican
12   Hispanic Assembly?
13        A     The National Hispanic Republican
14   Assembly, I don't recall doing anything specifically
15   with them.  That's an organization that I'm not
16   certain really got off the ground because they
17   weren't chartered through RPOF or they weren't an
18   official organization or something like that.
19        Q     How about the New Tampa Republican Club?
20        A     New Tampa Republican Club.  I don't
21   remember doing anything specifically with that
22   club.  I don't remember communicating with that
23   club.
24        Q     How about the North Pinellas Republican
25   Club?
```

```
 1          A     I can't be certain about -- I went to an
 2     event.  I staffed the chairman and some -- I went
 3     with the chairman and some other folks from RPOF to
 4     an event with a Pinellas County, a club; but I am
 5     not sure which club it was because I think they have
 6     several clubs in Pinellas County.  And I'm not
 7     familiar with every single club because some of them
 8     are just social and -- and they don't really provide
 9     volunteer resources.
10               But I do remember going to an event with
11     the chairman and other folks from RPOF, but I'm not
12     exactly sure which club it was in Pinellas.
13          Q     How about On Top Of The World Republican
14     Club?
15          A     I have heard that name before, and I'm --
16     I don't remember specifically doing anything with
17     that club.
18          Q     Peace River Federated Republican Women?
19          A     That club sounds very familiar, and I
20     believe I took the chairman to one of their club
21     meetings where she spoke.  And I remember I -- one
22     day I was having a meeting with my county chairman
23     and the leadership there in Charlotte County, and I
24     met them at the tail end of that meeting so I could
25     follow them to their campaign headquarters.  So I
```

108

```
1    remember being there for that.
2        Q      How about the Plant City Federated
3    Republican Women?
4        A      That club sounds familiar to me.  And I
5    can't remember offhand what we might have
6    communicated about.  But the name is -- certainly
7    sounds very familiar to me.
8        Q      How about the Republican Club of Bonita
9    and Estera?
10       A      I'm drawing a blank with that one.
11       Q      Republican Club of Greater Largo?
12       A      I'm drawing a blank with that one.
13       Q      Republican Club of Greater Seminole?
14       A      Seminole located where?  In Polk County?
15       Q      I don't answer questions, ma'am.  Do you
16   recall the Republican Club of Greater Seminole?
17       A      I'm just trying to -- for identification
18   purposes, I'm just --
19       Q      That's all I know.
20       A      Okay.  I don't think that's even in one
21   of my counties.  I don't believe that that club is
22   in my territory, but I'm not familiar with the club.
23       Q      Republican Club of Upper Pinellas?
24       A      I don't recall ever doing anything with
25   that club.
```

109
```
1      Q      Republican Party of Charlotte County?
2      A      That is a County REC.  I certainly
3  communicated with them.
4      Q      Republican Party of Manatee County?
5      A      I certainly communicated with them.
6      Q      Republican Party of Pinellas County?
7      A      I certainly communicated with them.
8      Q      Republican Party of Sarasota County?
9      A      I certainly communicated with them.
10     Q      Republican Women of Cape Coral?
11     A      Somehow I remember you asking me about
12  them before, and I'm not -- I don't -- I don't --
13  their name sounds familiar, but I don't remember
14  anything specific about them.
15     Q      How about the Republican Women's Club of
16  Cape Coral?
17     A      Is that the same name, just words
18  transposed?  I --
19     Q      If you don't recall, you don't recall.
20  That's fine.
21     A      I don't recall.  Sorry.
22     Q      Republican Women Forum?
23     A      That doesn't sound familiar.
24     Q      Sanibel-Captiva Republican Club?
25     A      That name sounds familiar, but I am not
```

113

110

```
 1    certain if -- I'm not certain about any
 2    communications with that club.
 3        Q      Sarasota Bay Republican Women's Club
 4    Federated?
 5        A      The name sounds familiar, but I don't
 6    remember anything specific about the club.
 7        Q      Sarasota County Republican Executive
 8    Committee?
 9        A      You asked me that before, and I told you
10    yes, that I had communicated with them.
11        Q      St. Petersburg Republican Club?
12        A      You asked me that before, and I told you
13    that I had gone to an event with the chairman and
14    some other folks at RPOF to something in Pinellas
15    County, but I'm not sure what organization it was
16    with.  I'm not certain, and I don't want to --
17        Q      St. Petersburg Young Republicans?
18        A      I don't -- that -- I don't recall going
19    to or communicating with that specific club.
20        Q      Southwest Florida Federated Republican
21    Women?
22        A      The name sounds familiar.  But I don't
23    recall doing anything specific with that club.
24        Q      STARS?  S-T-A-R-S.
25        A      I know I'm not supposed to ask questions,
```

111

```
 1   but what the heck is STARS?
 2        Q    If you don't know, you don't know.  State
 3   Republican Women's Federation?
 4        A    State Republicans Women's Federation.  If
 5   they're a part of the Florida Federation, I'm not
 6   certain if that's a state-wide federation or if it's
 7   a specific club in a specific area.  As I told you
 8   before to the answer of a previous question, I
 9   remember going with the chairman when I was staffing
10   her to an annual Federation Women's conference event
11   type thing.
12        Q    Student Republicans Association?
13        A    Student Republicans Association.  No.
14        Q    Suncoast Republican Women's Federated?
15        A    Suncoast Republicans Women's.  I don't
16   remember that club specifically.
17        Q    Tampa Bay Young Republicans?
18        A    You asked me that before.  I'm familiar
19   with the club, but I don't recall ever going to --
20   oh.  I may have gone to one of their events, I
21   think.
22        Q    Tampa Republicans Women Federated?
23        A    Tampa Republicans Women Federated.  There
24   is a couple women's Republican clubs in Tampa, and
25   I'm not certain which one is which.  I may have gone
```

112

```
 1    to one of their meetings, but I'm not certain that I
 2    was employed with RPOF when I went.  Because the
 3    names are so similar, I -- I don't really know one
 4    from another.  But I think -- I think I might have
 5    gone to one with Carol Carter, but I'm not 100
 6    percent certain, because she and I went to other
 7    things together, and so it's sort of starting to run
 8    together in my head.
 9         Q     Venice-Nokomis Federated Republican
10    Women's Club?
11         A     I'm familiar with the name.  I'm not
12    certain about any specific communication with that
13    club.
14         Q     Women's Republican Club of Naples
15    Federated?
16         A     Women's Republican Club of Naples
17    Federated.  That -- I do remember something about
18    this club in conjunction with the leadership of
19    Collier County.  I think it was my state -- I think
20    this is the club.  There are, I'm certain, numerous
21    women's clubs in Collier County and in Naples.  But
22    if this is the same club that my state committee
23    woman Jena Hahn is in the leadership of, then I
24    remember communicating with this club.
25         Q     Turning back to Exhibit 3, your January
```

116

                                    113
1    15, 2004 entry.
2         A     January 15.  Do you -- I'm sorry.  Do you
3    mind if I take a break?
4         Q     Sure.
5         A     Thanks.
6               (Recess from 2:15 to 2:29 p.m.)
7    BY MR. McKENNA:
8         Q     Ma'am, we were asking you to take a look
9    at Defendant's Exhibit 3, your January 15, 2004
10   entry.
11        A     What was the date again?
12        Q     January 15, 2004.
13        A     Okay.
14        Q     You allege that Mr. Kester asked you to
15   spy on Johnny Hunter during a Sarasota Republican
16   Executive Committee meeting.  Do you see that,
17   ma'am?
18        A     Yes.
19        Q     Where did that conversation take place?
20        A     I think it took place -- well, it had to
21   have taken place over the phone.
22        Q     Why do you say it had to take place over
23   the phone?
24        A     That's usually our mode of
25   communication.  Terry and I would communicate

114

```
1    usually over the phone or via e-mail because we
2    worked in two separate locations.
3         Q    Are you certain as we sit here today that
4    that conversation was over the phone?
5         A    I am very sure.
6         Q    Was that on your cell phone?
7         A    I don't remember.
8         Q    Do you recall your cell phone number?
9         A    Oh, gosh.  No, I don't recall my cell
10   phone number.
11        Q    Who was your cell phone provider in
12   January of 2004?
13        A    I'm not certain.  It would either have
14   been AT&T or Verizon.
15        Q    Now, in this -- is the conversation fully
16   set forth in your notes, or were there additional
17   things that were said?
18        A    Which notes are you talking about?
19        Q    The January 15, 2004 notes.
20        A    From which exhibit are you talking about?
21        Q    Exhibit 3.
22        A    Let me make sure I understand this
23   question.  You're asking me is the conversation
24   completely set forth in the notes?
25        Q    That's correct.  Or were there other
```

                                                    115

```
1    things?
2         A      There probably are other things.
3         Q      Can you recall any other things?
4         A      Not off the top of my head.
5         Q      Okay.  Mr. Kester said to you that this
6    is very important.  You're not being a team player.
7    Is that correct?
8         A      Among other things, yes.
9         Q      And those were his exact words?  You have
10   them in quotation marks.
11        A      That's a summary of some of the words
12   that he said.  And I'm not saying that he
13   necessarily said that concurrently.
14        Q      Are you saying that he -- start over.
15   You have these in quotation marks.  Correct?
16        A      They are in quotation marks.
17        Q      So my question to you, ma'am, is:  Are
18   you suggesting that these are the exact words he
19   said, or are you paraphrasing Mr. Kester?
20        A      I'm not -- I don't exactly remember if I
21   was paraphrasing him or not.  But the -- anything
22   that I would have written here is just a summary of
23   some of the things that we talked about.  It's not
24   every quote that he said, if that answers your
25   question.
```

116

```
 1        Q    I understand that, ma'am.  That's not the
 2   question.  The question is:  You have, quote, Look,
 3   this is very important.  You are not being a team
 4   player here, exclamation point, close quote.  Do you
 5   see that, ma'am?
 6        A    Yes.  You're --
 7        Q    Is that a paraphrase or is that an exact
 8   quote from Mr. Kester?
 9        A    You're asking me to answer about a
10   specific sentence in a multitude of sentences, and I
11   can't say for certain that it's not a paraphrase, if
12   that's what your question is.
13        Q    Now, you say also that he said that part
14   of your job is to gather information.  Do you see
15   that?
16        A    Yes.
17        Q    And he said something to that effect?
18        A    Yes, he said something to that effect,
19   among other things.
20        Q    Then he went on to say, "I thought you
21   were helping with African American outreach?"  Do
22   you see that, ma'am?
23        A    Yes.
24        Q    Did you respond to that?
25        A    I'm sure that I did.  I -- in the context
```

117

```
1    of having a conversation, I'm sure that there was a
2    statement after that.
3         Q     Well, it says:  "I explained to
4    Mr. Kester that spying on people was not African
5    American outreach."  Do you see that, ma'am?
6         A     Yes.
7         Q     Do you recall saying anything else about
8    African American outreach in that conversation?
9         A     We may have, and we may have talked
10   about --
11        Q     Do you recall anything else about African
12   American outreach in that conversation?
13        A     Not specifically anything in particular.
14   You know, if you are referring to something that I
15   might have said, you know, if you gave me something
16   that might refresh my recollection from what may
17   have happened in that conversation, I mean, but --
18        Q     As we sit here today, can you tell me
19   anything else that you believe was said about
20   African American outreach in that conversation on
21   January 15?
22        A     I'm sure that there was probably
23   something else that was said.
24        Q     What?
25        A     Well, as I sit here right now, I can't
```

118

```
1    regurgitate to you each specific comment that might
2    have been made about it, but I'm sure there were
3    other things discussed about it.
4         Q    Can you generally tell me what other
5    things were discussed about it?
6         A    Could you please repeat the question,
7    Mr. McKenna?
8              MR. McKENNA:  Read back the question,
9         please.
10             (The reporter read as requested.)
11        A    I think that's just a continuation of
12   your previous question when you asked me
13   specifically.  If I couldn't answer specifically,
14   I -- how would you think that I could answer
15   generally?  I told you that there probably was.  But
16   as I sit here right now, I can't give you specific
17   instances or general instances other than what, you
18   know, is right here.  But I have confirmed for you
19   that the conversation may have gone beyond that.
20        Q    Okay.  Were you helping with African
21   American outreach in January of 2004?
22        A    I was doing whatever I was told to do.
23        Q    That's not the question, ma'am.  The
24   question was:  Were you helping with African
25   American outreach in January of 2004?
```

119

```
 1          A      In the context of what?
 2          Q      The question, ma'am -- and for the third
 3    time -- is were you helping out with African
 4    American outreach in January of 2004?
 5          A      Mr. McKenna, I'm sort of confused about
 6    your question.  And I'm sorry that you're getting
 7    upset and that you've had to repeat it, but I don't
 8    -- if maybe you could ask it in a different way,
 9    because I just told you that I did any assignments
10    that I got.
11          Q      Are you done?
12          A      Until -- no, I'm not done.  Until I
13    started explaining to my employer my concerns about
14    projects that I got and started complaining about
15    those projects.  I hope that answers your question.
16               MR. McKENNA:  I'm taking that as a
17          refusal to answer, and I'm going to file a
18          motion on it.
19               MR. THOMPSON:  That's not a refusal to
20          answer that.
21          A      I am not refusing to answer your
22    questions.  I am happy to answer any questions that
23    you have.  And I --
24          Q      Okay.  I'll ask it one more time.  Look
25    at your January 15, 2004 entry.  Okay?  Are you
```

120

```
 1    looking at it?
 2         A    Yes, sir.
 3         Q    It says -- you quoted Mr. Kester as
 4    saying, "I thought you were helping with African
 5    American outreach?"  Do you see that, ma'am?
 6         A    Yes.
 7         Q    Now, my question to you is:  In January
 8    of 2004, were you helping with African American
 9    outreach?
10         A    But in the -- but the question doesn't
11    end there.  In the context of what?  I mean, you're
12    speaking --
13         Q    In the context of your job with the
14    Republican Party of Florida.
15         A    Well, I told you that I -- you know, I
16    did all the assignments that they gave me until I
17    started complaining about it and opposing
18    discrimination.
19         Q    In January of 2004, were you helping with
20    African American outreach at the Republican Party of
21    Florida?
22         A    Mr. McKenna, I've answered you.  I told
23    you that I --
24         Q    I'm moving on.
25         A    -- did -- well, I want to answer your
```

124

121

```
 1    question.  I told you that I did the projects that I
 2    was assigned until I started complaining about it.
 3         Q     Mr. Kester apparently thought you were
 4    helping out with American outreach -- African
 5    American outreach in January of 2005, didn't he?
 6         A     You'd have to ask Mr. Kester.
 7         Q     You can't tell from what you've quoted
 8    him as saying that he assumed you were helping out
 9    with African American outreach in January of 2004?
10         A     He couldn't -- he could not have assumed
11    that.
12         Q     You've quoted him as saying that, haven't
13    you?
14         A     Well, what specific quotes are you
15    referring to?  I mean, I don't like this general,
16    you know --
17         Q     You've got it in quotes, ma'am.  It's
18    right there.  It says:  "He went on to say, 'I
19    thought you were helping with African American
20    outreach?'"  So Mr. Kester obviously thought you
21    were helping out with African American outreach in
22    January of 2004.  Right?
23              MR. THOMPSON:  Object to form.
24         A     Just because he makes a statement doesn't
25    mean that he necessarily thought something, because
```

122

```
 1   we had talked about it before and I had continued to
 2   raise concerns about it, so I don't know how he
 3   could have thought that when we had talked about it
 4   before.  And he knew that I was, you know, raising
 5   somewhat of a fuss about it, and --
 6        Q     I'm sure you raised a fuss about many
 7   things.  Let's turn to January --
 8             MR. THOMPSON:  Object to form.
 9        Q     Let's turn to the January 20 --
10        A     There is no call for that.
11        Q     -- 2004 entry in your Defendant's Exhibit
12   No. 3.
13        A     January 2004.
14        Q     January 20, 2004.
15        A     January 20.  January 20, 2004.  I'm
16   there.
17        Q     Very good.  You claim that a man named
18   John Parsons filed a grievance against Mr. Kester.
19   Do you see that, ma'am?
20        A     Yes, sir, I do.
21        Q     How do you know that Mr. Parsons filed a
22   grievance against Mr. Kester?
23        A     Because Kester said something about it.
24   I remember -- somehow I remember him saying
25   something about Mr. Parsons.
```

123

```
1      Q      What do you remember him saying?
2      A      Well, it was in regards to him filing
3  this grievance.  And I vaguely remember hearing
4  about it from another party official as well, but
5  I'm just sort of drawing a blank to who that was.
6  But we -- but we had talked about it at some point.
7      Q      What did you talk about?
8      A      We talked about the fact that there was
9  this grievance.  And I remember talking about the
10 fact that he might cause some form of disturbance or
11 something like that during the annual meeting.  And
12 during the conference call I remember him saying to
13 contact, you know, people that you feel close to
14 like your county chairman who are going to be there
15 voting.  And if anything like that were to arise,
16 that he wanted to see him booed from the floor.
17     Q      Did you see a grievance that Mr. Parsons
18 filed against Mr. Kester?
19     A      No, I did not physically see a
20 grievance.  I heard about it.  I was told about it.
21     Q      What was the content of the grievance?
22     A      I'm -- I vaguely remember the -- what I
23 was told what the grievance was about.  I vaguely
24 remember it, and I don't want to guess about it
25 because I don't want to put inaccurate statements on
```

124
```
 1    the record.
 2         Q     Just tell us what you remember.  What was
 3    the grievance about?  If you don't remember, just
 4    say "I don't remember."
 5         A     I told you -- well, I do remember.  I
 6    remember the grievance --
 7         Q     Well, then tell us.
 8         A     -- and I remember the specific things
 9    that I've already told you on the record about the
10    grievance, Mr. McKenna.  And beyond that, you know,
11    I don't want to guess at stuff.
12         Q     Okay.  I'm going to ask one more time,
13    ma'am, then I'm going to go on and consider it a
14    refusal to answer.
15         A     I'm not refusing --
16         Q     What was the content of the grievance?
17    What was the grievance about?
18              MR. THOMPSON:  Are you asking her to
19         speculate?
20              MR. McKENNA:  No.  I'm asking her to
21         tell us what she remembers.
22         A     You are asking me to speculate.
23              MR. McKENNA:  If she doesn't remember,
24         she can say "I don't remember" or "I don't
25         know."
```

125

```
 1        A     I do remember.
 2              THE REPORTER:  I'm sorry.  One at a time,
 3        please.
 4              MR. McKENNA:  But if she knows, she
 5        needs to tell us.
 6              MR. ISLER:  Jim, it's a very legitimate
 7        question, and she has said -- let me just -- I
 8        have been very silent here, but she has said
 9        that she remembers something about the content
10        but she doesn't really want to tell us because
11        she's not a hundred percent sure if it's
12        accurate.  But she -- all Ed is asking her to
13        do is to tell us what you do remember, and
14        she -- and he is exactly right, she is
15        refusing to answer this question, and I think
16        that she needs to answer the question.
17        A     I'm happy --
18              MR. THOMPSON:  You can answer it, but
19        answer it under the condition that you're
20        guessing right now; you think that that's --
21              MR. ISLER:  You can say "to the best of
22        my recollection, blah, blah."
23              MR. THOMPSON:  Yeah.
24        A     I -- I remember that it was something
25        about Terry not doing something under the rules that
```

126

```
 1    was required to be done.  But I'm not exactly sure
 2    what it was or that -- something that was supposed
 3    to happen in accordance with the rules of procedure
 4    didn't happen.  But I just don't remember exactly,
 5    and so that's the part that I'm guessing about.  I'm
 6    not exactly sure what it was or -- I just don't --
 7    and I don't like to talk about stuff that I don't
 8    know the specifics on.
 9              And I've told you, Mr. McKenna, what I do
10    know.  I'm not trying to evade you whatsoever.  I'm
11    happy to answer your questions and comply with the
12    law.  But this is as much as I can give you on
13    this.  You know, I will continue to think about it.
14    If I have anything else, I'll --
15         Q    Have you told us everything you can
16    remember?
17         A    About the January 20, 2004 incident?
18         Q    No.  About the grievance.
19         A    Yes, I believe so.
20         Q    Is Mr. Parsons white or black?
21         A    He's white, to the best of my
22    recollection.
23         Q    What significance does this entry have to
24    your lawsuit?
25         A    Well, this entry is not related to a
```

130

127

```
 1    lawsuit.  I mean, it's an entry and some notes that
 2    I made.  I don't think it was in my interrogatories,
 3    sir.
 4         Q     Why did you provide it to the EEOC?
 5         A     As I told you before, these notes are
 6    just a summary of some of the things that happened
 7    during my employment.  It was just a glimpse into
 8    some of the things that happened.  And if you are,
 9    you know -- as I said, you know, I don't see
10    anywhere where I included this in my interrogatories
11    because I was responding to specific questions in
12    the interrogatories, and I'm not doing that here in
13    Exhibit 3 in the entry of January 20, 2004.
14         Q     So why did you give Exhibit 3 to the
15    EEOC?
16         A     As I said before, Mr. McKenna, I was just
17    trying to give them a glimpse into some of the
18    things that happened during my employment.
19         Q     You weren't trying to support your EEOC
20    charge?
21         A     I didn't have to.  I had -- you know, I
22    made the charge, and I think it stands on its own
23    merits.  And as I spoke to you before, you know, we
24    had an interview and I talked to them on several
25    occasions.
```

128
```
 1              MR. McKENNA:  We can go ahead and take a
 2        break now.
 3              (Recess from 2:49 to 3:02 p.m.)
 4   BY MR. McKENNA:
 5        Q     Based on a conversation we had off the
 6   record with your counsel, I'm going to ask you one
 7   more time, ma'am, that in January of 2004 were you
 8   involved in -- were you helping out on African
 9   American outreach in January of 2004?
10        A     I think I've already given you an answer
11   on that on the record, and I just wanted to add to
12   that answer.  Yes, as assigned.
13        Q     I'd like you to turn to Exhibit No. 1.
14        A     Exhibit No. 1.
15        Q     The amended complaint.  If you could turn
16   to page 6 for me, if you would, please.
17        A     6.
18        Q     Paragraph 25c, do you see that, ma'am?
19        A     Yes.
20        Q     It says that "Kester showed" you "a
21   portrait of the late Senator Strom Thurmond and
22   boasted, in a context intended to convey racial
23   hostility, that he believed Thurmond was 'the best
24   Senator who ever lived.'"  Do you see that, ma'am?
25        A     Yes, sir, I see that.
```

```
 1        Q    Is that a true statement, ma'am?
 2        A    Yes.  That -- I'm done.
 3        Q    When did that occur?
 4        A    It occurred at some point while I was in
 5   Tallahassee.
 6        Q    2003 or 2004?
 7        A    I believe this happened in February of
 8   2004 or early 2004.  And I think that that -- I
 9   think that should be in my interrogatories around --
10   somewhere around that time frame.  I don't remember
11   the exact date in my head.
12        Q    Would you take a look at Defendant's
13   Exhibit 3, please, and would you confirm for me that
14   nowhere in Defendant's Exhibit 3 do you allege that
15   Mr. Kester made any kind of a remark about the late
16   Senator Strom Thurmond?
17             MR. THOMPSON:  I'm going to object to
18        the form.
19        A    Repeat the question one more time, sir.
20             MR. McKENNA:  Please read it back.
21             (The reporter read as requested.)
22        A    You want me to just look at this whole
23   document, or are you referring to anything specific
24   in this document, sir?
25        Q    I'm asking you -- let me ask it this way
```

130

```
 1    then.  Did you say anywhere in Exhibit 3 that
 2    Mr. Kester made that remark about Strom Thurmond?
 3         A    I haven't read the entire document while
 4    I've been here.  I may or may not have stated it in
 5    Exhibit 3.  And I repeat again that this -- what
 6    you're calling Exhibit 3 is just a summary of some
 7    of the things that happened while I was employed and
 8    in no way does it include every single thing.  It's
 9    just a summary.  And if you're -- I mean, the
10    interrogatories in and of itself refer to specific
11    questions, and I'm answering specific questions
12    within the interrogatory, sir.
13         Q    Would you turn to page 10 of Exhibit 3,
14    please.  Do you see the entry for February 3?
15         A    Yes, sir.
16         Q    Do you see this last paragraph?  Would
17    you read it, please, out loud?
18         A    "I notice that Christina Sheppard had a
19    picture in her office of she and Strom Thurmond, a
20    racist and segregationist senator."
21         Q    Isn't it true, ma'am, that Mr. Kester
22    never made any remark to you about Strom Thurmond?
23         A    No, that is not true.  And you wouldn't
24    know because you weren't there.
25         Q    But what you put in your notice to the
```

134

131

```
 1    EEOC in your -- which we have marked as Exhibit 3
 2    was simply that you noticed that there was a picture
 3    in Christina Sheppard's office of her and Strom
 4    Thurmond.  Is that correct?
 5              MR. THOMPSON:  Object to form.
 6         A    The statement that I just read, yes, it's
 7    in my notes, if that's what your question is.
 8         Q    And that contradicts your statement in
 9    Defendant's Exhibit 1 that Mr. Kester made such a
10    comment to you, doesn't it?
11              MR. THOMPSON:  Object to form.
12         A    No, in no way does it do that.  It just
13    bolsters my contention that the picture exists and
14    that it was there in the office.
15         Q    So you thought it was important to tell
16    the EEOC that Ms. Sheppard had I just read in her
17    office but didn't think it was important to tell the
18    EEOC about Mr. Kester's comment?  Is that your
19    testimony?
20              MR. THOMPSON:  Object to form.
21         A    No, that's not my testimony at all, sir.
22         Q    Well, then, why didn't you tell the EEOC
23    about Mr. Kester's alleged comment in Defendant's
24    Exhibit 3?
25              MR. THOMPSON:  Object to form.
```

132

```
1        A      I don't know that I didn't tell the EEOC
2   about the comment.  We may have talked about it
3   during the interview portion.  As I mentioned to you
4   before, I didn't write down every single thing that
5   may have happened during my employment in Exhibit 3,
6   as I've stated to you on the record numerous times.
7        Q      Let's turn to the February 17 entry in
8   Defendant's Exhibit 3 which is on page 11.  Are you
9   there, ma'am?
10       A      Yes.  Exhibit 3?
11       Q      Yes.  Page 11, February 17, 2004 entry.
12  Do you see that, ma'am?
13       A      Yes, sir, I do.
14       Q      Would you read that out loud, please.
15       A      The entire --
16       Q      The entire entry.
17       A      For February 17th of '04?
18       Q      That's correct.
19       A      Okay.  (Inaudible).
20              THE REPORTER:  I'm sorry.  I have to
21       write what you're saying.
22              THE WITNESS:  I'm sorry.  I'll go
23       slower.
24       A      "It was our Tuesday conference call.  My
25  party laptop was not working again.  I spoke up and
```

133

```
 1    let Mr. Kester know about the situation on our
 2    conference call.  I was afraid that if I spoke to
 3    him one on one, the matter would not be resolved.
 4           "On our previous conference call he said
 5    the field staff would be getting new laptops.  I
 6    have never received one.  I was given the inferior
 7    equipment" -- let me start over with that sentence.
 8    "I was given the inferior equipment to the rest of
 9    the staff."  That's a typo or something.  "For the
10    first six months I worked for the party, I used my
11    personal computer because the Party laptop didn't
12    work properly.
13           "Mandy Fletcher the political director
14    for Bush/Cheney '04 sent me and Nathan Hollifield
15    the Bush/Cheney field director instructions on what
16    we were expected to do for Vice President Cheney's
17    event."
18        Q    Are those true statements, ma'am?
19        A    Yes.  What I was referring to was that if
20    I had to log in and check my e-mail, I might have
21    gotten on the internet with my personal computer.
22        Q    And the laptop was given -- you refer to
23    the laptop as "my Party laptop."  Correct?
24        A    That was -- yes, that's what it says, "my
25    Party laptop."
```

134

```
1         Q    And it says you were given inferior
2    equipment to the rest of the staff.  Is that
3    correct?
4         A    Yes.  My laptop was a secondhand, and my
5    co-workers' seemed to be in much better condition.
6         Q    Isn't it true that everyone had
7    secondhand laptops, didn't they?
8         A    I don't know that to be true, sir.
9         Q    Do you know it to be false?
10        A    Sir, I'll restate my answer.  I think,
11   from what I saw, their laptops looked a lot newer
12   than mine.  I don't know -- no, I don't --
13        Q    Are you finished with your answer?
14        A    Yes.
15        Q    Okay.  I'll ask the question one more
16   time.  Were the rest of the field staff given used
17   computers?
18        A    I don't think so, sir.
19        Q    Do you know whether they were or not for
20   a fact?
21        A    No, I don't know for a fact, but they
22   appeared to be in new condition to me.  I'm done.
23        Q    Now, you indicate here that for the first
24   six months you worked for the party you used your
25   personal computer.  Right?
```

135
```
 1       A     Yes.  Among other --
 2       Q     But that's contrary to your testimony
 3  yesterday in court, isn't it?
 4       A     Well, what -- the question that I think I
 5  was asked in court was did I save information on any
 6  other computers, and I actually -- this isn't
 7  complete in that I may have used other computers as
 8  well.  I remember using a computer at the University
 9  of Tampa and some other computers, which I did state
10  that in court.  But I thought the question in court
11  was did you save work that I had done on the hard
12  drives of any other computers.
13            MR. ISLER:  While we're at a brief
14       break -- not off the record -- but I would
15       just note to plaintiff's counsel I don't think
16       a good-faith effort has been made on your
17       client's behalf to answer or respond to the
18       document production requests that have been
19       served by the defendants in this case, if in
20       fact she has not gone through her home
21       computer, which she has acknowledged in this
22       document here that she used for work purposes,
23       and reviewed each and every document on her
24       computer to see whether this document --
25       whether it in fact contains work-related
```

136
1    material or whether or not she still has
2    copies of e-mails.  She's already said she
3    used the computer for e-mail purposes, and
4    there would be some record of that or there is
5    going to be some record of that.
6          So I would just encourage you to visit
7    with your client when, you know, we're done
8    here today and make sure that a complete
9    effort has been made to see if there are any
10   other responsive documents.
11         MR. THOMPSON:  I'm going to respond to
12   that two ways.  One, I will have my client do
13   that; but two, I believe that what she had
14   said was she didn't save anything onto her
15   hard drive and the e-mail she did was a
16   network e-mail as opposed to like a Microsoft
17   Outlook e-mail.  That wouldn't be saved onto
18   your computer.  It would be saved onto an
19   internet type of networking.
20         MR. McKENNA:  How do you know that?
21         MR. THOMPSON:  That was her testimony
22   yesterday.
23         MR. McKENNA:  How do you know that?
24         MR. THOMPSON:  My first part I said that
25   I would have my client look on her computer.

137

```
 1        That was the first part of the question.  My
 2   second part is basically saying I don't think
 3   it's going to produce anything, but I will
 4   certainly have my client look.
 5             MR. ISLER:  All I'm asking is for you to
 6   take a look, because it appears it hasn't been
 7   done.
 8             MR. THOMPSON:  I will do that.
 9             MR. ISLER:  Thank you.
10             MR. THOMPSON:  I'm asking you now.
11             THE WITNESS:  I'm happy to do that.  I'm
12   happy to provide anything I have.
13             MR. McKENNA:  I'm going to need a break
14   for a minute.
15             (Recess from 3:16 to 3:24 p.m.)
16             MR. THOMPSON:  For the record, I've
17   agreed that if we end up having to end the
18   deposition early before the full allotted
19   time, we would not object to reconvening at a
20   later date and continuing the deposition.
21             MR. McKENNA:  With some extra time.
22             MR. THOMPSON:  Small amount, yeah.  We
23   have not discussed the exact amount, but we'll
24   discuss that.
25             MR. McKENNA:  Okay.
```

```
                                     138
 1                THE WITNESS:  You look like you're
 2         excited.
 3                MR. ISLER:  I was just --
 4   BY MR. McKENNA:
 5         Q      If you would turn back to Exhibit No. 5
 6   for me, please.
 7         A      5.
 8         Q      And it's -- one, two, three, four, five,
 9   six, seven -- eighth unpaginated page.  The one that
10   begins at the very -- at the very bottom has the
11   "Week of February 23, 2004" on it.
12         A      You said it was the eighth page?
13         Q      I think it's the eighth page.  It has
14   "Week of February 23, 2004."
15                MR. THOMPSON:  Seventh page.
16         A      Yes, I'm there with you.
17         Q      All right.  And it says -- and I'm
18   paraphrasing once again -- that Mr. Kester
19   instructed you to "contact all the Black Republican
20   clubs and insist that they do not attend the NAACP
21   march on the Capitol.  Mr. "Kester said that the
22   RPOF wanted to respond to the NAACP in an
23   intelligent way and he said, 'the last thing we want
24   to see is some Black guy on a tv wearing a
25   Republican shirt responding to the press in an
```

139

```
 1    ignorant way.'"  Do you see that, ma'am?
 2        A    Yes, I do.
 3        Q    And is that a true statement?
 4        A    Yes, he said he was -- we had a
 5    conversation about that.
 6        Q    And where was that conversation?
 7        A    I'm quite sure it happened over the
 8    phone.
 9        Q    When you say "quite sure," why are you
10    quite sure?
11        A    I'm quite sure because I'm quite sure.
12        Q    Do you specifically have a recollection
13    of having that telephone conversation with
14    Mr. Kester?
15        A    We had multiple conversations about
16    this.  That's why I didn't put a specific date on
17    it.  That's why I put the "Week of," because I was
18    thinking that there might be more than one
19    conversation.
20        Q    Do you specifically recall a telephone
21    conversation with Mr. Kester about this issue?
22        A    Yes, I remember a telephone
23    conversation.  I just wanted to be specific that
24    there might have been more than one.
25        Q    And was that on your cell phone or on
```

140

```
 1      your home phone or some other phone?
 2           A      The call would have been on my --
 3      probably on my cell phone or home phone.  I don't
 4      remember which phone the call was on.
 5           Q      And during February of 2004 you were on
 6      AT&T or Verizon?
 7           A      Yes, sir.
 8           Q      Do you know which one?
 9           A      I don't know which one.  That's why I
10      gave you both.
11           Q      Now, if you turn back to Defendant's
12      Exhibit No. 3, page 8 -- I'm sorry, it's not page
13      8.  It's page 14.  There is a discussion there, is
14      there not, under February 27, 2004 regarding the
15      NAACP march in Jacksonville -- or in Tallahassee?
16           A      Yes, sir.
17           Q      And you do not have Mr. Kester as quoted
18      as saying, "the last thing we want to see is some
19      Black guy on tv wearing a Republican shirt
20      responding to the press in an ignorant way," do you?
21                  MR. THOMPSON:  I'm going to object to
22              the form.
23           A      Just refresh me.  I just got done reading
24      this.  What was the question again?
25           Q      The question was:  In this you do not
```

144

141

```
 1    reference Mr. Kester making a statement that "the
 2    last thing we want to see is some Black guy on tv
 3    wearing a Republican shirt responding to the press
 4    in an ignorant way."  Correct?
 5              MR. THOMPSON:  Same objection.
 6         A    That -- the quote in the language that
 7    you just stated is not in the February 27, 2004
 8    statement.  And again, you know, this is a summary
 9    of some of the things that happened.  By no means is
10    it everything.  And as I told you before, before you
11    even asked this question, that we had more than one
12    conversation, maybe multiple conversations, about
13    this thing the week -- the week that I noted in my
14    interrogatories.
15              And the interrogatory question that you
16    referred to on the week of February 23rd was
17    specific, and so I was trying to answer a specific
18    question.
19         Q    If you'd look up in the prior entry on
20    Defendant's Exhibit 3, February 25, 2004.
21         A    Uh-huh.
22         Q    It says that you were instructed to call
23    all Black Republicans and discourage them from going
24    to Tallahassee.  And you told Mr. Kester you felt
25    uncomfortable doing that.  "He said that the Party
```

142
```
 1    would have an African American Roundtable" and "He
 2    said that the Party wanted to respond to the
 3    negativity in a sophisticated way.  Mr. Kester
 4    suggested to me that he did not believe our Black
 5    Republican Clubs could speak in an intelligent
 6    way."
 7              So Mr. Kester never made the statement
 8    that you've referred to in Defendant's Exhibit No.
 9    5, did he?
10         A    That's false.  Mr. Kester did make those
11    statements, and, you know, my entry here in Exhibit
12    3 summarizes that.  We talk about discouraging them
13    from coming to Tallahassee.  I talk about -- I
14    didn't quote him as I did in the specific question,
15    but this entry on February 25th of 2004 isn't
16    answering a specific question, so I was just
17    summarizing one of the conversations that we had
18    about that.
19         Q    And you were uncomfortable about it
20    because you had already started contacting black
21    Republican clubs to come to Tallahassee for a
22    counter protest to the NAACP, hadn't you?
23         A    No, that's not why I was uncomfortable
24    with it.
25         Q    But you had, in fact, already started
```

146

143

```
 1   calling clubs about coming to Tallahassee, didn't
 2   you?
 3        A     In what context do you mean?
 4        Q     In the context we just discussed, ma'am;
 5   that there was going to be a NAACP march in the
 6   capitol.  You recommended that there be a counter
 7   demonstration by black Republican clubs.  And you
 8   had, in fact, started calling the clubs to have
 9   people come to Tallahassee.  Right?
10        A     That's not accurate.
11        Q     What's wrong with it?
12        A     What I did was I found out which clubs
13   were coming, and I think I communicated that to
14   Kester, which clubs told me that they were planning
15   on coming.  I think that was more along the lines of
16   what happened.
17        Q     It was your recommendation, wasn't it,
18   for a counter demonstration?
19        A     No, it wasn't exactly my recommendation.
20   What happened was some of the clubs told me that
21   they wanted to come, and I remember talking to Vice
22   Chairman Defoor about it, and he said that was a
23   great idea.  And I remember talking to Christina
24   Sheppard about it.  And I think what I recommended
25   was if they're going to come up there anyway is
```

144

```
 1      that, you know, maybe the chairman could talk to
 2      them or maybe we could have some coffee or something
 3      for them while they were there.
 4               And that's sort of how that whole
 5      thing -- my recollection is of how that whole thing
 6      got started.
 7          Q     And the decision was made not to have a
 8      counter demonstration, wasn't it?
 9          A     Terry said that they wanted to respond to
10      it in an intelligent way and at that point told me
11      to let them know not to come up there.  And so at
12      that point I let them know not to come up there.
13               MR. McKENNA:  Go ahead and mark that,
14          please.
15                  (Exhibit 9 marked for identification.)
16      BY MR. McKENNA:
17          Q     I'm going to hand you, ma'am, what we've
18      marked for purposes of identification as Defendant's
19      Exhibit 9.  Do you recognize that document?
20          A     Where is the rest of it?
21          Q     Ma'am, do you recognize Defendant's
22      Exhibit 9?
23          A     This is an e-mail that is not complete.
24      There were other parts to it than this.
25          Q     Do you recognize Defendant's Exhibit 9?
```

145

```
 1          A     Yes, I recognize it; but it's not
 2    complete.  It's part -- it looks like it's the
 3    middle of an e-mail, and you haven't included the
 4    whole thing.  You've just given me one part of a
 5    communication.
 6          Q     And you wrote an e-mail to Christina
 7    Sheppard, copying Andy Palmer, Geoffrey Becker,
 8    Terry Kester and Allison Defoor.  Is that correct?
 9          A     It appears so, yes.
10          Q     It appears so.  And in that you proposed
11    that the "RPOF should take the lead on this,"
12    meaning the counter demonstration, "with a morning
13    reception, press release, and news media."  Correct?
14          A     I think I -- I talked to them about
15    getting coffee, and it is -- and I'm trying to
16    remember the latter part of your question about the
17    press release and the news media.  There was
18    something already happening about -- there was
19    already a press release in place, but I can't be --
20    but I can't exactly remember what it was for.  And
21    then the news media was already going to be there,
22    is my recollection.  Because it was the first day of
23    session.
24          Q     And you proposed that the Republican
25    Party of Florida should take the lead on the counter
```

146

```
 1   demonstration to the NAACP.  Correct?
 2        A     Repeat that question one more time,
 3   please.
 4              MR. McKENNA:  Please read it back.
 5              (The reporter read as requested.)
 6        A     This e-mail references a conference call
 7   that we had.  And Andy was giving out assignments
 8   about points of contention, and that's what the
 9   e-mail starts off with, and that's what I'm
10   referring to as a point of contention.  And this was
11   something that we had talked about during the
12   conference call, and the part of the e-mail that I
13   was telling you about that you didn't include in
14   this was the part where they had sent me telling me
15   about the NAACP march.
16        Q     Did you propose that the Republican Party
17   of Florida take the lead on the counter
18   demonstration to the NAACP?
19        A     In the context of --
20        Q     In the context of your job in this
21   e-mail.  Did you make that proposal or not?
22        A     All I really was proposing was that --
23   was suggesting that if these folks were coming
24   anyway, that we be nice to them and give them coffee
25   and, you know, maybe the chairman spare a little bit
```

147

```
 1   of her time to give to these folks.
 2        Q    And that --
 3        A    If that was -- if that was their
 4   intention to come up there.  I mean, I really didn't
 5   care if they came up there or not.  But I was just
 6   saying, you know, if these folks are going to be
 7   rallying all day, I was just saying that it would be
 8   nice, you know, since I -- I think the press was
 9   already going to be there, you know, just to show
10   these folks some hospitality and give them coffee
11   and maybe the chairman could spare them a few
12   moments of her time.
13        Q    I'm going to ask it one last time.  Did
14   you propose, where it says here "I propose," that
15   the Republican Party of Florida, where it says here
16   "RPOF," should take the lead, where it says here
17   "should take the lead on this" -- "this" being the
18   counter demonstration to the NAACP -- did you
19   propose that?
20        A    Well, that determines what you are saying
21   the meaning of "this" means.  When I'm talking about
22   "this," I'm just -- all I'm saying is be nice to the
23   people when they come up there and give them --
24   you're -- the statement is there.  You're
25   interpreting it one way.  You know, I meant it
```

148

```
 1    another way, and, you know, the RPOF knew what I
 2    meant because we had talked about it on the phone.
 3    The statement as you read it speaks for itself.
 4         Q     So you made a voluntary proposal.  Right?
 5         A     This was something that we talked about
 6    during the conference call, and I reference it right
 7    here "on our last conference call Andy spoke about
 8    identifying points of contention," you know.
 9         Q     And you believed that one point of
10    contention will be on March 2, the first day of the
11    session where the NAACP has scheduled an 11,000
12    person march.  Right?
13         A     We talked about that on a conference
14    call, and it was determined by staff that that was a
15    point of contention.  And I was just refreshing from
16    the conference call.
17         Q     And nobody assigned you to make this
18    proposal.  You did it on your own.  Right?
19         A     No.  Actually, Christina -- I talked to
20    Christina Sheppard about it on the phone, and she
21    said, "Send us an e-mail about it."  And that's why
22    the e-mail is to her and that's why Andy and these
23    other folks are cc'd on it, because she and I had
24    spoken about it on the phone.
25         Q     So you proposed it to Christina Sheppard
```

149

```
 1   before you sent the e-mail?
 2        A    No, that's not how it happened.
 3        Q    Well, then how did it happen?
 4        A    I already told you.
 5        Q    Well, tell me again.
 6        A    I'm getting really tired.  Do you want me
 7   to start over from the beginning how this whole
 8   thing came about with the NAACP march, or where do
 9   you want me to begin, Mr. McKenna?
10        Q    What I want, ma'am, is you to tell me the
11   answer to my question.  That's what I want.  Now, my
12   question is --
13        A    I'm happy to do that.
14        Q    My question is, is then you said that you
15   called Christina Sheppard and she told you to send
16   an e-mail.  Right?
17        A    Yes.
18        Q    And in this e-mail you made a proposal.
19   Right?
20        A    Not exactly.  You are -- you're really --
21        Q    You used the word "proposed," didn't you?
22        A    Hum?  But that's just a word.  And --
23        Q    It's just a word.  It's a proposal?
24        A    But this e-mail does not start off as
25   "Dear Christina, here is my proposal for this."
```

150

```
 1      This e-mail is including a lot of different things,
 2      and you're just taking a word from here and a word
 3      from there and a word from here and you're making it
 4      into something -- because it talks about several
 5      different things.  It talks about a conference call,
 6      it talks about points of contention during the
 7      conference call, it talks about the march, it talks
 8      about the location of people, and --
 9          Q     And it talks about that you propose that
10      the RPF should take the lead on this.  Right?
11          A     I was just talking about having some
12      coffee and having the chairman spare a little bit of
13      her time with these folks if they were already going
14      to be up there.  That's really all I was.  I was
15      just saying that the RPOF, if they were going to
16      come up there anyway, that in anticipation of their
17      visit they could be shown a little bit of
18      hospitality.  And I have to go to the bathroom.
19          Q     As soon as I finish my next question you
20      can go to the bathroom.  And the next sentence after
21      that is:  "I propose we arrange to have press
22      coverage of our FFBR folks (have them interviewed)
23      as they rally all over the Capitol and advocate for
24      our Republican Leadership."  Do you see that, ma'am?
25          A     Yes, I see that.
```

154

151

```
1          Q    So you made a second proposal that we
2     arrange to have press coverage of the Florida
3     Federation of Black Republicans and have them
4     interviewed as they rally all over the Capitol and
5     advocate for the Republican leadership, didn't you?
6          A    If -- what I was speaking to is the fact
7     that I understood that press coverage was already
8     going to be there.
9          Q    So that's why you have to arrange for it,
10    because it's already going to be there?
11         A    The press coverage was going to be at
12    RPOF headquarters, but I didn't know where the FFBR
13    folks would be rallying at.  That's what I was sort
14    of alluding to there.
15         Q    So the purpose -- the proposal clearly
16    was more than just coffee, wasn't it?
17         A    I never said that it was only coffee.
18    You said that.
19              MR. McKENNA:  Okay.  We can take a break
20         now.
21              (Recess from 3:46 to 3:55 p.m.)
22              MR. McKENNA:  Would you mark that,
23         please?
24              (Exhibit 10 marked for identification.)
25    BY MR. McKENNA:
```

152
```
 1        Q    Ma'am, I'm going to hand you what we've
 2   marked for identification purposes as Exhibit No. 10
 3   and ask you if you can identify that document for
 4   me.
 5        A    Yes.
 6        Q    And what is that?
 7        A    It's a document that was prepared by
 8   counsel.
 9        Q    Okay.  Why was it prepared?
10        A    The reason it was prepared is privileged.
11             MR. THOMPSON:  Well, he's actually not
12        asking you your communications with counsel.
13        Just why it was prepared.
14        A    Well, I'd have to divulge communications
15   with counsel to answer the question.
16        Q    Well, not if you hadn't told me that, you
17   wouldn't have.
18             MR. McKENNA:  Are you going to instruct
19        her not to answer?
20             MR. THOMPSON:  Can I very briefly go off
21        the record to talk to her?
22             MR. McKENNA:  Sure.
23             MR. THOMPSON:  I want to find out where
24        she got the information from and how she got
25        it to know whether there is --
```

153

```
 1              (Recess from 3:57 to 4:00 p.m.)
 2              MR. THOMPSON:  I'm going to object based
 3        on attorney-client privilege to the last
 4        question as to what it was prepared for.
 5              MR. McKENNA:  I think I said why, but --
 6              MR. THOMPSON:  Why it was prepared,
 7        okay.  Different way of saying the same
 8        thing.  I've got no problem with you asking
 9        questions about the declaration, but as far as
10        that goes, I'm convinced by discussing it with
11        my client that it is attorney-client
12        privileged.
13              MR. McKENNA:  So you're instructing her
14        not to answer?
15              MR. THOMPSON:  I am instructing her not
16        to answer that particular question.
17              MR. McKENNA:  Okay.
18   BY MR. McKENNA:
19        Q     Was this document, Defendant's Exhibit
20   10, given to anybody?
21        A     Well, apparently it was.  But for the
22   purpose that I am aware that it was done in the
23   first place, it wasn't used for --
24              MR. THOMPSON:  I'm going to ask you not
25        to respond to that portion.
```

157

154

```
 1          A     I don't know how to answer the question
 2    without divulging privilege.
 3          Q     Was it given to anyone?  Was this
 4    document given to anyone?
 5          A     Well, it obviously was, because you got
 6    it.
 7          Q     Okay.  Who was it given to?
 8          A     Well, the top of it says "RNC
 9    Administration."
10          Q     Okay.  Do you know -- do you know, ma'am,
11    who this document was given to?
12          A     I do not know for a fact who this
13    document was given to.
14          Q     Do you have a belief or a suspicion as to
15    whom this document was given to?
16          A     Based -- yes, I have a --
17          Q     And who was it given to?
18          A     Well, it appears from what's at the top
19    -- well, I'm not certain because it says "From:  RNC
20    Administration."  I'm not certain.
21          Q     Okay.  Do you have a suspicion as to who
22    this -- who the -- all the people in the world that
23    this might have been given to?
24          A     Who it might have been given to?
25          Q     Right.
```

158

155

```
 1        A      Well, it was obviously given to you.
 2        Q      Okay.  Do you know anybody or do you have
 3   any suspicion that it was given to anybody else?
 4        A      It was obviously given to RNC because
 5   that's what the top of the fax says.
 6        Q      Anybody else?
 7        A      Other than the maker of the document, I
 8   don't know of anyone else who would have this
 9   document.
10        Q      Okay.  And when you say your attorney,
11   are you referring to Burr & Smith or Mr. Dubose, as
12   far as creating the document?
13        A      I would say the first two pages, Burr &
14   Smith.  The latter page, the third page, Keith
15   Dubose.
16        Q      Okay.  If you would turn back to
17   Defendant's Exhibit 3 for me for a minute.  On page
18   18 --
19        A      Yes, sir.
20        Q      -- it references that same conversation,
21   does it not?
22        A      Yes, sir, it does.
23        Q      And in Defendant's Exhibit 3, what it
24   says is:  "My attorney contacted Mr. Sechens,
25   General Counsel for the Party.  Mr. Sechens calls me
```

156

```
 1    and instructs me that if I do not arrive in
 2    Tallahassee for the meeting on Friday I will lose my
 3    job.  He also says that I am not allowed to conduct
 4    any business on behalf of the Party.  Mr. Sechens
 5    said he was speaking to my attorney at 11:45, but he
 6    did not have to.  Mr. Sechens said I do not have a
 7    right to an attorney."  Do you see that, ma'am?
 8         A    Yes, sir, I do.
 9         Q    Okay.  Now, in Defendant's Exhibit 10 you
10    put in a lot of other statements that you claim
11    Mr. Sechens made, don't you?
12         A    That's not a claim.  That's what
13    Mr. Sechens said.
14         Q    Okay.  For example, in Paragraph 6 you
15    said, "He stated, 'You don't have the right to speak
16    to the EEOC.  If you do that, you will lose your
17    job.'"  Do you see that, ma'am?
18         A    Yes, sir, I do.
19         Q    But you didn't tell that to the EEOC in
20    Defendant's Exhibit 3, did you?
21         A    I did tell that to the EEOC.  I
22    summarized in your Exhibit 3 -- I summarized in
23    Exhibit 3 what happened on that call.
24         Q    And you did not put in that "Mr. Sechens
25    said you don't have the right to speak to the EEOC.
```

157

```
 1    If you do that, you will lose your job."  Those
 2    words are not in Defendant's Exhibit 3.  Right?
 3         A    Those exact words as you have stated them
 4    are not in Exhibit 3.  But I did communicate this
 5    conversation and the contents of this conversation
 6    to the EEOC.
 7         Q    And why would you not put in a document
 8    you were sending to the EEOC a statement that
 9    somebody threatened you with your job if you
10    contacted the EEOC?
11              MR. THOMPSON:  Object to form.
12         A    But I did.  Again, this is a summary.
13    You know, when I -- it's a glimpse into what
14    happened.  It's not every single word of every
15    single thing that happened.  And everything that you
16    regurgitated, I said it here just in a different
17    way.  I just didn't use his exact quotes.
18         Q    So you think that the statement in
19    Defendant's Exhibit 3 is comparable to your
20    declaration in Defendant's Exhibit 10?
21              MR. THOMPSON:  Object to form.
22         A    My statement is, sir, that it is a
23    summary of what happened that day; a summary of some
24    of the events that happened that day.  I'm sorry,
25    that sounded horrible.
```

```
                                        158
1              MR. McKENNA:  Let's go off the record
2      for a minute.
3              (Recess from 4:08 to 4:15 p.m.)
4              MR. McKENNA:  We've had an
5      off-the-record discussion.  We're going to
6      continue the deposition at this point to
7      another day and time to be determined.  And
8      pursuant to the prior stipulation, I will have
9      my remaining time plus some additional amount
10     of time to be agreed upon after the documents
11     are produced.  Is that right?
12             MR. THOMPSON:  And we'll read.  Yeah.
13             MR. McKENNA:  And you'll read.
14             MR. ISLER:  I'll have then my two hours.
15             MR. McKENNA:  On top of that.
16             MR. THOMPSON:  No, I understand.  We
17     already did that.
18             MR. ISLER:  We're good.
19             MR. McKENNA:  Then we're good.
20             (At 4:15 p.m., the deposition was
21     adjourned.)
22
23
24
25
```

TAMPA:202319.1

# EXHIBIT EE

161

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


NADIA NAFFE,

       Plaintiff,

                      CASE NO:
                      8:04-cv-01916-JDW-TGW

vs.

REPUBLICAN PARTY OF FLORIDA,
et al.,

       Defendant.
                    /



VOLUME 2 (pp. 161 - 311)

CONTINUED
VIDEOTAPED
DEPOSITION OF:     NADIA NAFFE

TAKEN BY:          Counsel for Defendant Republican
                    Party of Florida

DATE:              September 14, 2005

TIME:              9:54 a.m.

PLACE:             Ford & Harrison LLP
                    101 East Kennedy Boulevard
                    Suite 900
                    Tampa, Florida

REPORTED BY:      Natalie W. Breaux, RPR, CRR
                    Notary Public
                    State of Florida at Large



RICHARD LEE REPORTING
(813) 229-1588
TAMPA:       email: rlr@richardleereporting.com   ST. PETERSBURG:
100 North Tampa Street, Suite 2060       535 Central Avenue
Tampa, Florida  33602       St. Petersburg, Florida  33701

162

APPEARANCES:

    JAMES MOTEN THOMPSON, ESQUIRE
    Nelson Bisconti & Thompson, LLC
    718 West Dr. Martin Luther King Jr. Boulevard
    Suite 200
    Tampa, Florida 33603-3104
        Appeared for Plaintiff;

    EDMUND J. McKENNA, ESQUIRE
    Ford & Harrison LLP
    101 East Kennedy Boulevard
    Suite 900
    Tampa, Florida 33602-5133
      - and -
    CHRISTINA M. SHEPPARD, ESQUIRE
    420 East Jefferson Street
    Tallahassee, Florida 32301
        Appeared for Defendant Republican Party of
        Florida;

    EDWARD LEE ISLER, ESQUIRE
    Ray & Isler, P.C.
    1919 Gallows Road
    Suite 320
    Tysons Corner
    Vienna, Virginia 22182
        Appeared for Republican National Committee
        and Bush/Cheney '04.

ALSO PRESENT:

    Mel Byrd, Videographer
    Michael Byrd, Videographer

I N D E X

                                PAGE

Examination by Mr. McKenna           165

163

                    EXHIBITS
NO.                DESCRIPTION                    PAGE

11   Bill Heard Chevrolet Employee counseling
     Statement                                    212

12   11/20/04 Bill Heard Chevrolet Employee
     Counseling Statement                         213

13   11/6/04 Bill Heard Chevrolet Employee
     Counseling Statement                         214

14   10/29/04 Bill Heard Chevrolet Employee
     Counseling Statement                         215

15   11/23/04 Bill Heard Chevrolet Employee
     Counseling Statement                         216

16   1/22/05 Bill Heard Chevrolet Employee
     Counseling Statement                         216

17   11/1/04 Bill Heard Chevrolet Employee
     Counseling Statement                         217

18   8/20/05 letter to Nadia from Marjorie
     Kincaid                                       236

19   8/25/05 letter from Marjorie Kincaid         243

20   Letter with envelope to Margie Kincaid
     from Nadia Naffe                              246

21   Nadia K. Naffe resume                        248

164

```
 1          The continued videotaped deposition, upon
 2    oral examination, of NADIA NAFFE, taken on the 14th
 3    day of September, 2005, taken by Counsel for
 4    Defendant Republican Party of Florida, at the
 5    offices of Ford & Harrison LLP, 101 East Kennedy
 6    Boulevard, Suite 900, Tampa, Florida, beginning at
 7    9:54 a.m., reported by Natalie W. Breaux, Registered
 8    Professional Reporter, Certified Realtime Reporter,
 9    and Notary Public in and for the State of Florida at
10    Large.
11                      * * * * * *
12          THE VIDEOGRAPHER:  We are on the record
13          at 9:54 a.m. September 14th of 2005.  This is
14          the continuation of the deposition of
15          Ms. Naffe.  Would you swear the witness,
16          please.
17               MR. McKENNA:  Do we have to if it's a
18          continuation?
19               THE REPORTER:  I don't think so, unless
20          anyone wants her sworn in.
21               MR. McKENNA:  Oh, sure, swear her in
22          again.
23                    NADIA NAFFE,
24    being again duly sworn to testify to the truth, the
25    whole truth and nothing but the truth, was examined
```

165

```
 1    and testified as follows:
 2                      EXAMINATION
 3    BY MR. McKENNA:
 4         Q     Ms. Naffe, do you recall the discussion
 5    we had at the beginning of your prior deposition
 6    about the format of depositions?
 7         A     I vaguely remember it.
 8         Q     Do you recall that you have to do verbal
 9    responses?
10         A     Well, why don't you repeat everything
11    again.
12         Q     Repeat everything again, sure.  This
13    deposition is being taken pursuant to notice under
14    the Federal Rules of Civil Procedure.  It will be
15    used for discovery, cross examination and other
16    purposes permitted by law.  Do you understand that,
17    ma'am?
18         A     Could you talk a little slower, please?
19         Q     Do you understand that, ma'am?
20         A     Well, I'd like you to repeat it just a
21    little bit slower.  You're going too fast.
22               MR. McKENNA:  Would you read back the
23         question, please?
24               (The reporter read as requested.)
25         A     Yes, I understand that.
```

166

```
1              MR. McKENNA:  Counsel, I'd request a
2         stipulation we reserve all objections except
3         to form of the question and responsiveness of
4         the answer until trial or later proceeding.
5              MR. THOMPSON:  That's fine.
6    BY MR. McKENNA:
7         Q    Ma'am, do you understand the format of a
8    deposition?
9         A    Yes, I guess.
10        Q    I ask questions and you answer them.  Do
11   you understand that?
12        A    Yes.
13        Q    You don't ask questions and I don't
14   answer questions.  Do you understand that?
15        A    Well, if I have a question about your
16   question you will have to answer a question.
17        Q    No, I won't.  But anyway, you ask -- I
18   ask and you answer is the way a deposition works.
19   Now, it's important for us only to talk at one
20   time.  The court reporter can only take down what we
21   say if we speak one at a time.  Do you understand
22   that, ma'am?
23        A    I understand we're going to speak one at
24   a time.
25        Q    Now, if you do not understand the
```

167

```
1    question, you may ask me to rephrase that question.
2    Otherwise I will assume you understood the question
3    and your answer is responsive.  Do you understand
4    that?
5          A     Yes.
6          Q     And you understand it's important to have
7    verbal responses; that nodding, shrugging of
8    shoulders, uh-huh's and uh-uh's do not transfer well
9    to the written transcript?
10         A     Yes.
11         Q     And you understand the testimony is given
12   under oath?
13         A     Yes.
14         Q     And even though we're in an informal
15   setting sitting around a conference table, the same
16   penalties for perjury or lying apply here as in a
17   court of law.  Do you understand that, ma'am?
18         A     Yes.
19         Q     You understand that your attorney has --
20   may make an objection at some point today for the
21   record but that that does not mean you do not have
22   to answer the question.  The only time you may not
23   answer a question is if your attorney instructs you
24   specifically do not answer that question.  Do you
25   understand that, ma'am?
```

168

```
 1        A     Can you repeat that again?
 2              MR. McKENNA:  Would you read it back,
 3     please?
 4              (The reporter read as requested.)
 5        A     Yes.
 6        Q     And you have the right to explain your
 7     answer, but I have the right to an answer to a
 8     question that I ask.  Therefore, if I ask you a
 9     yes-or-no question, you should answer the question
10     yes or no and then make any further explanation that
11     you feel is necessary.  Do you understand that,
12     ma'am?
13        A     I will if I can.
14        Q     Do you understand, ma'am, if I ask you a
15     question that has a yes-or-no answer, you are to
16     answer the question yes or no and then add any
17     explanation that you choose?  Do you understand
18     that?
19        A     Yes.  And I will if I can.
20        Q     Is there any reason why you cannot answer
21     the questions I'm going to ask you today truthfully,
22     accurately and completely?
23        A     No reason.
24        Q     Are you on any medication that would
25     affect your ability to testify?
```

169

```
1        A      Maybe.
2        Q      What medication is that?
3        A      The same medications as last time.
4        Q      Which are?
5        A      Prozac and Ambien.
6        Q      And why do you believe that Prozac would
7   affect your ability to testify?
8        A      I can't make that determination.  I'm not
9   a doctor.
10       Q      Do you have any reason to believe that
11  the Prozac would affect your ability to testify here
12  today?
13       A      I don't know.
14       Q      Do you have any reason to believe that
15  the Ambien would have any effect upon your ability
16  to testify here today?
17       A      I don't know.
18       Q      What did you do to prepare for your
19  deposition today?
20       A      Nothing, really.
21       Q      Did you review any documents?
22       A      I looked at the complaint.
23       Q      Anything else?
24       A      As far as what I looked at?
25       Q      Yes, ma'am.
```

170

```
 1         A     I read my bible.
 2         Q     Anything else?
 3         A     No, Mr. McKenna.
 4         Q     Other than the claims that we're here on
 5    today, have you ever made a claim of discrimination,
 6    harassment or anything similar, against another
 7    employer?
 8         A     No.
 9               MR. McKENNA:  Let's go off the record
10         for a minute.
11               (Recess from 10:00 to 10:14 a.m.)
12    BY MR. McKENNA:
13         Q     Pursuant to the discussion that counsel
14    had off the record, I'm going to ask you again,
15    ma'am:  Do you have any reason to believe that
16    Prozac will affect your ability to testify
17    completely, accurately and truthfully?
18         A     Is that the same question that you asked
19    me last time?  Well, I don't have the question in
20    front of me.
21               MR. THOMPSON:  Just go ahead and answer.
22         Q     That's the question, ma'am.  Are you
23    going to answer it?
24         A     Is that the question you asked me last
25    time?
```

173

171

```
 1        Q      Are you refusing to answer the question,
 2   ma'am?
 3        A      No, I am not refusing to answer the
 4   question.
 5               MR. THOMPSON:  Just --
 6        A      Could you repeat the question?
 7               MR. McKENNA:  Please read back the
 8   question.
 9               (The reporter read as requested.)
10        A      I don't think so, but I'm not a doctor.
11               MR. ISLER:  I want to note -- can I
12   ask --
13               MR. McKENNA:  Sure.
14               MR. ISLER:  I want to note, while we're
15   on the record, that this question was
16   essentially the same question that was asked
17   last time.  In the first day of the
18   deposition --
19               THE WITNESS:  It is not exactly the
20   question.
21               MR. ISLER:  You will not interrupt me
22   again.  In the first day of the deposition the
23   deponent was asked the question:  "Are you
24   taking any medication that might affect your
25   testimony today?"
```

174

172

```
1              Answer:  "I don't think my medicine
2         affects my testimony."
3              Are you testifying in a different manner
4         today?
5              THE WITNESS:  No.  I completely agree
6         with my former statement.
7              MR. ISLER:  So you don't think that your
8         medicine affects your testimony.  Is that
9         correct?
10             THE WITNESS:  That's my opinion, yes.
11             MR. ISLER:  Okay.
12    BY MR. McKENNA:
13        Q      What's your date of birth?
14        A      It's ████████████████
15        Q
16        A      ███████████████.
17        Q      Curre
18        A      It's ██████████████████
19        Q      Where is that located?
20        A      It's in Lutz, Florida.
21        Q      And how long have you resided at the ████
22    ██████████████████
23        A      For two months.
24        Q      And do you own or rent?
25        A      I rent.
```

175

173

```
1      Q      Is there an apartment number?
2             ███████ .  I'm sorry.  ███████████
3      ████████████
4      Q      Does anyone live with you at that
5  residence?
6      A      Yes.  I have three roommates.
7      Q      What are their names?
8      A      Brandy -- they go by nicknames --
9  Duchess and Treesha.
10     Q      What's Brandy's last name?
11     A      Jones.
12     Q      What's Duchess' last name?
13     A      I don't know her last name.  And Dutchess
14  is a nickname.  Sherry is her first name.  She goes
15  by Duchess.
16     Q      And what's Treesha's last name?
17     A      I don't know.
18     Q      Do you share expenses?
19     A      No, we do not.
20     Q      Who pays for the apartment?
21     A      I do.
22     Q      By yourself?
23     A      Yes.  Let me clarify that.  Each one of
24  our suites is an individual lease, so I have my own
25  lease and they have their own lease.  It's like a
```

176

174

```
 1    college dorm type arrangement.
 2         Q     How much do you pay in rent?
 3         A     $449 a month.
 4         Q     Does anyone assist you in paying that
 5    rent?
 6         A     Yes.
 7         Q     Who?
 8         A     My mother.
 9         Q     How much does your mother pay?
10         A     It's not really a set amount.  Different
11    amounts.
12         Q     Approximately?
13         A     Last month she paid all of it.  I never
14    really added it up.
15         Q     What about this month?
16         A     Well, last month's rent is this month.
17         Q     What about the previous month's rent?
18         A     Previous month's rent?  I paid it.
19         Q     You paid all of it?
20         A     Yes.
21         Q     Prior to the
```



```
24         Q     Tampa?
25         A     Yes, sir.
```

175

```
 1      Q      And did you own or rent?
 2      A      Neither.
 3      Q      Well, what did you do?
 4      A      I lived with a friend.
 5      Q      Who was that?
 6      A      Margie Kincaid.
 7      Q      Why did you move?
 8      A      For personal reasons.
 9      Q      Why did you move?
10      A      Personal reasons.
11      Q      What are the personal reasons?
12      A      Well, there are several.  One reason was
13   there were several people who had keys to the house,
14   and I felt uncomfortable with that.  But there
15   wasn't anything I could do about it because it
16   wasn't my house.  And I thought that Margie needed
17   to have a nurse or someone who was skilled at taking
18   care of an elderly person be with her and not me.
19      Q      Any other --
20      A      Because she --
21      Q      I'm sorry, go ahead.
22      A      She had some specific needs.
23      Q      Any other reasons?
24      A      The main reason was that there were
25   people who had keys to the house, and I didn't like
```

176

```
1    that.  I didn't like the fact that, you know, there
2    were men who could just come into the house at any
3    given time.  And that really bothered me.
4                      ther reasons why you left the ████
5    ████████████  address?
6        A    No.  That was the main reason.
7             MR. McKENNA:  Move to strike as
8    nonresponsive.
9    BY MR. McKENNA:
10       Q    Are there any other reasons besides the
11   fact that several people had keys to the house and
12   that you believe that Margie needed a nurse, as she
13   was an elderly person?
14       A    None come to me right now.
15       Q    Is there anything you could look at that
16   could help refresh your recollection as to why you
17   left the ███████████████████████
18       A    Not to my knowledge.
19       O    Who did you reside with at the ████████
20██  ███████████████
21       A    Margie.
22       Q    Anyone else?
23       A    Well, there was a dog.  But other than
24   that, just the two of us and the dog.  We were the
25   only ones who lived in the house.
```

177

```
1       Q     And you paid no rent?
2       A     No, I did not.
3       Q     Did you perform any services for your
4   privilege of living there?
5       A     Well, yes, I did.
6       Q     What did you do?
7       A     I made sure that the house was clean; I
8   walked her dog for her; I ran errands for her and
9   kept her company.
10      Q     In addition to your ability to live
11  there, were you paid anything else for these
12  services?
13      A     No, I wasn't paid anything for those
14  services.  But shortly after I began living there I
15  started doing part-time work at her brickyard for a
16  period of time.
                        did you reside at the ████████

19      A     Several months.
20      Q     How many months?
21      A     I would say from January or December
22  until July.
23      Q     Of 2005?
24      A     Yes, July of 2005.
25      Q     January and December of 2005?
```

180

178

```
 1        A     Not January and December of 2005.  It
 2   would have been either December '04 or January '05
 3   that I moved in, and I moved out around July '05.
 4                              id you live prior to the
 5
 6        A     I lived at
 7
 8        Q                          rry, go ahead.
 9        A                          Tampa, Florida.
10        Q     And did you rent?
11        A     Yes.
12        O     Did anyone else reside with you at the
13
14        A     No.
15        Q     How long did you live there?
16        A     I lived there two or more years.  While I
17   was living there I lived at another apartment in
18   that complex.
19        Q     Well, let's stick with the
20        .  How long did you live in that apartment?
21        A     Over a year.
22        Q     So from approximately December of '03 to
23   December of '04?
24        A     That sounds right.  But I'm not -- I
25   mean, within those time frames.
```



```
                                  179
1        Q      What apartment did you live in prior to
2   that?
3        A      I think it was ████
4        Q      Did anyone reside with you at that
5   apartment?
6        A      No.
7        Q      And how long were you in that apartment?
8        A      I was in that ____tment for several
9   months before I moved to ████
10       Q      How many months?
11       A      I don't know exactly how many months.
12       Q      More than six?
13       A      Yes, I think so.
14       Q      More than 12?
15       A      I don't know.
16       Q      Less than 12?
17       A      Maybe it was less than 12 and more than
18  six.
19       Q      And what did you pay for rent in
20  ████████████
21       A      $669 a month.
22       Q      And how much did you pay in ████████
23  ████
24       A      $599 a month.
25       Q      And why did you leave ████████████
```

182

180

```
 1        A      I'm sorry.  Repeat that one more time.
 2        Q      Why did you leave ███████████
 3        A      My lease was up.
 4        Q      Any other reason?  Are you going to
 5   answer the question?
 6        A      You're interrupting me.  You haven't
 7   given me a chance to answer.  Can you repeat the
 8   question, please?  You broke my chain of thought.
 9               MR. McKENNA:  Please read back the
10        question.
11               (The reporter read as requested.)
12        A      I'm sure there were other reasons, but
13   the main one was my lease was up.
14        Q      Are you finished with your answer?
15        A      Yes.
16        Q      What were the other reasons that you
17   left?
18        A      As I sit here I can't think of any,
19   Mr. McKenna.
20        Q      Is there anything you can look at that
21   could help refresh your recollection?
22        A      Maybe.
23        Q      What?
24        A      I don't know.  I mean, I'll think about
25   it and get back with you.  I can't think of anything
```

183

181

```
 1   right now as I sit here to be more specific.  But I
 2   remember my lease was up.
 3        Q     Are you finished with your answer?
 4        A     Yes, sir.
 5        Q     Why did you leave ████████████
 6        A     I had a Peeping Tom problem.
 7        Q     What sort of a Peeping Tom problem?
 8        A     I would get off from work late at night,
 9   and there was someone who would come to my window
10   and perform obscene acts.  I was in a ground-floor
11   apartment, and there didn't seem to be anything that
12   the apartment complex could do about this problem,
13   so they moved me to a second-floor apartment.
14        Q     Did you make a police report?
15        A     Yes.
16        Q     Did you know the individual who was
17   making the obscene incidents?
18        A     No, I didn't.  The cops thought that he
19   was either someone who lived nearby me or lived in
20   the adjacent apartment community.  They never could
21   catch him.
22        Q     Any other reason why you left ████████
23   ████
24        A     That was the reason.
25        Q     The only reason?
```

182

```
1      A     Yes, Mr. McKenna.
2      Q     Are you currently married?
3      A     No.
4      Q     Have you ever been married?
5      A     Yes.
6      Q     From when to when?
7      A     I was married from 1996 until 2000.
8      Q     And to whom were you married?
9      A     Gerald Naffe.
10     Q     Do you know where Mr. Naffe is today?
11     A     No.  I've been trying to find him.
12     Q     Where were you married?
13     A     In Pensacola.
14     Q     Where did he last live that you know of?
15     A     In the New Orleans/Gulfport, Mississippi
16  area.
17     Q     When was the last time you had contact
18  with him?
19     A     Last year.
20     Q     When last year?
21     A     I don't remember what month it was.
22     Q     Beginning of the year or the end of the
23  year?
24     A     I don't remember.
25     Q     You have no idea when during the last
```

185

183

```
1    year you last spoke to Mr. Naffe?
2         A      No.  It was a very short conversation.
3         Q      Where were you divorced?
4         A      Here in Tampa.
5         Q      Do either of you pay alimony?
6         A      I'm sorry.  Repeat that.
7         Q      Do either of you pay alimony?
8         A      Do we pay alimony?
9         Q      Yes.
10        A      No.
11        Q      Were either of you ordered to pay
12   alimony?
13        A      No.
14        Q      Were either of you ordered to pay child
15   support?
16        A      No.
17        Q      What did Mr. Naffe do?
18        A      At --
19        Q      What was his job?
20        A      At the time that we divorced he had
21   started back to school.
22        Q      Had he been employed while you knew him?
23        A      Yes.
24        Q      What was his employment?
25        A      He was a stockbroker.  He sold
```

186

184

```
1    investments.
2         Q     What company?
3         A     I know he worked for the New England
4    Securities.  He worked for, I want to say,
5    Travelers.  And he had been in other types of sales.
6         Q     Do you have any children?
7         A     No, I do not.
8         Q     Any other prior spouses?
9         A     Define spouse.
10        Q     Someone to whom you were married.
11        A     No.
12        Q     Any other individual with whom you
13   resided as husband and wife?
14        A     Yes.
15        Q     Who?
16        A     Robert Stottlemyer.
17        Q     Anyone else?
18        A     No.
19        Q     And from when to when did you reside with
20   Mr. Stottlemyer?
21        A     I want to say 2002 till -- we moved in
22   together, it was either in 2001 or 2002.
23        Q     Until?
24        A     Until 2003.
25        Q     Where did you --
```

185

```
 1        A      Wait.  I don't know if that's right.
 2    Yeah, it had to be 2003.
 3        Q      Where did you reside?
 4        A      ██████████████████████
 5        Q      Where is that located
 6        A      That's off -- that's  ██████████████████
 7    ████████████████
 8        Q      Tampa?
 9        A      Yes, sir.
10        Q      Is that a house or an apartment?
11        A      It's a house.
12        Q      Did you own or rent?
13        A      Neither.
14        Q      It was Mr. Stottlemyer's house?
15        A      Yes.
16        Q      Was he owning or renting?
17        A      He owned.
18        Q      Anyone else that you resided with as
19    husband and wife?
20        A      No.
21        Q      Did you graduate from high school?
22        A      Yes.
23        Q      Where?
24        A      PJC High School.
25        Q      What does PJC stand for?
```

186

```
 1         A     Pensacola Junior College.
 2         Q     That's a high school?
 3         A     They have a high school, yes.  It's
 4  like --
 5         Q     Sorry.  Go ahead.
 6         A     No, I'm done.
 7         Q     When did you graduate from Pensacola
 8  Junior College with a high school degree?
 9         A     In 1996.  Wait.  Yes, I think that's when
10  it was, 1996.
11         Q     Did you go straight through a four-year
12  program?
13         A     Sort of -- no.
14         Q     What did you do?
15         A     Well, I went to high school for a couple
16  of years and then I got into an accelerated
17  graduation program at PJC because I wanted to
18  graduate early.
19         Q     Did you attend another high school
20  besides Pensacola Junior College?
21         A     Yes.
22         Q     What school was that?
23         A     I think I went to Woodham or Washington
24  High Schools.
25         Q     You went to both?
```

187

```
 1        A    I -- no, I went to one of them.  I just
 2   can't remember which one.
 3        Q    Are they in Pensacola?
 4        A    Yes, sir.
 5        Q    Did your high school degree have any sort
 6   of concentration?
 7        A    No.  Just a regular high school diploma.
 8        Q    Do you have any post high school
 9   education?
10        A    Yes.
11        Q    What is that?
12        A    The University of Tampa, bachelor of
13   science in business.
14        Q    And from when to when did you attend
15   University of Tampa?
16        A    From late 1999 until 2002.  Oh, I'm --
17   hold on.  Let me back up for a minute.  I attended
18   other schools.  I attended the University of West
19   Florida and I attended PJC, Pensacola Junior
20   College.
21        Q    When did you attend University of West
22   Florida?
23        A    In 1998, 1999, I think; in that time
24   period.
25        Q    And do you have any sort of degree or
```

188

```
 1   certificate from University of West Florida?
 2        A     Not a certificate or a degree, no.
 3        Q     Do you have anything else?
 4        A     I have credits that transferred to the
 5   University of Tampa from them.
 6        Q     How many credits?
 7        A     I don't remember.
 8        Q     Were you a freshmen, sophomore, junior?
 9        A     At which school?
10        Q     University of West Florida.
11        A     I was a freshmen or a sophomore, I
12   suppose.  Probably a freshmen.
13        Q     And you transferred from University of
14   West Florida to University of Tampa?
15        A     Yes, sir, that's correct.
16        Q     So you attended Pensacola Junior College
17   prior to attending University of West Florida?
18        A     Yes, sir.
19        Q     How long did you attend Pensacola Junior
20   College as a collegian?
21        A     About a year.
22        Q     What year was that?
23        A     It was immediately after I graduated from
24   high school.  I remember I was off two weeks and
25   then I started college there.
```

191

189

```
1        Q      So you spent a year -- so you graduated
2    with your high school degree, you spent a year at
3    Pensacola Junior College and then you spent
4    approximately a year at University of West Florida.
5    Is that correct?
6        A      I think it was a year at University of
7    West Florida.  I'm not exactly sure about the dates.
8        Q      And then you transferred to University of
9    Tampa?
10       A      Yes.
11       Q      Was that immediate, or was there any sort
12   of gap in there?
13       A      There wasn't any gap.
14       Q      Why did you transfer to University of
15   Tampa?
16       A      Mostly because of my spouse.
17       Q      Why?
18       A      Can you be more specific in your
19   question?
20       Q      Why did your spouse have you transfer to
21   University of Tampa?
22       A      Because he was transferring there.
23       Q      He was transferring for work?
24       A      He was transferring for school.
25       Q      Was your spouse attending any of the
```

190

```
1    other colleges with you?
2         A    Yes.  He attended all of the other
3    colleges with me.
4         Q    And did he make the decision to go to
5    University of Tampa?
6         A    Yes, he was primarily the reason why we
7    moved.
8         Q    What was his major?
9         A    Finance.
10        Q    Any other post high school education?
11        A    Post high school education?  Oh, I did
12   take a semester course at HCC one summer.  It was a
13   course that I couldn't get at UT --
14        Q    Okay.
15        A    -- during the summer, and I took it at
16   HCC.
17        Q    Hillsborough Community College?
18        A    Yes, sir.
19        Q    Any other post secondary education?
20        A    No, sir, not that I can think of.
21        Q    Is there anything you could look at that
22   would refresh your recollection?
23        A    Not that I can think of.  I think that
24   pretty much sums it up.
25        Q    Were you ever in the military?
```

191
```
 1        A    No, sir.
 2        Q    After high school what was your first
 3   employment?
 4        A    Oh, gosh.  I have no clue.  I don't
 5   know.  I can't remember.
 6        Q    What's the first employment after high
 7   school that you can remember?
 8        A    First employment after high school.  Oh.
 9   I had a job at a resort on Pensacola Beach.
10        Q    What was the name of the resort
11        A    Clarion Suites Resort.
12        Q    In Pensacola?
13        A    It's in Pensacola Beach.
14        Q    What did you do there?
15        A    Hotel sales and reservations.
16        Q    How long did you do that job?
17        A    About a year I guess.
18        Q    Was that while you were in college?
19        A    Yes.
20        Q    Was it a part-time position?
21        A    No.  It was full time.  I worked full
22   time and I went to school full time.
23        Q    Who was your immediate supervisor?
24        A    I don't remember her name.
25        Q    Where was the Clarion Suites located?  On
```

192

```
 1    what street?
 2         A     It's on Twig -- Via de Luna, Pensacola
 3    Beach.
 4         Q     Why did you leave that job?
 5         A     Hurricane.
 6         Q     How did the hurricane cause you to leave
 7    the job?
 8         A     I guess it was the flooding.  I guess
 9    they couldn't -- they couldn't -- they had no need
10    for reservation staff because of damage to the
11    suites.  The place doesn't even exist anymore.
12         Q     So you were let go?
13         A     No.  Actually, I quit.
14         Q     Why did you quit?
15         A     To pursue looking for another job.
16         Q     I'm sorry?
17         A     I quit because there was this hurricane
18    and I needed to pursue looking for another job.
19         Q     So they would have continued to employ
20    you?
21         A     Possibly, but not in the manner that I
22    had been employed before.  Not in a full-time
23    capacity.  And I needed to work full time.
24         Q     How long were you employed?
25         A     About a year.
```

195

193

```
 1       Q     From when to when?
 2       A     Oh, I don't know.  It was around -- it
 3  was around the time I was going to school at PJC.
 4       Q     What was your initial rate of pay?
 5       A     I don't remember.
 6       Q     Did you have any disciplinary issues
 7  while you were at Clarion Suites?
 8       A     No.
 9       Q     Any evaluations?
10       A     I remember getting an evaluation because
11  I got a raise with the evaluation.
12       Q     Any promotions?
13       A     No.
14       Q     Were you asked to resign?
15       A     No.
16       Q     What's the next employment you can recall
17  after the Clarion Suites?
18       A     The next employment that I recall after
19  Clarion is working for the dean at UT.
20       Q     When was that?
21       A     It was February of 2000 until the
22  semester before I graduated.  It was until 2002.
23       Q     When in 2002?
24       A     It was the semester before I graduated.
25  I graduated in the fall, so I guess in the summer.
```

194

1       Q     And what dean?
2       A     I did work for all the deans.
3  Dr. Corrine Young, Dr. Joe McCann, Dr. Bill Ray,
4  Dr. Mary Ann Watson.  And I also worked with the
5  director of marketing, Carol Delia.
6       Q     Anyone else?
7       A     Not that I can think of.  I think that
8  sums it up.
9       Q     What did you do for these deans?
10      A     I did administrative projects, I did
11  research.  Whatever they -- we had a lot of
12  different programs, educational programs.  I did
13  research, I helped at functions.
14      Q     What sort of administrative projects did
15  you do?
16      A     I designed marketing collateral for the
17  MBA programs, introduction.  I --
18      Q     Are you finished with your answer?
19      A     No.  Can you repeat the question again?
20      Q     Sure.
21            MR. McKENNA:  Read the question back,
22  please.
23            (The reporter read as requested.)
24      A     Surveys and research.
25      Q     Are you finished with your answer?

197

195

```
 1         A     Yes, sir.
 2         Q     What are marketing -- what marketing --
 3    what is marketing collateral?
 4         A     Marketing collateral is like that handout
 5    that you have with half your face on it and it talks
 6    about you're a state board mediator and all those
 7    different legal qualifications.  I did that type of
 8    collateral for the college of business.
 9         Q     And what kind of introduction did you do?
10         A     Introduction to what, sir?
11         Q     I don't know, ma'am.  You answered the
12    question.  You said you did some sort of
13    introduction.
14         A     Oh.  We introduced a new MBA program when
15    the college opened, the John Sykes College of
16    Business.  I was involved in assisting with the
17    marketing for that project.
18         Q     What sort of surveys did you perform?
19         A     The dean did a survey of automotive
20    dealers in the -- it was -- it was about -- it was a
21    sales customer service type survey.  The dean was
22    doing research among automotive dealers in the Tampa
23    Bay area.  And I compiled the research for him
24    and --
25         Q     Which dean?
```

196

```
1          A      Dean Ray.
2          Q      What kind of research did you do?
3          A      We did -- I did research for Dean Ray for
4     the automotive survey.  I did research for Dean
5     McCann on baby boomers and their effect -- their
6     effects on the economy for his book.  And I did some
7     other types of research that I can't remember by
8     name right now.
9          Q      What were your -- what were you paid?
10         A      The position was in conjunction with a
11    work study scholarship type arrangement.
12         Q      Meaning it was unpaid?
13         A      No, I got paid, but there was other
14    compensation that I can't add up for you.  That's
15    what I'm getting at.
16         Q      How much money were you paid?
17         A      Somewhere between seven and nine dollars
18    an hour.  I don't remember exactly which -- where.
19         Q      Did you receive any discipline while you
20    were employed at UT?
21         A      No, never.
22         Q      Did you receive any evaluations while you
23    were employed at UT?
24         A      Yes.  Carol evaluated me.
25         Q      Carol who?
```

197

```
 1        A     Carol Delia.
 2        Q     A formal written evaluation?
 3        A     No.  She just sat me down and told me I
 4   was doing a good job.  And the next semester Dean
 5   McCann gave me a raise.
 6        Q     Did you receive any promotions?
 7        A     It wasn't that type of job.  I was just a
 8   student assistant.
 9        Q     So the answer is no, you did not receive
10   any promotions?
11        A     No, sir.
12        Q     Did you leave voluntarily?
13        A     Yes, sir.  My internship was up.  I was
14   graduating.
15        Q     What's the next position that you can
16   recall?
17        A     While I worked at -- while I worked for
18   the dean I also had a job at Tommy Bahama.
19        Q     Where was that located?
20        A     In Hyde Park.
21        Q     Is that on Rome?
22        A     It's near Rome.  You know, I think you're
23   right.  I think it is on Rome.
24        Q     Who was your immediate supervisor?
25        A     Sheila Carlisle.
```

198

```
 1        Q      How much did you make at Tommy Bahama?
 2        A      I don't remember exactly.  I don't want
 3   to guess.
 4        Q      Approximately how much did you make?
 5        A      I don't want to put inaccurate statements
 6   on the record.  I don't want to -- I don't know.
 7        Q      You have --
 8        A      I think I know, but I'm not sure if I'm
 9   thinking of my job at the dean's office.
10        Q      Tell us what you think you made.
11        A      That's guessing.
12        Q      Are you refusing to answer the question,
13   ma'am?
14        A      No, sir.  My answer is I don't know.
15        Q      Well, you just said that you thought you
16   knew.  Now I'm asking you to tell us what you think,
17   recognizing that it may not be completely accurate.
18   What do you think?
19        A      I think it was nine or ten dollars an
20   hour.
21        Q      How long were you employed there?
22        A      Between a year and a half and two years.
23        Q      And from what date to what date?
24        A      I want to say the summer of 2000, I
25   think.
```

                                                    199
```
 1        Q       Until when?
 2        A       2001 or 2002.
 3        Q       Do you know when in 2001 or 2002?
 4        A       No, sir.
 5        Q       Was it towards the January-December time
 6   frame?
 7        A       I'm not certain, but I'm sure you could
 8   ask Tommy Bahama, and they would know.
 9        Q       What were your duties?
10        A       I was a sales associate.
11        Q       Did you receive any promotions?
12        A       No.
13        Q       Did you have any disciplinary issues?
14        A       No.
15        Q       Did you receive any evaluations?
16        A       I did receive an evaluation.
17        Q       What kind of evaluation?
18        A       What do you mean, "what kind of
19   evaluation"?
20        Q       Verbal or written.
21        A       Well, it was certainly verbal.  Now,
22   whether or not it was written, I don't recall.
23        Q       Why did you leave that job?
24        A       I left the job because after 9/11 my
25   hours got cut and I needed to get more hours.
```

```
                                    200
1          Q      Were you asked to quit -- were you asked
2     to resign?
3          A      No.
4          Q      Did you leave voluntarily?
5          A      I resign -- I resigned.
6          Q      Did you leave voluntarily?
7          A      Yes.
8          Q      What's the next position that you recall
9     after Tommy Bahama?
10         A      I know I worked somewhere else.  I'm just
11    drawing a blank as to where it was.
12         Q      What's the next position you remember
13    after Tommy Bahama?
14         A      Steak & Shake.
15         Q      When did you work there?
16         A      It was 2002 to 2003.
17         Q      When in 2002?
18         A      I started working there in December.
19         Q      When in 2003?
20         A      December of 2003.  That's what I meant.
21    December -- I started December 2003.
22         Q      You started December 2003?
23         A      No, no, no, no, no.  I started December
24    2002.
25         Q      And when did you leave?
```

203

201

```
 1        A     Around August of 2003.  And before you
 2    ask your next question, I need to go to the lady's
 3    room.
 4               MR. McKENNA:  Let's go off the record.
 5               (Recess from 11:03 to 11:11 a.m.)
 6    BY MR. McKENNA:
 7        Q     Where was the Steak & Shake that you
 8    worked located?
 9        A     I worked at several Steak & Shakes.
10    Which do you want me to give you?
11        Q     Give me all of them, please.
12        A     Okay.  My training store was in Spring
13    Hill off of U.S. 19, and the other training store
14    that I worked at was the Steak & Shake across from
15    Countryside Mall.
16        Q     What street is that on?
17        A     I have no idea.  It's the one side --
18    it's near -- it's off U.S. 19, but it's right across
19    the street from the Countryside Mall.  And behind
20    there is the training center that I had my classes
21    at.  Excuse me.
22        Q     Any other stores that you worked at?
23        A     Yes.  I worked at the one on North Dale
24    Mabry.  I worked at the one on -- the one by Citrus
25    Park Mall.
```

202

```
1      Q      Any others?
2      A      No, not that I can think of.
3      Q      Who was your immediate supervisor?
4      A      Mark Tolle.
5      Q      T-o-l-l?
6      A      E.  T-o-l-l-e, sir.
7      Q      What was his title?
8      A      He was my district manager.
9      Q      What was your initial rate of pay?
10     A      $34,000.
11     Q      Per year?
12     A      Yes, sir.
13     Q      Did you receive any promotions?
14     A      Yes, sir, I received a promotion.
15     Q      What was that?
16     A      I was promoted out of the
17     manager-in-training program and into the restaurant
18     management division.
19     Q      What was your position?
20     A      Restaurant manager.
21     Q      Did you have any disciplinary issues at
22     Steak & Shake?
23     A      What do you call disciplinary issues?
24     Q      Well, ma'am, I've asked you that about
25     four times now, and you haven't had any problem
```

205

203

```
 1    answering questions.
 2         A     I just want you to describe it for me,
 3    please.
 4         Q     Well, you've already answered that
 5    question three times.  Did you have any discipline
 6    issues with you and your superiors or co-workers
 7    while you were at Steak & Shake?
 8         A     No.
 9         Q     Did you have any evaluations while you
10    were at Steak & Shake?
11         A     Yes.
12         Q     How many?
13         A     One.
14         Q     Was it written or oral?
15         A     It was written.
16         Q     Why did you leave Steak & Shake?
17         A     Several reasons.
18         Q     And what are those several reasons?
19         A     Career reasons; I wanted to pursue a
20    career in politics.  Family reasons; I wanted a more
21    flexible schedule because of a health condition my
22    mother had.
23         Q     Any other reason?
24         A     Yes, there were other reasons.
25         Q     What were the other reasons?
```

204

```
1         A     I didn't particularly like working all
2    night.  My mother was really concerned, after I had
3    the Peeping Tom, about me going to work at five and
4    getting off at three and four in the morning, and I
5    got tired of that type of schedule as well.
6         Q     Any other reasons why you left Steak &
7    Shake?
8         A     None that come to mind as I sit here.
9         Q     Is there anything you can look at that
10   would refresh your recollection?
11        A     No, not that I can think of as I sit
12   here.
13        Q     Did you leave voluntarily?
14        A     Yes.
15        Q     Were you asked to resign?
16        A     No.
17        Q     What's the next employment that you
18   recall after Steak & Shake?
19        A     The Republican Party of Florida.
20        Q     After the Republican Party of Florida,
21   what was your next employment that you can recall?
22        A     Nordstrom restaurant division.
23        Q     And when did you work at Nordstrom?
24        A     I worked at Nordstrom -- gosh, I don't
25   remember the exact dates.
```

205

```
1        Q      Approximately?
2        A      I don't remember approximately.
3        Q      Well, how long was it after you left
4   Republican Party of Florida?
5        A      I'm thinking.
6        Q      Well, you let us know when you're done
7   thinking.
8               MR. THOMPSON:  Mr. McKenna, just for the
9           record, she's trying to think when she started
10          the job.  You have the documents that show
11          when she started the job.  If you want to play
12          games with it you can, but don't blame my
13          client when she's unable to answer when you've
14          got a document that will help her answer in
15          the first place.
16       Q      Are you going to answer the question?
17       A      I thought I already did.  I told you I
18  didn't know exactly what the dates were.
19       Q      And I asked you how long after you left
20  Republican Party of Florida were you employed at
21  Nordstrom's.
22       A      Months after I left.  I don't know how
23  many months after I left.  I don't remember off the
24  top of my head.
25       Q      And how long approximately were you
```

208

206

```
 1   employed at Nordstrom's?
 2        A    A few months.
 3        Q    And what did you do there?
 4        A    I was a management trainee.
 5        Q    Who was your immediate supervisor?
 6        A    I had a training manager and I had a
 7   district manager.
 8        Q    Are you finished?
 9        A    Yes, sir.
10        Q    What was the training manager's name?
11        A    I don't remember her name.  I remember
12   the district manager's name was Dawn.
13        Q    Dawn what?
14        A    I don't remember her last name.
15        Q    What were your specific duties while you
16   were at Nordstrom's?
17        A    I was in a management training program,
18   and my duties were consistent with that training
19   program.
20        Q    And what did the training program consist
21   of?
22        A    I don't have the manual before me.  It
23   was basically learning their processes and how they
24   operate and how the -- what the paperwork was and
25   what their systems were and --
```

207

```
 1        Q      Are you finished?
 2        A      -- building sales and how to manage sales
 3   expectations and things like that.
 4        Q      Where were you assigned?
 5        A      To the Tampa Nordstrom.
 6        Q      At International Mall?
 7        A      Yes, sir.
 8        Q      Were you in a particular department?
 9        A      The restaurant division.
10        Q      And what did you do in the restaurant
11   division?
12        A      Sir, I just told you when you asked me
13   what my job duties were.
14        Q      Why don't you tell me again.
15        A      I was in the management training program.
16        Q      And whom did you manage?
17        A      Well, actually I was a trainee so I
18   didn't specifically have to manage anybody.  It was
19   my responsibility to learn the components of the
20   program so that I could manage people.
21        Q      What position would you have managed had
22   you completed the training program?
23        A      I would have managed all the positions
24   under me.  I would -- you're laughing, but --
25        Q      Because you're not answering the
```

210

208
```
 1    question, ma'am.  What were the names of the
 2    positions?  Were they waitresses, cooks?  What kind
 3    of positions?  What did you -- what were you
 4    training to do at Nordstrom's?
 5         A     The -- they were called baristas and --
 6         Q     What was called a barista?
 7         A     That's what they called the people that
 8    worked there.  That was what they called them.  And
 9    they didn't call them cooks.
10         Q     Were they cooks?
11         A     Well, yeah, but that's not what they were
12    called.  They didn't cook food.
13         Q     What did they cook?
14         A     Coffee-related products.
15         Q     So it was a coffee shop?
16         A     Yes, that sold food.
17         Q     Why did you leave that position?
18         A     There's lots of reasons.
19         Q     Of course.
20         A     I don't understand why you're taking this
21    adversarial attitude with me.
22         Q     What were the reasons why you left
23    Nordstrom's?
24         A     There are several reasons.  Mostly
25    because I was depressed.
```

209

```
1       Q       What are the other reasons?
2       A       Well, they're all related to depression.
3       Q       Okay.  Tell me what they are.
4       A       Fatigue, lack of energy, stress, lack of
5   concentration.
6       Q       Anything else?
7       A       Depression, fatigue, lack of energy,
8   stress, things that were going on with my body.
9       Q       What things that were going on with your
10  body?
11      A       The lack of energy and the stress and the
12  fatigue.
13      Q       Any other reasons why you left
14  Nordstrom's?
15      A       Those are the reasons.
16      Q       Any other reasons than those for why you
17  left Nordstrom's?
18      A       Oh.  It was -- I thought the hours were a
19  lot.
20      Q       Any other reasons?
21      A       No.  Mostly the reasons were related to
22  depression.
23      Q       Did you have any disciplinary issues
24  while you were at Nordstrom's?
25      A       No.
```

212

210

```
 1        Q     Did you leave voluntarily?
 2        A     Yes.
 3        Q     Were you asked to resign?
 4        A     No.
 5        Q     How much were you making at Nordstrom's?
 6        A     30,000 a year.
 7        Q     Did any healthcare provider tell you that
 8   you should leave employment at Nordstrom's because
 9   of your depression, fatigue, stress, lack of
10   concentration or the other things that were going on
11   with your body?
12        A     Can you repeat the question, please?
13              MR. McKENNA:  Read it back, please.
14              (The reporter read as requested.)
15        A     No.
16        Q     What's the next position that you recall
17   after Nordstrom's?
18        A     Oh.  I worked for a car dealership.
19        Q     What car dealership?
20        A     Bill -- if you let me answer, Bill Heard
21   Chevrolet.
22        Q     When did you work for Bill Heard
23   Chevrolet?
24        A     I worked for Bill Heard Chevrolet --
25   I started September of '04.
```

211

```
 1        Q      When did you leave Bill Heard Chevrolet?
 2        A      In the beginning of 2005.
 3        Q      And what was your position?
 4        A      I was in sales.
 5        Q      How much did you -- were you paid?
 6        A      Commission.
 7        Q      How much of a commission?
 8        A      It was different for each car I sold.
 9        Q      What did you average on a weekly basis
10  while you were at Bill Heard Chevrolet?
11        A      I can't tell you weekly, but I could
12  probably tell you monthly.
13        Q      Okay.  Tell me monthly.
14        A      I would say 2500 to 3,000 dollars a
15  month.
16        Q      Who was your immediate supervisor?
17        A      Had several supervisors.  I guess it
18  would be Lorenzo Pena.
19        Q      What was Mr. Pena's title?
20        A      General sales manager.
21        Q      Did you have any disciplinary issues
22  while you were at Bill Heard Chevrolet?
23        A      Yes.
24        Q      What were those?
25        A      I got written up for not wearing a Bill
```

214

212

```
 1   Heard t-shirt to work.
 2        Q     Any --
 3        A     And I got written up for being late to a
 4   sales meeting.
 5        Q     Anything else?
 6        A     That's all I can think of as I sit here.
 7        Q     Were you written up for telling a
 8   customer that he had too much negative equity in a
 9   car?
10        A     I don't remember that.
11              MR. McKENNA:  Mark that, please.
12              (Exhibit 11 marked for identification.)
13   BY MR. McKENNA:
14        Q     I'm going to hand you what we've marked
15   for purposes of identification as Defendant's
16   Exhibit No. 11 and ask you to take a look at that
17   and see if that refreshes your recollection about
18   being written up for telling a customer he had too
19   much negative equity in a car.
20        A     Mr. McKenna, I'd like to bring to your
21   attention where it says "Name," it says "Netta
22   Oliver."  That's not me.  That's someone else.
23        Q     How many times were you written up for
24   being late to work?
25        A     I don't remember.
```

215

213
```
 1         Q      It was repeatedly, wasn't it?
 2         A      It was more than once.  I wouldn't call
 3    that repeatedly.
 4         Q      Were you written up for not securing
 5    customer documents?
 6         A      That sounds familiar.
 7         Q      Is that a yes?
 8         A      I said it sounds familiar.  I remember us
 9    having a conversation about that after I started.  I
10    left a customer's driver's license or something in a
11    desk that wasn't locked or something like that.  I
12    did something like that.  And it wasn't proper and
13    they talked to me about that.
14              MR. McKENNA:  Mark that, please.
15              (Exhibit 12 marked for identification.)
16    BY MR. McKENNA:
17         Q      I'm going to hand you what we've marked
18    for purposes of identification as Defendant's
19    Exhibit 12 and ask you if that refreshes your
20    recollection about being written up for failing to
21    secure customer documents.
22         A      Yes, it refreshes my recollection.
23         Q      So you were in fact written up for
24    failing to secure customer documents at Bill Heard
25    Chevrolet.  Correct?
```

214

```
1        A     Yes, I was written up, as I told you
2   before, because I didn't lock my drawer, and it was
3   a mistake.
4        Q     Were you written up for not filling out
5   an up card?
6        A     Maybe.
7              (Exhibit 13 marked for identification.)
8        Q     I'm going to hand you what's been marked
9   for purposes of identification as Defendant's
10  Exhibit 13 and ask you if that refreshes your
11  recollection about being written up for failing to
12  fill out up cards.
13       A     Yes, I remember this.
14       Q     So you were in fact written up for
15  failing to fill out up cards.  Is that correct?
16       A     Can you repeat the question again?
17             MR. McKENNA:  Please read the question
18  back.
19             (The reporter read as requested.)
20       A     I was written up because after I finished
21  with one customer, I failed to jot down their name
22  and phone number on the log.
23       Q     And you had repeated attendance issues
24  while you were working at Bill Heard Chevrolet.
25  Isn't that true?
```

215

```
1      A     No, that's not true.  I had --
2      Q     Are you finished with your answer?
3      A     No, I'm not finished.
4            THE WITNESS:  Can you repeat the
5      question again?
6            (The reporter read as requested.)
7      A     I had issues related to my depression
8   that caused attendance-related issues.
9            MR. McKENNA:  Would you mark that,
10     please.
11           (Exhibit 14 marked for identification.)
12  BY MR. McKENNA:
13     Q     I'm going to hand you what we marked for
14  purposes of identification as Defendant's Exhibit 14
15  and ask you if you recognize that as a write-up for
16  being late for a Friday sales meeting on October 29,
17  2004.
18     A     I remember the write-up, and I see here
19  that I disagreed with it.
20           MR. McKENNA:  Move to strike as
21     nonresponsive to the question.
22  BY MR. McKENNA:
23     Q     Do you recognize that document as a
24  write-up for you for being late for a Friday sales
25  meeting on October 29, 2004?
```

216

```
 1          A     I recognize this document as a write-up
 2    that says, one, "Late for sales meeting" and an
 3    explanation.  But I was present at the sales
 4    meeting, and I protest the write-up.
 5          Q     Is that your signature at the bottom?
 6          A     Yes.  And that acknowledges that I read
 7    this document before I signed it.
 8                MR. McKENNA:  Would you mark that,
 9          please.
10                (Exhibit 15 marked for identification.)
11    BY MR. McKENNA:
12          Q     I'm going to hand you what we've marked
13    for purposes of identification as Defendant's
14    Exhibit 15.  Do you recognize that document as a
15    write-up for not wearing proper attire --
16          A     Yes.
17          Q     -- on 11/23/2004?
18          A     Yes.
19          Q     Is that your signature at the bottom?
20          A     Yes, it is.
21                (Exhibit 16 marked for identification.)
22          Q     I'm going to hand you what we've marked
23    for purposes of identification as Exhibit No. 16 and
24    ask you if you recognize that as a write-up for you
25    for failing to be on time for final work, which is
```

217

```
 1   indicated as being a final warning.
 2        A     Yes.
 3        Q     And it indicates that you must call with
 4   a legitimate excuse if you're going to be late.  Do
 5   you see that?
 6        A     I see that, but I don't remember that
 7   being on here before.  And it looks to me as though
 8   the first two lines and the second two lines are in
 9   different handwriting.
10        Q     Was it the policy of Bill Heard Chevrolet
11   that you had to call with a legitimate excuse if you
12   were going to be late?
13        A     I don't remember what the policy on that
14   was, but I think it was quite discretionary.
15        Q     Was illness a legitimate excuse at Bill
16   Heard Chevrolet for being late?
17        A     Illness?  Can you repeat the question
18   again?
19              MR. McKENNA:  Please read back the
20        question.
21              (The reporter read as requested.)
22        A     To my knowledge it was.
23              (Exhibit 17 marked for identification.)
24   BY MR. McKENNA:
25        Q     I'm going to hand you what's been marked
```

218

```
 1    for purposes of identification as Defendant's
 2    Exhibit 17.  Do you recognize that, ma'am, as a
 3    write-up for you for being late to work on November
 4    1, 2004?
 5         A    Yes.
 6         Q    Why did you leave Bill Heard Chevrolet?
 7         A    There were a lot of reasons.
 8         Q    And what were the reasons?
 9         A    Well, the main reason was I would leave
10    the dealership to meet with Pastor Henry, and when
11    I'd come back I just didn't feel like selling cars.
12    I just was in a persistent sad mood, and I didn't
13    have any motivation to sell cars, and that was how I
14    made my living there.
15         Q    Any other reason why you left?
16         A    There were a lot of other reasons.
17         Q    What were the other reasons?
18         A    That was the main reason.
19         Q    What were the other reasons?
20         A    It was mostly because I was depressed.
21    In late November I quit working there and all my
22    managers begged me to come back.  And they knew that
23    I was depressed.  I talked to my manager Lorenzo
24    about the depression, and he gave me time off from
25    work during the day to go and meet with Pastor
```

219

```
 1    Henry.  And it was an ongoing thing with my
 2    depression, and I just didn't feel like I could sell
 3    cars in my situation.  I just -- just -- I just
 4    didn't feel like I could.
 5              So when I quit the second time, he said
 6    he understood because his wife had depression and
 7    she had to go to counseling.
 8         Q    Are you finished with your answer?
 9         A    Yes, sir.
10              MR. McKENNA:  Move to strike as
11         nonresponsive.  Let's take a break to change
12         tape.
13              (Recess from 11:46 to 11:55 a.m.)
14    BY MR. McKENNA:
15         Q    What were the other reasons why you left
16    Bill Heard Chevrolet?
17         A    I told you my reasons were depression
18    related.
19         Q    You told me that that was your primary
20    reason and that there were other reasons, did you
21    not?
22              MR. THOMPSON:  I'm going to object to
23         form.
24         A    There was my primary reason, and it all
25    really stems from that.
```

220

```
1        Q      From what?
2        A      The fact that I was depressed.
3        Q      So the reason you left Bill Heard
4   Chevrolet was because you were depressed.  Is that
5   correct?
6        A      That was the main reason, yes.
7        Q      Did any other -- did any healthcare
8   provider tell you that you should leave Bill Heard
9   Chevrolet?
10        A      No.
11        Q      Did Pastor Henry tell you you should
12   leave Bill Heard Chevrolet?
13        A      Not in those exact words, no.
14        Q      What words did he use?
15        A      I need to talk to my attorney.
16             MR. McKENNA:  Let's go off the record.
17               (Recess from 11:57 to 11:59 a.m.)
18   BY MR. McKENNA:
19        Q      What did Pastor Henry tell you about
20   working at Bill Heard Chevrolet?
21        A      Pastor Henry said that he didn't think it
22   was a very nurturing environment and that it could
23   compound stress, and he suggested other
24   alternatives.
25        Q      Are you finished with your answer?
```

221

```
 1         A     Yes, sir.
 2         Q     What were the other alternatives he
 3    suggested?
 4         A     Environments that would be more
 5    nurturing.
 6         Q     For example?
 7         A     Different types of work.
 8         Q     What kind of work?
 9         A     We talked about -- we didn't get very
10    specific into the different fields as we did talk
11    about the similarities between the job at the
12    dealership and my job at RPOF.  And that's why
13    Pastor Henry recommended I get a job that was in a
14    less cut-throat environment, as he put it.
15         Q     So if I understand you correctly, Pastor
16    Henry did not suggest any specific areas or any
17    specific jobs to you.  He was just suggesting
18    something less cut-throat.  Is that correct?
19         A     Yes and no.
20         Q     Okay.  How is it no?
21         A     Well, it wasn't until, I think, after I
22    had already quit the job that Pastor Henry
23    recommended other fields.  But when we were having
24    counseling about things, we talked about the types
25    of people that I was surrounded with at this job.
```

224

222

```
1        Q     Did Pastor Henry suggest any specific
2   fields, any specific positions or any specific
3   companies that he thought you should go to work for?
4        A     Yes.
5        Q     What were those?
6        A     We talked about marketing, we talked
7   about going back into the restaurant business, we
8   talked about going to law school, we talked about --
9   we talked a lot about going to law school and taking
10  the LSAT.  We talked about -- I'm done.
11       Q     Any specific companies that Pastor Henry
12  suggested?
13       A     I don't remember specific companies off
14  the top of my head.
15       Q     Is there anything you can look at that
16  would help refresh your recollection?
17       A     No, I don't think so.
18       Q     I believe you testified that they gave
19  you time off at Bill Heard to go see Pastor Henry?
20       A     Yes.
21       Q     And I believe you testified that you quit
22  on two occasions?
23       A     Yes.
24       Q     And they asked you to come back the first
25  time?
```

225

223

```
 1        A      Yes, sir.
 2        Q      And what was not nurturing about the
 3   environment at Bill Heard?
 4        A      I'm sorry, I'm going to have to take a
 5   break.  I can't concentrate.
 6               (Recess from 12:05 to 12:12 p.m.)
 7               MR. McKENNA:  Read back the pending
 8        question, please.
 9               (The reporter read as requested.)
10        A      Pastor Henry just thought it wouldn't be
11   a good idea for me to work in a high-stress
12   environment like that at this point in my life.
13        Q      Ma'am, the question was, is what did you
14   think was not nurturing about the environment at
15   Bill Heard.
16        A      I thought it was a very aggressive
17   environment.  It was extremely driven by making
18   money and, you know, pushing customers sometimes
19   into buying a car that they might not even want.
20   And the people around that were very stressed
21   because that's how everyone made their -- their
22   living.  And it was just a very -- I'm not saying
23   it's a stressful environment for everyone because
24   everyone hasn't been through what I've been through,
25   but it was stressful for me.  And Pastor Henry
```

```
 1    didn't think it was a very nurturing environment.
 2         Q     Anything else?
 3         A     What do you mean, "anything else"?
 4         Q     Any other reasons why you believe that
 5    Bill Heard was not a nurturing environment?
 6         A     I'm certain there is other reasons that
 7    will pop into my head when I leave this deposition.
 8    But as I sit here right now, I can't think of any
 9    others.
10         Q     Is there anything you can look at that
11    would help refresh your recollection?
12         A     Maybe.
13         Q     What?
14         A     I don't have anything that would refresh
15    my recollection.
16         Q     Are you finished with your answer?
17         A     Yes, I think so.
18         Q     Any other position -- did you seek any
19    other positions at Bill Heard Chevrolet?
20         A     Did I seek any other positions at Bill
21    Heard Chevrolet?
22         Q     Yes.
23         A     No.  When I quit the first time in
24    November, when I came back it was the same position.
25               MR. McKENNA:  Move to strike as
```

225

```
1          nonresponsive.
2     BY MR. McKENNA:
3          Q     The question is:  Did you seek any other
4     non-sales positions at Bill Heard Chevrolet?
5          A     No.
6          Q     Were you subjected to any discrimination
7     while you were at Bill Heard Chevrolet?
8          A     No.
9          Q     Did you resign because you were told that
10    one more tardy or absence and you would be fired?
11         A     No.
12               MR. McKENNA:  Do you want to take a
13         lunch?
14               MR. THOMPSON:  It sounds good to me.
15               (Recess from 12:17 to 1:12 p.m.)
16    BY MR. McKENNA:
17         Q     You understand you're still under oath?
18         A     Yes, sir.
19         Q     Where did you work after Bill Heard
20    Chevrolet?
21         A     I worked at Kincaid Brick Company.
22         Q     When did you begin there?
23         A     In early 2005.
24         Q     Early as in February, March?
25         A     I don't remember the exact month.
```

228

226

```
1        Q       What was your position at Kincaid Brick
2   Company?
3        A       I was the office manager.
4        Q       I'm sorry, I need to back up for a
5   minute.  At Bill Heard Chevrolet did you have
6   benefits?
7        A       No, I didn't have benefits while I worked
8   there.
9        Q       Why not?
10       A       Because I hadn't been there long enough.
11       Q       How long did you have to be there to
12  qualify for benefits?
13       A       I don't remember.
14       Q       What benefits would you have qualified
15  for had you stayed?
16       A       Health benefits, I'm sure of.  I'm not
17  certain what the other benefits that they had were.
18       Q       Did you have benefits while you were at
19  Nordstrom's?
20       A       No, I did not.
21       Q       Why not?
22       A       I hadn't accumulated enough hours.
23       Q       What kind of benefits would you have had
24  had you accumulated enough hours?
25       A       I would have had health benefits and
```

227

```
1    other types of benefits.
2         Q     Did you have benefits at Steak & Shake?
3         A     Yes.
4         Q     What kind of benefits?
5         A     Health benefits.
6         Q     Anything else?
7         A     I'm certain I was entitled to other types
8    of benefits, but I didn't necessarily take advantage
9    of all of them.
10        Q     I'm sorry.  Now going back to Kincaid
11   Brick Company, what did your job as an office
12   manager involve?
13        A     A little bit of everything, actually.  At
14   first it was just accounts payables, and then I
15   worked -- when we had some people leave the company,
16   I worked in the back office, in the brickyard
17   itself.
18        Q     What kind of things did you do in the
19   back office?
20        A     Assist customers.
21        Q     In what way did you assist them?
22        A     Well, if a customer came in and they
23   wanted to order a pallet of brick, I would assist
24   them with that, or if a customer called on the phone
25   I would communicate with them.
```

230

228

```
 1          Q       How much were you paid at Kincaid Brick
 2     Company?
 3          A       $500 a week.
 4          Q       Were you full time or part time?
 5          A       I worked, I guess, full time.
 6          Q       Who was your immediate supervisor?
 7          A       Joe Rosser for a period of time.  And
 8     then he left and then it became Margie Kincaid.
 9          Q       What was Mr. Rosser's position?
10          A       He came into the company to be a partner,
11     a managing partner in the company.
12          Q       Do you know why he left?
13          A       Mrs. Kincaid, she fired him.  But at the
14     time that she fired him he was in the process -- he
15     was pretty much already gone.  He was severing his
16     ties with the company.
17          Q       Do you know why she fired him?
18          A       During the time that he was with the
19     company, he decided that he didn't want to be in the
20     brick business, and he began starting his own
21     company.  And he stole one of her -- well, let me
22     back up for a minute.
23                  One of her employees who had been with
24     her over 30 years left the company to go work for
25     Mr. Rosser.
```

229

```
 1        Q      What was Mr. Rosser's new business?
 2        A      Bison Supply.
 3        Q      I'm sorry?
 4        A      Bison Supply, sir.
 5        Q      Do you know where that's located?
 6        A      Yes.  It's on 40th Street.
 7        Q      In Tampa?
 8        A      Yes, sir.
 9        Q      Now, this job -- let me back up.  Earlier
10   you said that you did things for Margie Kincaid in
11   exchange for living at her house.  Is that correct?
12        A      Yes.
13        Q      And is this job distinct from what you
14   did for her -- for Ms. Kincaid -- in order to live
15   at her house?
16        A      Yes.  I started -- when I began living
17   with her, I was still working at Bill Heard.  And so
18   she said the main thing she wanted was somebody to
19   keep her company because she was all alone.  Her
20   husband was deceased, she had no children and she's
21   in her mid eighties.  And mostly it was loneliness,
22   and so I kept her company during the time that I was
23   at home, which in the beginning was not very often.
24        Q      You said you were living with her while
25   you were at Bill Heard?
```

230

```
 1        A     Yes, sir.
 2        Q     Were you living with her while you were
 3   at Nordstrom's?
 4        A     No, sir.
 5        Q     And did you discuss with Ms. Kincaid the
 6   reasons why you left Bill Heard Chevrolet?
 7        A     Not in so many words.  I thought that it
 8   would be best to keep Margie out of my business.
 9        Q     Why did you think that?
10        A     Well, she gossips a lot, and I don't
11   particularly like that.
12        Q     So is it your testimony, ma'am, that you
13   did not discuss your reasons for leaving Bill Heard
14   Chevrolet with Ms. Kincaid?
15        A     It's possible that I did, but I don't
16   recall at this time having a conversation with her
17   about it.
18        Q     Did you receive any promotions while you
19   were at Kincaid Brick?
20        A     Yes, I did.
21        Q     What was the promotion?
22        A     I don't really know how to describe it.
23   It was from -- can you ask -- repeat the question
24   one more time, please?
25              MR. McKENNA:  Read the question back,
```

233

231

```
 1          please.
 2                    (The reporter read as requested.)
 3          A     The promotion was basically from a very
 4     limited role to a more substantial role.
 5          Q     How did your duties change?
 6          A     The duties didn't primarily change.  The
 7     time that I was spending there changed, because when
 8     I first started -- when I first started helping
 9     Margie out, I had another job, and I was helping her
10     out on my one day off a week.  I had one day off a
11     week from the dealership.  And -- and then when I
12     quit working at the dealership, I took some time off
13     to regroup.  And then when I started helping them
14     out at the brickyard, it was -- in a paid capacity,
15     it was a part-time kind of situation.  And then
16     later on it became more of a full-time situation.
17          Q     So the duties didn't change.  The amount
18     of time you spent there changed?
19          A     Yes.  Well, let me back up for a minute.
20     Okay.  I can -- the duties did change in that when
21     she hired a CPA, I coordinated, I guess you could
22     call it, the month-end close processes so that our
23     sales tax and our payroll tax and things like that
24     would be filed with our CPA firm.  I began to do
25     that when Mr. Isler began to sort of phase out of
```

234

232

```
 1   the picture.
 2        Q     Mr. who?
 3        A     I'm sorry.  Mr. -- I'm sorry.  I can't
 4   concentrate.  Mr. Rosser.
 5        Q     Did you have any disciplinary issues at
 6   Kincaid Brick Company?
 7        A     No, none.
 8        Q     Did you receive any evaluations at
 9   Kincaid Brick Company?
10        A     No, no evaluations.  The only thing of
11   note that I guess could either -- even be considered
12   an evaluation is they -- a very beautiful letter
13   that Margie wrote for me a short time -- a short
14   time before I stopped working there.
15        Q     Do you have a copy of that letter?
16        A     Yes, I do.
17        Q     Did you provide it to your attorney in
18   response to the request for production of documents
19   that we made?
20        A     Well, the letter was written after the
21   request.
22              MR. McKENNA:  Obviously, Jim --
23        A     It's ongoing?  The production for
24   documents is an ongoing thing?  So like anything I
25   get I have to give you?
```

235

233

```
1              MR. McKENNA:  Jim, I think --
2        A     I didn't know that.
3              MR. McKENNA:  I think we're going to
4        need some supplementation.
5              MR. THOMPSON:  I'll get that to you.
6   BY MR. McKENNA:
7        Q     Why did you leave Kincaid Brick?
8        A     For several reasons.
9        Q     Which are?
10       A     The main reason was school.  The second
11   reason was because Margie fired my boss.  And the
12   third reason was the financial vulnerability of the
13   company.  When Joe Rosser left, all the customers
14   followed him to his new company.  And all the talent
15   in the business left with Joe Rosser.  The employee
16   that had the most institutional knowledge on the way
17   that company was run left and went to work for Joe
18   Rosser.
19             And the fact that, No. 1, I was getting
20   ready to go to school; No. 2, the company
21   financially wasn't doing well; No. 3, the lack of
22   business acumen and Margie's personal health and
23   mental condition, and it just -- the job just didn't
24   make sense anymore.
25       Q     Any other reasons why you left Kincaid
```

234

```
 1    Brick?
 2         A     I think I've -- I think I've summed it
 3    up.
 4         Q     What was the issue about school?  Why did
 5    that have an impact on your leaving Kincaid Brick?
 6         A     Well, Margie knew I was about to start
 7    school.  She wrote a glowing letter of
 8    recommendation for me to the dean of the master's of
 9    accountancy program at the University of Tampa.  And
10    she knew I had gotten accepted, and I told her that
11    I was going to pursue going to school full time.
12         Q     Have you done that?
13         A     Yes and no.
14         Q     Tell me about the yes first, then you can
15    tell me about the no.
16         A     Well, yes, I am going back to school and
17    I thought it was going to be this semester, and I
18    found out the week before school, after I registered
19    for all my classes and everything, that my financial
20    aid wouldn't be available until next semester.  And
21    so I have to start school in January now.
22         Q     And you're starting an MBA program.  Is
23    that correct?
24         A     An MSA program.
25         Q     What does MSA stand for?
```

235

```
 1         A     Master's of science in accountancy.
 2         Q     And when would you have started had you
 3    had the financial aid in place?
 4         A     I would have started August 29th, August
 5    30th; somewhere in there.
 6         Q     When you -- and when you say you left
 7    because Margie fired your boss, that was the issue
 8    with Joe Rosser?
 9         A     That was Joe Rosser, yes.
10         Q     Okay.
11         A     And, you know, just the financial
12    situation that was going on with the company was
13    disturbing to me.
14         Q     And what do you mean by -- how was it
15    disturbing to you?
16         A     Well, when I started working there, they
17    were several months behind in filing sales taxes,
18    several months behind in filing payroll taxes, and
19    then the company hadn't filed its business taxes.
20    And then after I started there, me and Joe Rosser
21    realized that she was paying all her personal bills
22    out of the business operating account.
23         Q     By "her" you mean --
24         A     Margie.
25         Q     Okay.
```

236

```
 1          A       And that had been going on for some time
 2     that she hadn't been claiming it as income.  And
 3     that was sort of -- that was sort of not a good
 4     thing.  And so -- and that's one of the reasons why
 5     he decided that he did not want to be in a
 6     partnership with her.  And he began to start his own
 7     company.  And then while I went -- during the time I
 8     worked there, she switched CPA's four times, and she
 9     had memory problems.  She would do things and then
10     she would forget that she did them.  And I really
11     felt like she needed a nurse or somebody who could
12     really -- I felt bad that she didn't have any kids
13     or anything to step into the picture and help her.
14               But Pastor Henry said that, you know,
15     that's the place for family and that all I can do is
16     pray for her and that, you know, I have to set
17     boundaries and, you know, just stuff like that.
18               (Exhibit 18 marked for identification.)
19          Q       I'm going to hand you, ma'am, what we've
20     marked for purposes of identification as Defendant's
21     Exhibit 18.  My question is:  Do you recognize that
22     document?
23          A       No, I do not recognize this document.  I
24     have never seen this document before.
25          Q       It's addressed to you, is it not?
```

239

237

```
 1      A     Yes, it is.
 2      Q     And it is dated August 20, 2005?
 3      A     Yes, it is.  And I reiterate that I have
 4  never seen this document before.
 5      Q     That's fine.  It begins -- and I'm
 6  paraphrasing -- "I was disappointed when on August
 7  16, 2005 you unexpectedly and abruptly quit your job
 8  as Office Manager/Accounting because of the issue of
 9  benefits."  Do you see that, ma'am, where I'm
10  reading that?
11      A     I see that.
12      Q     Okay.  Did you quit your job on August
13  16, 2005?
14      A     No, I didn't.
15      Q     When did you quit your job?
16      A     I think I quit it before that.
17      Q     Did you give notice?
18      A     Yes and no.  I thought -- we had a
19  discussion about school and, you know, me going to
20  school full time and all these things.  And I
21  explained to Margie that I wouldn't be able to work
22  at the brickyard during the day anymore.
23      Q     Did you give two weeks' notice that you
24  were going to be quitting prior to leaving Kincaid
25  Brick?
```

238

```
 1          A     No, I didn't give two weeks' notice, and
 2     I wasn't required to.
 3          Q     Okay.  Now, it says here that you
 4     abruptly quit your job because of an issue of
 5     benefits.  Do you see that, the relationship to
 6     benefits?
 7          A     We had a conversation about benefits.
 8          Q     Well, my question, ma'am, is:  Did you
 9     quit because you weren't receiving benefits?
10          A     No.
11          Q     What was the conversation that you had
12     about benefits?
13          A     The conversation that we had about
14     benefits was when I was discussing with her our
15     unpaid bills that we needed to address, that was one
16     of the unpaid bills.  And when I talked to her about
17     it, she said, "Benefits?  What benefits?"  And she
18     completely had no recollection of the benefits,
19     absolutely no recollection, she claimed, at all.
20                And I talked to her about it and talked
21     to her about it, and I said, "You know, Margie, I've
22     had benefits all this time.  How could you say that
23     you don't remember."  And I talked to Joe Rosser
24     about it later that day, and his recollection about
25     our discussion about the benefits was the same as
```

239

```
 1    mine.  So that was -- that was -- that was our
 2    conversation about benefits.
 3         Q    So you had benefits the entire time you
 4    were working at Kincaid Brick Company?
 5         A    When I became full time, I did.
 6         Q    When did you become full time?
 7         A    I don't remember.  You probably should
 8    ask Margie.
 9         Q    It's after you left Bill Heard, though.
10    Right?
11         A    Oh, yes.
12         Q    Within a day or two?
13         A    No.
14         Q    How long after?
15         A    Mr. McKenna, I don't know how long after,
16    and I don't want to guess because I don't want to
17    put inaccurate statements on the record.
18         Q    Days, weeks or months?  Are you going to
19    answer the question, ma'am?
20         A    I'm thinking about the question.
21         Q    Okay.
22         A    Repeat the question, please.
23         Q    The question was:  Was it days, weeks or
24    months between when you left Bill Heard Chevrolet
25    and when you began working full time at Kincaid
```

240

```
 1    Brick Company?
 2         A     It would have had to have been months.
 3         Q     More than six months?
 4         A     Maybe.
 5         Q     More than ten months?
 6         A     I don't know.
 7         Q     More than a year?
 8         A     It couldn't have been that long,
 9    Mr. McKenna.
10         Q     If you go down to the next paragraph, it
11    states that "Within three days of receipt of this
12    letter you are expected to return immediately the
13    following:
14              "all keys in your possession for property
15    located at 4526 South Dale Mabry."  Do you see that,
16    ma'am?
17         A     Yes, I do.
18         Q     Did you have keys for the property
19    located at 4526 South Dale Mabry?
20         A     I did at one time.  However, when I quit,
21    I gave her back all the keys.  And these other
22    items, I never had any credit or debit cards.
23         Q     Just let me ask the questions and then
24    you can answer.
25         A     You're interrupting me.
```

243

241

```
 1        Q    You're not answering the question.  Did
 2   you have any other personal property that belonged
 3   to Margie Kincaid?
 4        A    The only thing that I have that belonged
 5   to her was a cell phone.  And me and Joe Rosser got
 6   together, because he had a company cell phone as
 7   well, and we sent our cell phones and a note to her
 8   and the charger back to her certified mail, and it
 9   went out that week.
10        Q    What week?
11        A    Right after I got -- I was going to send
12   mine in, and Joe was like, "Wait, Nadia, wait.  You
13   know, send mine when you send yours," and --
14        Q    You sent it within that week.  My
15   question is:  What week?
16        A    I don't remember what week, but I believe
17   I have the -- I can find out and get back with you.
18        Q    Well, ma'am, you just said it went out
19   that week.  Did you mean --
20        A    Well, it went out like shortly after.  It
21   went out --
22        Q    Shortly after what?
23        A    -- shortly after I got Joe Rosser's cell
24   phone.
25        Q    Did you have Cingular telephones for the
```

244

242

```
1    numbers that are listed under bullet point 3?
2         A    I had one of those cell phones.
3         Q    Which one?
4         A    The ██████.
5         Q    Did you have either of the other two
6    phone numbers listed?
7         A    No.  One of them was hers, and the other
8    phone was Joe Rosser's.
9         Q    Did you have in your possession check
10   registers for a SunTrust checking account in the
11   name of Kincaid Company?
12        A    No, I did not.  She has her check
13   register, her checkbook, and she's the only person
14   who can sign for the checks.  She's the only person
15   on the operating accounts.
16        Q    Did you have a 941 payroll tax coupon
17   book?
18        A    No.  To my knowledge, we've never had a
19   941 payroll tax coupon book.  The coupon was always
20   prepared by our CPA.
21        Q    It then says the "July month-end
22   invoices" that "you were to deliver to Paul
23   Bedinghaus CPA for filing of Florida State Sales
24   Tax."  Do you see that, ma'am?
25        A    Yes.
```

243

```
 1        Q      Do you know who Paul Bedinghaus is?
 2        A      Bedinghaus.  Yes, I know Paul.  And Paul
 3   received all those -- all those documents.  When she
 4   fired -- when Margie fired Joe Rosser, she also
 5   fired her CPA.  And I took these documents to Paul's
 6   office in St. Pete right before Paul went to Miami
 7   for the RPOF quarterly.
 8        Q      And then it says:  "reimbursement in the
 9   amount of $253.05 for three days of unfulfilled
10   employment" for "which you were paid."  Do you see
11   that, ma'am?
12        A      Yes, I see that.
13        Q      Did you reimburse Kincaid Brick Company
14   for that -- those three days?
15        A      I never knew I owed them anything to
16   reimburse.  This is the first time I've ever seen
17   this document.
18               (Exhibit 19 marked for identification.)
19        Q      Do you have any documents from your
20   employment with Kincaid Brick Company?
21        A      Yes, I do.
22        Q      Did you provide those to your attorney in
23   response to the request for production of documents?
24        A      The document that I have is a letter of
25   recommendation, and I did not know that I was
```

246

244

```
 1    supposed to provide that to my attorney.  But I am
 2    happy to provide that.
 3         Q     Is there any other documents that you
 4    have from Kincaid Brick Company?
 5         A     Yes.  I have copies that I made of my pay
 6    stubs.
 7         Q     Did you provide those documents to your
 8    attorney in response to the request for production
 9    of documents?
10         A     Certainly.
11              MR. McKENNA:  I don't think we've got
12         them.
13              MR. THOMPSON:  I think you probably did.
14              MR. McKENNA:  I'll double-check.
15              MR. THOMPSON:  I don't think I would
16         have pulled those out.
17              MR. ISLER:  The Kincaid ones?
18              THE WITNESS:  It doesn't -- it doesn't
19         say Kincaid on them.  It's just -- it's like
20         copies of like a check register.  We -- it's
21         such a small company, we didn't have pay
22         stubs.
23    BY MR. McKENNA:
24         Q     Do you have any other documents from
25    Kincaid Brick Company?
```

245

```
 1        A     Not that I'm aware of as I sit here.
 2        Q     Let me show you what we've marked for
 3   purpose of identification as Defendant's Exhibit
 4   19.  My first question to you is:  Do you recognize
 5   that document?
 6        A     No, I don't.  This is the first time I've
 7   ever seen this document.
 8        Q     Do you know why Ms. Kincaid would confirm
 9   that you had been employed in the position of office
10   manager and accounting at Brickcrete, Inc., from
11   January 31, 2005 until her resignation on August 16,
12   2005?
13        A     Can you repeat the question one more
14   time?
15              MR. McKENNA:  Read it back, please.
16              (The reporter read as requested.)
17        A     A, this letter is not signed, so I don't
18   know if Ms. Kincaid is confirming it or not.  2, I'm
19   going to -- I suppose that if she did prepare this
20   document, it was in response to a subpoena.
21        Q     Any other reason why you think
22   Ms. Kincaid might prepare Defendant's Exhibit 19?
23        A     You would have to ask her that.  I can't
24   answer for another person.
25        Q     I'm not asking you to answer for another
```

246
```
 1    person.  I'm asking if you know of any other reason.
 2        A    I'm going to -- it's probably in response
 3    to a subpoena if she did prepare this document.
 4        Q    Do you know of any other reason why
 5    Ms. Kincaid might have prepared this document?
 6        A    No, Mr. McKenna, without reading her
 7    mind, I don't.
 8        Q    Are the dates of employment correct on
 9    here?
10        A    I don't believe so.
11        Q    What do you think is wrong?
12        A    I believe I resigned earlier than this.
13        Q    Is the start date --
14        A    But I'm not certain.
15        Q    Are you finished with your answer?
16        A    Yes.
17        Q    Is the beginning date accurate?
18        A    I don't think it's accurate either.  I
19    want to say I think I might have been working before
20    then.
21             (Exhibit 20 marked for identification.)
22        Q    I'm going to hand you, ma'am, what we've
23    marked for purposes of identification as Defendant's
24    Exhibit No. 20 and ask you if you recognize that
25    document.
```

247

```
1         A    Yes.  This is the note that I sent to
2    Margie for the cell phones.
3         Q    And if you look on the second page of
4    Composite Exhibit 20 there is a copy of an envelope.
5    Is that correct?
6         A    Yes, there is.
7         Q    Is that your handwriting on that?
8         A    Yes, it is.
9         Q    If you see, there is a handwriting where
10   it says "8-22" up in the right-hand corner.  Do you
11   see that, ma'am?
12        A    Yes, I see the handwriting.
13        Q    And is that when you sent the cell phones
14   back?
15        A    No.  It must have been on August 20th,
16   because that's what the postmark says.
17        Q    That's when it was received, it would be
18   August 22nd.  Right?
19             MR. THOMPSON:  Object to the form.
20        A    I don't know when it was received because
21   I don't control the mail.
22        Q    You sent that back immediately after
23   receiving Ms. Kincaid's letter requesting the cell
24   phones coming back.  And that's what you meant by
25   that very week when you testified earlier, didn't
```

248

```
 1    you?
 2         A     No.  I meant the week that I got Joe
 3    Rosser's cell phone.  That's what I was waiting on.
 4         Q     Did you provide copies of those documents
 5    to your attorney in response to the request for
 6    production of documents?
 7         A     I didn't have those -- Exhibit 18.  This
 8    is the first time I've seen Exhibit 18.  This is the
 9    first time I've seen Exhibit 19.
10         Q     I'm asking you about Exhibit 20, ma'am.
11         A     Exhibit 20, I didn't know I was supposed
12    to give it to my attorney.  It's a letter of me
13    sending back two cell phones.
14              (Exhibit 21 marked for identification.)
15              MR. McKENNA:  Again, Jim, I think we
16         have some supplementation required.
17              MR. THOMPSON:  Mr. McKenna, do you want
18         me to copy this and send it back to you or --
19              MR. McKENNA:  I want a copy of what
20         she's got.
21              MR. THOMPSON:  Okay.
22    BY MR. McKENNA:
23         Q     The return address, it says Nadia Naffe,
24    Joe Rosser at Bison Supply Tampa.  Do you see that
25    ma'am?
```

249

```
1        A      Yes.
2        Q      Were you working at Bison Supply in
3   Tampa?
4        A      No.
5        Q      So why do you have that down as the
6   return address?
7        A      If she wanted to send the package back,
8   she could send it back there.
9        Q      Why would she want to send the package
10  back?
11       A      You would have to ask her that.
12       Q      Why did you think she would want to send
13  the package back?  Because you're the one that put
14  that down as the return address.
15       A      I don't understand your question.  You
16  ask -- I don't understand your question.
17       Q      Okay.  You put down Bison Supply as your
18  return address on Exhibit 20.  Is that correct?
19              MR. THOMPSON:  Object to form.
20       A      Yes and no.
21       Q      All right.  Let's start with the yes.
22  What does that mean?
23       A      I was returning the cell phones for me
24  and Joe Rosser.  He paid for the certified mail, so
25  I put his return address.
```

250

```
 1         Q      So why did you put your name on it?
 2         A      Because the letter was from me, and part
 3    of the contents of the package was from me as well.
 4    It was from us, and I cc'd him on the letter.
 5         Q      Have you ever received --
 6         A      Before you ask that question I need to go
 7    to the bathroom.  I'm going off the record.
 8                (Recess from 1:51 to 1:59 p.m.)
 9    BY MR. McKENNA:
10         Q      Did you ever receive anything of value
11    from Mr. Rosser?
12         A      What do you mean by that?
13         Q      I mean did you ever receive anything of
14    value from Mr. Rosser.
15         A      I want you to be specific about what
16    you're talking about as far as value.
17                MR. McKENNA:  Let's go off the record.
18         I'll go get the dictionary.
19                (Recess from 1:59 to 2:01 p.m.)
20                MR. THOMPSON:  Just for the record, I'd
21         just like to --
22                MR. McKENNA:  If you have an objection,
23         you say objection to form.  Otherwise that's
24         it.
25                MR. THOMPSON:  No.  For the record, I've
```

251
```
 1        got an objection with the fact that you are
 2        not allowing my client to ask you to clarify a
 3        question.
 4             MR. McKENNA:  Fine.  I'm going to
 5        clarify the question.
 6             MR. THOMPSON:  She has every right to do
 7        that.
 8             MR. McKENNA:  I'm going to clarify the
 9        question.
10   BY MR. McKENNA:
11        Q    Value, ma'am, means of monetary worth.
12        A    No.
13        Q    Now --
14        A    Well --
15        Q    Did you ever receive anything of value
16   from Mr. Rosser?
17        A    No, I've never received anything of
18   monetary worth from Mr. Rosser.
19             MR. McKENNA:  Would you mark that,
20        please.
21             (Exhibit 21 marked for identification.)
22   BY MR. THOMPSON:
23        Q    I'm going to hand you what we've marked
24   for purposes of identification as Exhibit 21.  Do
25   you recognize that document?
```

252

```
 1        A     Yes.  It's a copy of my --
 2        Q     Did you provide a copy of that document
 3   to your lawyer in response to the request for
 4   production of documents?
 5            MR. McKENNA:  I don't have another
 6        copy.
 7            MR. THOMPSON:  Can I see it?
 8   BY MR. THOMPSON:
 9        Q     Do you understand that question, ma'am?
10        A     Why don't you stop jumping on me.
11            MR. THOMPSON:  Mr. McKenna, there is
12        absolutely no reason to be rude to my client.
13            MR. McKENNA:  I'm simply asking her if
14        she understands.
15            MR. THOMPSON:  But the rudeness is
16        uncalled for.
17            MR. McKENNA:  Jim, I'm not going to sit
18        here and have a diatribe with you.
19   BY MR. McKENNA:
20        Q     Now, the question, ma'am, is:  Did you
21   provide that document to your client in -- to your
22   lawyer in response to the request for production of
23   documents?
24        A     I believe I did.
25            MR. McKENNA:  Well, it wasn't provided.
```

253

```
 1          And I think we need some serious
 2          supplementation.
 3               MR. THOMPSON:  Mr. McKenna, I personally
 4          have reviewed that.  I've seen that before.  I
 5          know that that was provided to you.  We're
 6          going to be able to -- I'll get you one with
 7          the Bates stamp on it if that's what you
 8          need.  I don't know about all of the other
 9          ones that you're accusing us of withholding,
10          but I know that this one was provided.
11  BY MR. McKENNA:
12      Q    Are you employed currently?
13      A    Yes.
14      Q    Where?
15      A    At Bernini of Ybor.
16      Q    What do you do at Bernini of Ybor?
17      A    I'm a server.
18      Q    How long have you been there?
19      A    About a month.
20      Q    Have you ever had any jobs between the
21  time you left Kincaid Brick and working at Bernini?
22      A    No.
23      Q    How much are you paid?
24      A    Tips.
25      Q    You get no hourly rate?
```

254

```
 1         A      Oh, I'm sure I do.  I don't know how much
 2    it is an hour.
 3         Q      Are you working anywhere else besides
 4    Bernini?
 5         A      No, sir.
 6         Q      Who is your immediate supervisor?
 7         A      The owner, Jason.
 8         Q      What's Jason's last name?
 9         A      I think Fernandez.
10         Q      How much do you make at Bernini?
11               MR. THOMPSON:  That's asked and
12    answered.
13               MR. McKENNA:  No.  I asked her how much
14    she makes, not what her hourly rate was.
15               MR. THOMPSON:  Okay.
16         A      You know, I have never sat down and
17    calculated out the tips and the hourly rate.  But
18    I'm going to estimate -- and for the purposes of
19    your question, this is merely an estimate.  It's
20    about $15 an hour.
21         Q      Do I now have a complete list of your
22    employment since high school?
23         A      Yes and no.  Yes, I've told you
24    everything that I can remember as I sit here.  I
25    think that I have given you everything, but I don't
```

257

255

```
 1    want to say yes for certain because I would be doing
 2    myself a disservice if I did that, if I did in fact
 3    forget something.  So as I sit here, I've told you
 4    about everything that I can recall at this moment.
 5         Q    Is there anything you could look at that
 6    would refresh your recollection?
 7              MR. THOMPSON:  It's easy for you to say.
 8              MR. McKENNA:  It's been a long day.
 9         A    I don't know.  Why don't you show me
10    something that might refresh my recollection.
11              MR. McKENNA:  Move to strike as
12         nonresponsive to the question.
13    BY MR. McKENNA:
14         Q    Do you know of anything that you can look
15    at that would refresh your recollection?
16         A    Maybe.
17         Q    What?
18         A    Well, I don't know what until I see it.
19         Q    As we sit here today, you don't know of
20    anything you can look at that would refresh your
21    recollection.  Is that correct?
22         A    Nothing comes to mind.
23         Q    I'm going to hand you what we marked
24    previously as Defendant's Exhibit No. 1.  And I want
25    you to turn to the first page there for me.  And --
```

256

```
 1         A      This -- okay.  Sorry.  Go ahead.
 2         Q      Paragraph No. 1, it relates to -- it
 3    talks about intentional race discrimination, the
 4    maintenance of a racially hostile work environment
 5    and retaliation.  Do you see that, ma'am?
 6         A      Yes, sir.
 7         Q      Are those the claims you're making in
 8    this case?
 9         A      Yes, sir.
10         Q      All right.
11         A      Wait a minute.  Is this -- okay.  Yes.
12    Mr. McKenna, I need to take a quick break.  I need
13    to take some more aspirin.  Sorry.
14              (Recess from 2:08 to 2:15 p.m.)
15    BY MR. McKENNA:
16         Q      All right, ma'am.  If you turn to page 2
17    of Defendant's Exhibit No. 1, Paragraph No. 5 --
18         A      I'm sorry.  Page 2, Paragraph No. 5?
19         Q      Correct.  It says -- and I'm
20    paraphrasing -- Naffe complained to officials of the
21    RPF and the other defendants about race-matched job
22    assignments and hostile work environment.  Do you
23    see that, ma'am?
24         A      Yes.
25         Q      Now if you would turn for me to page 5,
```

257

```
1    Paragraph 21, it says that in December 2003 you
2    complained to Terry Kester about race-matched job
3    assignments.  Do you see that, ma'am?
4         A    Yes, sir.
5         Q    And is that in fact true?
6         A    Yes, sir.
7         Q    And then if you go to Paragraph 26 on
8    page 7, it says that faced with the ongoing
9    race-matched job assignment and --
10        A    Wait.  I don't see that.  Wait.  Where
11   are you?
12        Q    Page 7, Paragraph 26.
13        A    Okay.
14        Q    Are you there?
15        A    Yes.
16        Q    It says:  "Faced with the ongoing
17   race-matched job assignments and Kester's mounting
18   hostility, Naffe decided to complaint to other RPF
19   officials."  Do you see that, ma'am?
20        A    Uh-huh.
21        Q    I need you to answer verbally, ma'am.
22             MR. ISLER:  She's chewing.
23        A    Your attorney -- your co-defendant gave
24   me candy.  I'm sorry, Mr. McKenna, repeat the
25   question, please.
```

260

```
                                           258
 1                MR. McKENNA:  Would you read back the
 2        question, please.
 3                (The reporter read as requested.)
 4        A     Yes, sir.
 5        Q     Then it says in January 2004 you told
 6   Christina Sheppard that you were being pigeonholed.
 7   Do you see that, ma'am?
 8        A     It says that, among other things.
 9        Q     And is that true?  Did you complain at
10   that time?
11        A     Yes.
12        Q     And then next -- very next paragraph it
13   says that "Naffe next complained to carol Jean
14   Jordan, and she replied 'Terry can't help it.
15   That's the way he is.  He comes from a redneck part
16   of the state.'"  Do you see that, ma'am?
17        A     Yes.
18        Q     Did you make that complaint?
19        A     Yes.
20        Q     Then it goes to Paragraph 28 and it says
21   that on another occasion Naffe complained to Jordan
22   about it and he said I'm not going to tell Terry how
23   to do his job.  Do you see that, ma'am?
24        A     Carol Jean Jordan is not a he.  It says
25   "Jordan replied."
```

```
                                              259
 1          Q       Do you see the paragraph I'm referring
 2  to?
 3          A       If you're referring to "Jordan replied,"
 4  yes, sir, I do.
 5          Q       I'm referring to Paragraph 28.
 6          A       Yes, I do.
 7          Q       Did you in fact make that complaint?
 8          A       Yes, I did.
 9          Q       Then going on to Paragraph 29, it says
10  that on February 28 you complained to Jeffrey
11  Becker.  Do you see that, ma'am?
12          A       Yes.
13                  MR. THOMPSON:  I'm going to object to
14          the form.
15                  MR. McKENNA:  Why?
16                  MR. THOMPSON:  It just -- it says "On or
17          about."
18  BY MR. McKENNA:
19          Q       Okay.  Did you in fact make that
20  complaint?
21          A       Yes.
22                  (Exhibit 22 marked for identification.)
23          Q       Now I'm going to hand you what's been
24  marked for purposes of identification as Defendant's
25  Exhibit 22, which is the charge of discrimination
```

260

```
 1    that you filed.  Do you see that, ma'am?
 2         A    Yes.
 3         Q    In here it says on January 23 and on
 4    February 28 you complained about Kester's behavior
 5    to Jeffrey Becker.  Do you see that, ma'am?
 6              MR. ISLER:  Is there a Bates number at
 7         the bottom of that one?
 8              MR. McKENNA:  No.
 9         A    Yes, I do see that.
10         Q    All right.  Now, I'm confused because,
11    for example, you say here that on January 23 and on
12    February 28 you complained to Becker.  But in your
13    complaint you don't say anything about complaining
14    to Jeffrey Becker on January 23rd.  Is that
15    accurate?
16         A    Repeat the question again.
17         Q    Okay.  In your complaint in Paragraph 29
18    you say that you complained to Jeffrey Becker on
19    February 28th, but in your charge of discrimination
20    you say not only did you complain on February 28th
21    but you also complained on January 23 to
22    Mr. Becker.  Do you see that, ma'am?
23         A    Yes, sir.
24         Q    So you do not have the complaint -- the
25    alleged complaint to Mr. Becker on January 23 in
```

261

```
1    your amended complaint.  Correct?
2         A    I don't know that to be true.  I'd have
3    to read the entire complaint to see if maybe counsel
4    stuck it in somewhere else.
5         Q    Well, why don't you read the entire
6    complaint and see if counsel stuck it in somewhere
7    else.
8              MR. McKENNA:  Unless you want to
9         stipulate that it's not in there.
10             MR. THOMPSON:  I would have to read it
11        too.
12        A    We're talking about the date on January
13   23, 2004.  Is that correct?
14        Q    That's the one that's not in the amended
15   complaint.
16        A    Just say yes or no.
17             MR. ISLER:  That's really inappropriate.
18        Q    Are you going to answer the question?
19        A    I told you I'd have to read the whole
20   thing before I can answer.
21        Q    Then read it.  We've got all the time in
22   the world.
23             MR. THOMPSON:  For the record, you're
24        asking her to read the entire complaint on a
25        document that speaks for itself just to get
```

262

```
1     her to say whether --
2           MR. McKENNA:  Do you want to stipulate
3     that it's not in there?
4           THE WITNESS:  We're not going to
5     stipulate to anything.
6           MR. THOMPSON:  I would certainly
7     stipulate that the document speaks for
8     itself.  If it's not in there, it's not in
9     there.  You would know.
10          MR. McKENNA:  I'd love to testify, Jim,
11    but I can't.  The only person who can testify
12    is your client.
13          MR. THOMPSON:  But I'm stipulating that
14    the document speaks for itself.
15          MR. McKENNA:  Do you want to stipulate
16    that it's not in there?
17          MR. THOMPSON:  I am stipulating that the
18    document speaks for itself.  I would have to
19    read the whole thing to see if it's in there.
20          MR. McKENNA:  You wrote it.
21          MR. THOMPSON:  I understand.  I don't
22    have it memorized.  I'm sorry, Mr. McKenna.
23          MR. McKENNA:  Why don't we go off the
24    record while she reads it and then we'll go on
25    from there.
```

263

```
 1              (Recess from 2:22 to 2:30 p.m.)
 2    BY MR. McKENNA:
 3         Q     Have you finished reviewing the
 4    complaint?
 5         A     Yes.
 6         Q     And the alleged complaint that you have
 7    in your charge for February 23, 2004, your complaint
 8    to Jeffrey Becker is not contained within the
 9    complaint.  Is that correct?
10         A     Repeat that question again, please.
11              MR. McKENNA:  Read it back, please.
12              (The reporter read as requested.)
13         A     Yes and no.  And this is very curious to
14    me because somehow I remember Jeffrey's name being
15    in here.  I don't see it in Section 26 of the
16    complaint that you're referring to, Mr. McKenna, but
17    it is very clear it says "faced with ongoing
18    race-matched job assignments and Kester's mounting
19    hostility, Naffe decided to complain to other RPOF
20    officials."  Mr. Becker is an RPOF official, so
21    therefore he would be included in that.
22         Q     Do you have any explanation for why the
23    January 23rd alleged complaint to Mr. Becker is not
24    contained in your amended complaint?
25         A     Do I have any idea?
```

266

                                                        264
```
 1          Q     Do you have any explanation for why the
 2    alleged complaint to Mr. Becker on January 23, 2004
 3    is not contained within your amended complaint?
 4          A     As I sit here with you today, no.  But
 5    I'm going to find out because it's very mysterious
 6    to me.
 7          Q     Did you in fact -- do you contend that
 8    you complained to Mr. Becker on January 23, 2004?
 9          A     Yes.
10          Q     Now, if you go down a few lines, it says
11    on February 6, 2004, and February 20, 2004, you
12    complained to Carol Jean Jordan.  Do you see that?
13          A     I'm not with you.  What paragraph are you
14    in?
15          Q     I'm in Exhibit 22, the charge, a few
16    lines down from the January 23rd date.  It says on
17    February 6, 2004 and February 20, 2004 you
18    complained to Carol Jean Jordan.  Do you see that,
19    ma'am?
20          A     Yes.
21          Q     Now, if you turn back to the complaint
22    and going back to Paragraph 27, it says you
23    complained to Carol Jean Jordan.  Do you see that,
24    ma'am?
25          A     Yes.
```

265

```
 1          Q      But it doesn't have a date on it.  Can
 2     you tell me which complaint that was; the February
 3     6th or the February 20th complaint?
 4          A      Not without -- I could tell you if I
 5     looked at my response to the RNC's interrogatories,
 6     because it's in there.
 7                 MR. THOMPSON:  Mr. McKenna, if you want
 8          to save time, I can turn her to the page where
 9          it is.
10                 MR. McKENNA:  That's fine with me.
11                 MR. THOMPSON:  Okay.
12                 MR. McKENNA:  Assuming she wants to.
13                 THE WITNESS:  I want to.
14                 MR. THOMPSON:  That's not appropriate.
15          Starting here.
16          A      Okay.  Repeat the question, Mr. McKenna.
17                 MR. McKENNA:  Please read it back.
18                 (The reporter read as requested.)
19          A      I'm sorry.  What is it that you're -- I'm
20     just a little confused.  What part of it are you
21     trying to ask me about?
22          Q      All right.  On -- in Paragraph 27 you
23     contend that you complained to Carol Jean Jordan and
24     that her response was something to the effect Terry
25     can't help the way he is.  He comes from a redneck
```

266

```
 1   part of the state.  Do you see that, ma'am?
 2        A    Yes.
 3        Q    I'm trying to find out what date that
 4   was.
 5        A    Which one are you talking about?  The
 6   racially insensitive part or the -- which part?
 7   Because there is two different complaints that we're
 8   talking about.
 9        Q    I'm talking about the complaint where
10   Jordan replied Terry can't help the way he is.  He
11   comes from a redneck part of the state.
12        A    I believe it was on February 20th.
13        Q    Okay.  And then does that mean that the
14   complaint in Paragraph 28 would have occurred on
15   February 20th?
16        A    No.
17        Q    Did I say that backwards?
18        A    Repeat your question again.  You're
19   confusing me.
20        Q    Let's back up.  What date did you say
21   that you believed that the complaint in Paragraph 27
22   occurred?
23        A    I've already answered that question.
24        Q    I know, ma'am.  Would you please answer
25   it again?
```

267

```
 1              MR. THOMPSON:  I'm going to object to
 2       form.
 3       Q    Okay.
 4       A    I'm sorry, I don't mean to be taking so
 5  long to answer your question.  I just have such a
 6  striking headache and I'm so nervous.  Could you
 7  repeat your question again?
 8       Q    Yes.  In Paragraph 27 you contend you
 9  complained to Carol Jean Jordan and she replied
10  Terry can't help the way he is.  He comes from a
11  redneck part of the state.  And I just want to
12  confirm on which date that conversation, complaint
13  and response took place.
14              MR. THOMPSON:  I'm going to object to
15       form.
16       A    I believe it was on February 20th.
17       Q    Okay.  So you think the complaint in
18  Paragraph 27 was on the 20th.  How about the --
19              MR. THOMPSON:  Object to form.
20       Q    How about the complaint in Paragraph 28
21  then?  Would that have been on the 8th?
22       A    Where are you getting this date, the 8th,
23  from?
24       Q    From your charge of discrimination,
25  Exhibit 22.
```

268

```
 1                  MR. THOMPSON:  The 6th do you mean?
 2                  MR. McKENNA:  Pardon me?
 3                  MR. THOMPSON:  Do you mean the 6th?
 4         A     That's why I'm confused.  All your dates
 5    are different from what I'm reading.
 6         Q     Oh.  The 6th.  I apologize.  Yes, the
 7    6th, not the 8th.
 8         A     I think you did that on purpose.
 9         Q     Well, you're entitled to your opinion.
10         A     Okay.  Now that you've got the date
11    squared away, what is your question?
12         Q     Was the complaint in Paragraph 28 the one
13    that occurred on February 6th?
14         A     Which part of the complaint?
15         Q     The one where Jordan replied, "I'm not
16    going to tell Terry how to do his job.  Just talk to
17    him."
18         A     I believe that's the one that occurred on
19    February 6th.
20         Q     Okay.  Now --
21         A     Before you ask your next question, I need
22    to take a quick break.  I'm going off the record.
23                  (Recess from 2:41 to 2:51 p.m.)
24    BY MR. McKENNA:
25         Q     Now, ma'am, have we discussed all of the
```

269

```
 1    complaints that you made from the beginning of your
 2    employment until February 28 that have to do with
 3    your claim of discrimination?
 4         A     Yes and no.  Mr. McKenna, you used the
 5    word "discussed."  And --
 6         Q     Have we listed?  Would you be happier
 7    with that word?  I just want to know if we've
 8    listed, if we've got all of your complaints from the
 9    time that you began from the -- employment with FORP
10    until February 28 --
11         A     Who is FORP?
12         Q     The party of -- Republican Party of
13    Florida.  Do we have all of your complaints?  Have
14    we noted them?
15         A     In what manner?  In all manners?
16         Q     Today, in the discussion we just had of
17    looking at your charge of discrimination --
18         A     Okay, today.  Things we've talked about
19    today.
20         Q     In the charge of discrimination and the
21    amended complaint, are those all of the complaints
22    that you allege that you have made about
23    discrimination from the beginning of your employment
24    until February 28, 2004?
25              THE WITNESS:  Now, will you repeat
```

270

```
 1          everything he just said in its entirety, the
 2          whole last question?
 3                MR. McKENNA:  You can read it back.
 4                (The reporter read as requested.)
 5                THE WITNESS:  Repeat it one more time.
 6                (The reporter read as requested.)
 7        A     I don't understand that question.  I -- I
 8   need you to ask me that question in a different way.
 9        Q     Okay.  Let's do it in baby steps.  Turn
10   back to Exhibit No. 1.  Turn back to Exhibit No. 1,
11   please.
12        A     Don't talk to me that way.
13                MR. ISLER:  The amended complaint.
14        A     I want to go off the record to talk to my
15   attorney.
16        Q     Now, turn to Paragraph 5.
17                MR. THOMPSON:  No.
18        Q     I'm not agreeing to go off the record.  I
19   want to ask some questions, and I haven't been able
20   to ask any.
21        A     Well, I wish you weren't so nasty and so
22   argumentative and so rude.
23        Q     Now --
24                MR. THOMPSON:  What's more is we are
25          well over seven hours at this point.  How long
```

271

```
1    do you plan on going?  If I'm going to give
2    you -- agree to extra time, how much extra
3    time do you need?
4         MR. McKENNA:  I'm not going to have a
5    discussion with you on the record.  I want to
6    ask my questions.
7         MR. THOMPSON:  I actually think that if
8    it's something you're going to try to address
9    to the Court, I think the record is the best
10   place to have the discussion.
11        MR. McKENNA:  I'm not prepared to
12   discuss it.  I want to ask my questions.
13        MR. THOMPSON:  You just want to --
14        MR. ISLER:  I want to note for the
15   record we've actually -- (inaudible)
16        THE REPORTER:  I'm sorry.  I can only
17   write -- I didn't hear your --
18        MR. THOMPSON:  No, we are at the
19   seven-hour mark.
20        MR. ISLER:  We did three hours and 41
21   minutes.
22        MR. THOMPSON:  We did three hours and
23   55 minutes, I thought.
24        MR. McKENNA:  Am I going to be able to
25   ask my questions?
```

272

```
 1                    MR. THOMPSON:  Well, at some point when
 2          we get a pause I would like to discuss this
 3          within the next half an hour or so.
 4                    MR. McKENNA:  Fine.
 5     BY MR. McKENNA:
 6          Q     Now --
 7          A     And I think right now is a good time
 8     because I need to speak with my attorney off the
 9     record.
10          Q     -- if you would turn to Paragraph 5 of
11     the amended complaint --
12                    THE WITNESS:  Jim, I really need to talk
13          to you.
14                    MR. McKENNA:  Well, first of all, as
15          Mr. Thompson well knows, he has no right to
16          discuss anything with you once you sit down to
17          discuss this unless it's a privilege issue.
18          And that's very clear under the case law.
19          Now, I want to ask questions.  Are you -- do
20          you have a privilege issue you want to discuss
21          with your client?
22                    MR. THOMPSON:  No, I don't.  She has a
23          question of me, and I don't know --
24                    MR. McKENNA:  You know perfectly well,
25          unless it's a privilege issue, you're not
```

273
```
 1        permitted to have any discussions with her
 2        about her testimony.
 3              MR. THOMPSON:  Until I know the
 4        question, I don't know whether it is a
 5        privilege issue, Mr. McKenna.  I don't know
 6        what the question is right now.  I don't know.
 7              MR. McKENNA:  What do you want to do,
 8        Jim?
 9              MR. THOMPSON:  I'm not good at reading
10        minds.  I will hear the question.  I'm not
11        even going to answer it.  Just go ahead and
12        explain it to me.  Go ahead, Mr. McKenna.
13              MR. McKENNA:  Thank you.
14   BY MR. McKENNA:
15        Q    Turning to Paragraph 5 of the amended
16   complaint, it says:  "Naffe complained to officials
17   of the RPOF."  Do you see that, ma'am?
18        A    Yes.
19        Q    Now, what I'm trying to determine is how
20   many times you complained to the officials of the
21   RPOF.  And we have so far, by my count, six that are
22   contained either in the amended complaint or in your
23   charge of discrimination.  Do you understand that,
24   ma'am?
25        A    I understand that you say you've counted
```

274

```
 1    six.
 2         Q     All right.  Are there any other
 3    complaints that you contend you made to officials of
 4    the RPOF or the other defendant other than the ones
 5    we just noted that are in the amended complaint
 6    and/or the charge of discrimination?
 7         A     Well, let me count them.
 8         Q     I'm not interested in a count, ma'am.
 9    I'm interested --
10         A     What's your question?
11         Q     If those are all of them.
12         A     Maybe.  You don't want me to count and
13    you want me to answer without knowing the answer.
14         Q     I'm not interested in the number.  I'm
15    interested in whether --
16         A     Then why did you say a number?
17         Q     I'm interested in whether those are all
18    of the complaints that you contend that you made.
19         A     Then you are interested in a number.  If
20    those are all, all is addition.
21         Q     I'll try it one more time a different
22    way.  Do you contend there are any other complaints
23    that you made other than the ones that we just noted
24    in the amended complaint and in the charge of
25    discrimination?
```

275

```
 1          A      I just answered your question.  My answer
 2    was maybe.
 3          Q      Okay.  And why do you say that?
 4          A      Without having a chance to go through the
 5    complaint and count them -- you told me you didn't
 6    want me to do that.  Without going through and
 7    counting, I have to take your word for it that it's
 8    about six.  And that's why I said maybe, because I
 9    don't know definitively --
10          Q      Okay.
11          A      -- how many there are in the -- and
12    you're talking about me adding up the number of
13    complaints in all of the charges and complaints and
14    any others.
15          Q      All right.  Fine.
16              MR. McKENNA:  Let's go off the record.
17          She can review the complaint and we can
18          determine whether there are any additional
19          complaints that she alleges that she made.
20              (Recess from 2:59 to 3:14 p.m.)
21    BY MR. McKENNA:
22          Q      Ma'am, the question that was pending
23    before we took the break was whether the complaints
24    that we discussed in the amended complaint, Exhibit
25    1, and your charge of discrimination, Exhibit 22,
```

276

```
1    are all of the complaints that you contend you made.
2         A    I believe that the bulk of the complaints
3    are contained within those two exhibits.  And as I
4    sit here today, I cannot think of any additional
5    complaints; however, that doesn't mean that
6    additional complaints don't exist.  It just means
7    that as I sit here right now I can't think of any.
8         Q    Is there anything you could look at that
9    would refresh your recollection?
10        A    Again, Mr. McKenna, as I sit here, I
11   can't think of anything.
12        Q    You can't think of any documents that
13   would help refresh your recollection to determine if
14   there were any other complaints.  Is that correct?
15        A    As I sit here, no, Mr. McKenna.
16        Q    No, you cannot think of any?
17        A    I already gave you my answer.  And please
18   don't put words in my mouth and please don't try to
19   make me say things that I don't want to say.  I
20   think that's extremely unethical.
21             MR. ISLER:  That's what we lawyers do.
22        Q    Yes.  So --
23        A    Well, if that's the case --
24        Q    -- as we sit here today, you cannot name
25   me a document that you can look at to refresh your
```

277

```
 1    recollection about any other complaints that you may
 2    have made.  Is that right?
 3         A     Not as I sit here today.
 4         Q     Now, let's go to the earliest one, which
 5    is the December 2003 complaint to Kester that's
 6    contained in amended complaint Paragraph No. 21.
 7         A     What exhibit are we talking about?
 8         Q     Exhibit 1, the amended complaint,
 9    Paragraph 21.  Are you with me?
10         A     Yes, sir.
11         Q     All right.  Where did that discussion
12    take place?
13         A     Could you please repeat the question,
14    sir?
15         Q     Where did that discussion take place?
16         A     The discussions took place over the
17    phone.
18         Q     Okay.  And what telephone were you using?
19         A     I know that I was using my cell phone for
20    one of the complaints, and -- pardon?
21         Q     I'm interested in the one that's
22    referenced in Paragraph 21.
23         A     Paragraph 21 says "complained."  It
24    doesn't say complain.  It says "complained."
25         Q     Yeah.  It says in December 2003 you
```

278

```
 1    complained to your immediate supervisor about the
 2    race-matched job assignment.  And then it says not
 3    only was Kester unresponsive to your complaints but
 4    you accused that -- if I may paraphrase -- of being
 5    insubordinate and not being a team player for
 6    raising the issue.
 7            So my question is, is when you made that
 8    complaint in December of 2003, you were on your cell
 9    phone.  Is that correct?
10        A    I used my cell phone and my home phone.
11        Q    At the same time?
12        A    No, of course not.
13        Q    Well, then I don't understand.  How could
14    you have made a complaint in December 2003 on both
15    your cell phone and your home phone?
16        A    Because the first time that we were
17    talking about it I remember being in my car and the
18    chairman was in the car with me and we were talking
19    on the phone.  And then I sent Terry an e-mail that
20    night complaining about the assignment, and the next
21    day he said I had to call the office.  And when I
22    called the office, I don't remember -- and I was
23    complaining at that point as well, but I don't
24    remember if I was on my cell phone or home phone
25    when I called the office the next day, is the point
```

279

```
 1    I'm trying to make.
 2         Q    So there were two complaints that you're
 3    contending occurred in Paragraph 21?
 4         A    Yes and no.  There -- there was a
 5    complaint, and we had more than one conversation
 6    about it.
 7         Q    Let's start with the first conversation.
 8    You were on the telephone with Mr. Kester.  Is that
 9    right?
10         A    Yes.
11         Q    On your cell phone or on your home phone?
12         A    The first time we talked about it I was
13    in my car, so it was my cell phone.
14         Q    Okay.  And did you call him, or did he
15    call you?
16         A    I think he called me.
17         Q    Okay.  And what did he say to you when he
18    called you?
19         A    I don't -- I don't remember his exact
20    words, but it was something to the effect that he
21    wanted me to coordinate this event with the black
22    republicans.
23         Q    What event with the black republicans?
24         A    A banquet.
25         Q    Where was this banquet going to be?
```

280

```
1         A      The banquet was in Sarasota.
2         Q      Which was within your geographical scope
3    of your responsibilities?
4         A      Sarasota is in my geographic area.
5    However, coordinating these types of events never
6    was my responsibility.
7         Q      And when you say black republicans, are
8    you referring to the African American round table?
9         A      This wasn't an African American round
10   table.  This was -- no, I am not referring to an
11   African American round table.
12        Q      Then what are you referring to?
13        A      This was an event.  It was an
14   appreciation -- it was an appreciation event for the
15   Black Republican Federation.  It was -- they called
16   it a black empowerment banquet.
17        Q      Who was sponsoring it?
18        A      Who was sponsoring it.  I'm not certain
19   who all the sponsors of that event were.
20        Q      Do you remember any of them?
21        A      You'd have to ask Johnny Hunter.  I'm
22   sure he would know.
23        Q      Well, I'm asking you, ma'am.  Do you
24   remember any of the sponsors?
25        A      Not off the top of my head, no.
```

```
 1          Q      Is there anything you could look at to
 2   refresh your recollection?
 3          A      If you gave me something, possibly.
 4          Q      Do you know of anything that you could
 5   look at to refresh your recollection?
 6          A      To my knowledge, the folks who would have
 7   access to that information would be Johnny Hunter
 8   and those folks.
 9          Q      Have you finished your answer?
10          A      Repeat the question again.
11          Q      The question is, ma'am, is do you know of
12   anything you could look at to refresh your
13   recollection as to who the sponsors of this banquet
14   were?
15          A      No, I can't think of anything.
16          Q      Was this the Federation of Black
17   Republicans?
18          A      It was -- it was a -- it was a -- how can
19   I say it -- a conjoined event.  It was -- yes and no
20   is the answer.
21          Q      Okay.  How about the yes part?
22          A      I would say yes in aspect -- in the
23   aspect of the RPOF's role in it with the video
24   presentation, and they presented for the first
25   time -- I think it was the first time that -- the
```

282

```
 1   video that the RPOF worked with them to create
 2   regarding the history of blacks and the Republican
 3   Party.  That was one of the main recruitment tools
 4   that they were going to use.  And I know Johnny
 5   Hunter talked a lot about that.  And when the
 6   chairman spoke before the group, she talked a lot
 7   about that.
 8            And it was -- and then the no part would
 9   be the Saramana Club did a lot of work on the
10   project because they were -- quote, unquote -- the
11   flagship club, and they were trying to set a
12   precedent for the other black clubs that were to
13   come after them.
14       Q     So do I understand your testimony that
15   the Federation of Black Republicans and the Saramana
16   Republican Club conjoined to put on this banquet?
17       A     Well, it's almost the same thing, really,
18   because the folks who are the leadership -- at that
19   point the folks who were the leadership of the
20   federation essentially were --
21       Q     The leaders of the Saramana Club?
22       A     Mostly, yes.  It was not completely.
23   There was other folks involved, but --
24       Q     And Johnny Hunter was head of the
25   Saramana Republican Club?
```

283

```
 1        A     Yes.
 2        Q     Now, what did Mr. Kester want you to do
 3   with respect to this banquet?
 4        A     Terry wanted me to get their itineraries
 5   and coordination for the event.
 6        Q     Get whose itinerary?
 7        A     This event.  He wanted me to get involved
 8   with this event.  I guess he -- he wanted -- at
 9   first he wanted the itinerary and some other items
10   for this event, and he wanted me to get involved
11   with assisting and coordinating the event and
12   coordinating the chairman's schedule in this event
13   and some other things.  And -- what was the question
14   again?
15        Q     What did Mr. Kester want you to do with
16   respect to the banquet?
17        A     Primarily he wanted me to, as I said,
18   coordinate the -- assist with coordinating the event
19   and deal with these itinerary -- deal with the
20   itinerary.
21        Q     Okay.  Whose itinerary?
22        A     Their itinerary, the event itself, the
23   event itinerary and the chairman's -- the chairman's
24   going to this event.
25        Q     So he wanted you to coordinate the
```

286

284

```
 1    chairman's appearance at the event?
 2         A    Yes, and --
 3         Q    No.
 4         A    -- other things.  Are you trying to
 5    answer for me?
 6         Q    I wouldn't think of it.  What were the
 7    other items he wanted you to get besides the
 8    itinerary?
 9         A    I've already told you the other items.
10         Q    I don't believe I understand then, so why
11    don't you tell me again.
12         A    I told you assisting with coordinating
13    the event.
14         Q    What does that mean, "coordinating the
15    event"?
16         A    Terry was concerned about -- can you
17    repeat the question?
18              MR. McKENNA:  Would you read it back,
19         please?
20              (The reporter read as requested.)
21         A    Exactly what I said, coordinating the
22    event.
23         Q    Well, I don't understand what
24    "coordinating the event" means.
25         A    Well, you've got the dictionary right
```

287

285
```
 1   here.  You can look it up.
 2        Q     So why don't you tell me what you mean.
 3   Were you putting table cloths on tables?  Were you
 4   sweeping the floor?  Were you arranging for
 5   speakers?  Were you manning the drink cart?  Were
 6   you selling alcohol?  Were you picking out food?
 7   What were you doing in coordinating the event?
 8        A     I set the entire schedule for the event.
 9   I sat down with Johnny Hunter and went through it
10   with him, made some suggestions, recommendations.
11   And that's -- that's it.
12        Q     So, for example, you were determining who
13   would be the keynote speaker?
14        A     No.
15        Q     No.  Were you determining who would be
16   the MC?
17        A     No.  But I did assist him in the order in
18   which people would speak.
19        Q     Okay.  So you assisted him in the order
20   in which people would speak.  Did you assist on the
21   topics upon which the people would speak?
22        A     No.  And neither did he.
23        Q     Are you finished with your answer?
24        A     No.  I'm at the end of a thought, and it
25   won't come to me.  I can't answer your question.  I
```

286

```
 1    have more to add, but it won't come to me at this
 2    minute, so maybe we can come back to that one.
 3         Q     Were there awards given out at this
 4    banquet?
 5         A     Yes.
 6         Q     And did you have a determination as to
 7    who would be receiving an award?
 8         A     Wait a minute.  I don't remember if there
 9    were awards or not.
10         Q     You indicated that there was a video
11    played at the banquet?
12         A     Yes, there was.
13         Q     Did you make a determination of when the
14    video was to be played?
15         A     I believe I was involved in that.
16         Q     Was there food at this banquet?
17         A     Yes, there was.
18         Q     Were you involved in selecting the food?
19         A     No, I -- I recommended to Johnny Hunter
20    how he could go about delegating those type of
21    specific tasks.
22         Q     Did you make a recommendation or
23    determine where the location for the banquet would
24    be?
25         A     No.  They had carved out who would speak
```

287

```
 1    at the banquet and where the banquet was going to be
 2    before I got involved with it.
 3         Q    Okay.  And you were to staff the chairman
 4    during this banquet?
 5         A    Yes.
 6         Q    And that means picking her up at the
 7    airport and driving her to the function and being
 8    around if she needs anything?
 9         A    That's part of staffing the chairman,
10    yes.
11         Q    And that was a normal part of your job.
12    Correct?
13         A    Staffing the chairman?
14         Q    Yes.
15         A    They told me that it was.
16         Q    And is this where the chairman came to
17    give the Florida Federation of Black Republicans its
18    charter?
19         A    No, she did not -- I'm sorry.  Repeat
20    that question one more time.
21         Q    Was this the event where the chairman
22    came to give the Florida Federation of Black
23    Republicans its charter?
24         A    No.  I think she did that on January
25    23rd.
```

288

```
1         Q      Okay.  All right.  So Mr. Kester calls
2    you up and he tells you he wants you to get
3    involved in --
4         A      Before you start, I need to go take a
5    break.
6         Q      Sure.  Why not.
7                (Recess from 3:40 to 3:50 p.m.)
8    BY MR. McKENNA:
9         Q      All right, Ms. Naffe.  So Mr. Kester
10   calls you and tells you he wants you to coordinate
11   the event and staff the chairman.  And what did you
12   say in response?
13        A      Terry didn't exactly say that.  He --
14   those were some of the things that he said, and the
15   conversation wasn't exactly like that.  I remember
16   being in my car and driving the chairman somewhere.
17   And I remember him asking me to get to him -- I
18   think it was an invitation to this event on the
19   fly.  And I had no way to do that.  I was in the
20   car, I was traveling, I didn't have the item on me.
21   And obviously he had some knowledge of the event or
22   else he wouldn't be asking for the invitation.  And
23   I recommended that maybe he could ask Suzann
24   Guimond, the chairman's assistant, because she
25   maintains all the invitations and she maintains
```

289

```
 1   Chairman Jordan's schedule.
 2        Q     Okay.  I'm confused.  Did he not ask you
 3   to staff the event in this phone call?
 4        A     I'm not certain -- I'm not certain -- I'm
 5   not certain if it was in that phone call.  I talked
 6   to him -- I talked to him at some point when I was
 7   on my way to the Ritz Carlton, and I think I talked
 8   to him when I was taking Chairman Jordan to the
 9   airport.  And I'm not certain which phone call it
10   was in, but I remember us talking about that.
11              And then during one of the phone calls I
12   remember him telling me to drop everything else I
13   was doing with all my other counties, drop -- you
14   know, wipe all my speaking events for that day off
15   the calendar and get him this invitation for this
16   Black Republican Club.  And, you know, he wanted me
17   to do all these things.
18              And as I was talking to him about it -- I
19   can't remember if it was the chairman or if it was
20   Carol Carter that raised the point that that's
21   actually Suzanne's job.  And I talked to the
22   chairman about it in the car, and we talked about my
23   sending Terry an e-mail.  And she told me that I
24   could copy her on the e-mail as well to find out why
25   isn't Suzann coordinating her attendance to this
```

290

```
 1    event with this Black Republican Club and to find
 2    out why I am instead doing it.
 3         Q    Okay.  Let's go back then to Paragraph 21
 4    of the amended complaint.  What I'm interested in is
 5    the conversation that you had with Mr. Kester where
 6    you made this complaint and he accused you of being
 7    insubordinate and not a team player.  Do you
 8    understand that, ma'am?  Do you understand what I'm
 9    asking?
10         A    Yes.
11         Q    Okay.  That's the conversation I want to
12    focus on.  Okay?
13         A    Okay.
14         Q    Now, was that conversation in your car?
15         A    No.  That conversation was the day after
16    I sent him the e-mail questioning the assignment,
17    questioning the race-based job assignment.
18         Q    Okay.  So you had this conversation with
19    Mr. Kester the next day.  Is that right?
20         A    Yes.
21         Q    And where did this conversation take
22    place?
23         A    It took place in my house.
24         Q    All right.  By telephone?
25         A    Yes.
```

291

```
1        Q    Okay.  Who called whom?
2        A    They instructed me to call the office.
3        Q    "They" being whom?
4        A    Terry sent me an e-mail, and I -- I can't
5   remember if he cc'd Christina on it or not, but he
6   sent me an e-mail:  You are to call the office at
7   11 a.m.
8        Q    Okay.  And you did that?
9        A    Yes, sir.
10       Q    And you said hello?
11       A    I'm sure -- I don't remember if I said
12  hello.  I'm sure I gave some greeting.
13       Q    Okay.  And Mr. Kester said what?
14       A    I've already told you what he said.  It's
15  in my interrogatories.
16       Q    Well, ma'am, would you please tell me
17  again?  For the written record, you're reviewing the
18  answers to interrogatories to the Republican
19  National Committee.  Is that correct?
20       A    I haven't finished with answering the
21  first question yet.
22            MR. THOMPSON:  Well, he's just asking
23       what you're reviewing.
24       A    Yes.  Can we go off the record?
25       Q    No, ma'am.  You need to answer the
```

292

```
 1   question that's pending.  What did Mr. Kester say to
 2   you in the telephone call?  If you don't remember,
 3   you can say you don't remember.
 4        A     Well, there is parts of it that I do
 5   remember and then there is parts of it that I don't
 6   remember.
 7        Q     Well, why don't you tell us the part that
 8   you do remember.
 9        A     I want to tell you the answer to the
10   question in totality.  So if you want to waste your
11   time on the record while I look for something in the
12   interrogatories, that's fine.  It's up to you.
13        Q     Are you refusing to answer the question,
14   ma'am?
15        A     No, absolutely not.  I need more time to
16   answer the question.
17            MR. THOMPSON:  Ms. Naffe, just -- all
18        you have to do is answer what you remember and
19        say everything else that I -- is in the
20        interrogatory answer.  And I think that's what
21        Mr. McKenna is looking for.  Is that --
22            MR. McKENNA:  I just want to know what
23        she remembers.
24            MR. THOMPSON:  Okay.
25        A     Repeat your question, sir.
```

293

```
 1        Q     What did Mr. Kester say after you said
 2   hello or made whatever greeting you made?
 3        A     He started off by saying something to the
 4   effect "I'm going to be very stern with you."  And
 5   he sounded like he was upset.  And one of the first
 6   questions he asked me was why did I copy the
 7   chairman on the e-mail when I complained about the
 8   race-based job assignment.  And he was upset that I
 9   brought it to the chairman's attention that I felt
10   that the assignment was not appropriate.  And I
11   asked him in the e-mail why he'd given me the
12   assignment, and I told him on the phone that I was
13   confused.  I did not understand why he was, you
14   know, giving me this assignment and that isn't it
15   Suzanne's responsibility to coordinate with groups,
16   coordinate the chairman's schedule and when she is
17   to speak and things of that nature with groups.
18              And he -- he was just livid that I
19   questioned my employer's, what I felt was,
20   discriminatory practice.  And he -- he asked me --
21   he asked me something else.  I can't remember the
22   other thing that he asked.  He asked me some other
23   questions.  And when I asked him why am I getting
24   this assignment, basically his answer was, "Because
25   I say so.  Because I say you will do this.  And
```

294

```
 1    because I say so, you will do it."
 2              And I felt like I was being forced to do
 3    it and I felt like I was being -- I was getting in
 4    trouble for complaining about what I thought was
 5    discriminatory.  And I was very confused by that,
 6    because I know that I have a right -- a legitimate
 7    right to question my employer's behavior when I feel
 8    that that behavior is discriminatory.
 9         Q    So do I understand now from your
10    testimony that you're contending that you made the
11    complaint of -- about race-matched job assignments
12    in an e-mail?
13         A    I complained about the assignment that
14    Terry gave me in December in an e-mail.
15         Q    Okay.  So it wasn't a telephone call
16    where you made the complaint.  It was in an e-mail.
17    Is that correct?
18         A    It was both.
19         Q    But the initial complaint that you
20    contend you made in December of 2003 was in an
21    e-mail?
22         A    No.  It was both.
23         Q    Well, "initial" being first.  Which one
24    was first?
25         A    You're confusing me.
```

295

```
1      Q      Okay.
2      A      I don't -- you're asking questions too
3  fast.
4      Q      This page is before this page.  I want to
5  know which complaint was before which complaint.
6      A      Mr. McKenna, the record speaks for
7  itself.
8             MR. ISLER:  Jim, this is a very
9         legitimate question.  You need to instruct your
10        client to answer this question.
11            MR. THOMPSON:  If you remember which
12        complaint came first.
13            THE WITNESS:  Can we talk off the
14        record, please?
15            MR. THOMPSON:  Actually we can't while
16        there is a question pending.  If you remember
17        which one you did first, fine.  If you don't,
18        fine.  But either way, Mr. McKenna is entitled
19        to an answer.
20      A      What was your question again?
21      Q      Which complaint was first?  The one in
22  the e-mail or the one on the telephone?
23      A      I would have to say it was probably the
24  one when he asked me to do this the first time I
25  recommended that he talk to Suzann, and that was the
```

```
 1    same day that I sent the e-mail.  So those two
 2    complaints sort of work together.
 3              We talked about it on the phone and then
 4    I followed up with him, because I was concerned,
 5    with an e-mail, and I was very concerned.  And
 6    that's why I sent him the e-mail and that's why I
 7    copied the chairman on the e-mail.
 8        Q    So where were you when you had this first
 9    conversation where you contend that you made a
10    complaint about race-based assignments?
11        A    Mr. McKenna, I have been very, very clear
12    with you.  We had a conversation in my car about
13    this assignment, and I told Mr. Kester -- I
14    recommended to Mr. Kester at that point that Suzann
15    is usually the person who coordinates the chairman's
16    itinerary.  And further I told him that I didn't
17    have -- I mean, I don't know what he expected me to
18    do.  Pull over on the way to taking the chairman to
19    a speaking engagement and fax to him something I
20    didn't have.  I don't know what he expected when he
21    called me with this.  But I thought it was very
22    strange.
23        Q    Did you say anything else in that
24    conversation?
25        A    Maybe.
```

297

```
 1      Q     Like what?
 2      A     I don't remember every single thing that
 3 I said in the conversation, but I'm sure we talked
 4 about other things.  If you have some way to help me
 5 with my recollection, I'm happy to look at that.
 6            Before you ask your next question, I need
 7 to go to the bathroom.
 8      Q     Sure.  Why not.
 9            (Recess from 4:09 to 4:16 p.m.)
10 BY MR. McKENNA:
11      Q     I'm going to hand you what we've
12 previously marked at your deposition as Exhibit 3
13 and ask you to take a look at the November 20 on the
14 very first page -- no, ma'am, on the very first
15 page, the November 20 entry -- and tell me:  Is that
16 what you're referring to what you've just been
17 discussing?
18      A     Yes, this is the very conversation that
19 I've been discussing.
20      Q     Okay.  Does that suggest to you that it
21 should have been in November instead of December?
22      A     What?
23      Q     If you turn back to Exhibit 1, the
24 complaint, page 5, Paragraph 21.
25      A     Hold on a second.  The complaint.
```

298

```
 1        Q    No. 1.
 2        A    No. 1?
 3        Q    Exhibit No. 1.
 4        A    Okay, I've got Exhibit No. 1.
 5        Q    Page 5, Paragraph 21.  Do you see there
 6   it says in December 2003?  Now, Exhibit 3 indicates
 7   November 2003, does it not, for that conversation?
 8        A    The conversation had to have taken place
 9   in November because the event was in November of
10   '03.
11        Q    Okay.  All right.
12             MR. McKENNA:  Do you have a copy of
13        that?
14             MR. ISLER:  You need this?
15             MR. McKENNA:  Yeah.
16             MR. ISLER:  That's my copy.
17             MR. McKENNA:  I know.  I'll give it
18        right back.
19             MR. ISLER:  Yeah.  No, that's fine.  I
20        just didn't want you to lose it.
21   BY MR. McKENNA:
22        Q    So then is it correct that on November
23   19, 2003, you were staffing the chairman and asked
24   you on the details on an event that was to be held
25   the following Saturday?
```

299

```
 1         A     I don't know if I was staffing her on the
 2   -- well, I guess I was staffing her on the 19th.
 3         Q     That's what Defendant's Exhibit 3
 4   indicates.  Right?
 5         A     That's what that indicates, correct.
 6         Q     Okay.  And you say you -- in the third
 7   paragraph down you returned home and e-mailed
 8   Mr. Kester the information he requested and faxed
 9   him a copy of the invitation to the event.  Do you
10   see that, ma'am?
11         A     Yes.
12         Q     And how long did that take you?
13         A     Which portion of it?
14         Q     "E-mailed Mr. Kester the information he
15   requested and faxed him a copy of the invitation to
16   the event."
17         A     I'm not certain what period of time it
18   took.  The e-mail in and of itself did not take that
19   long to prepare, but the invitation portion of it
20   took longer.
21         Q     What did you have to do to obtain the
22   invitation?
23         A     I had to get it from somebody.
24         Q     Who did you have to get it from?
25         A     Johnny Hunter's folks.
```

300

```
1         Q      So did you telephone them and request an
2    invitation?
3         A      Yes, I believe so.
4         Q      And did they fax you the invitation?
5         A      I don't remember if it was faxed or if it
6    was e-mailed.
7         Q      Okay.
8         A      But it was -- they got me -- they got me
9    an invitation and information about the event.
10        Q      Okay.  And what was discriminatory about
11   that, in your opinion?
12        A      What was -- what I felt was -- what I was
13   questioning about this situation was why was he
14   asking me to do this.
15        Q      As opposed to Suzann?
16        A      Exactly.  It was -- it was sort of an
17   unusual thing, because Suzann had done this type of
18   thing before.  And even the chairman was confused
19   about why Suzann wasn't doing it.  And basically
20   Terry was very upset that I even asked him about
21   this situation.
22        Q      Okay.
23        A      And he was unconcerned about my feelings
24   or concerns about the situation.
25        Q      And your concern was that you believe
```

301

```
1    Suzann -- Guimond, is that how you pronounce that?
2         A    Guimond.
3         Q    Guimond -- should have done what you were
4    being asked to do.  Is that right?
5         A    No.
6         Q    What was your concern?
7         A    I just told you.
8         Q    That's what I just heard, so you need to
9    tell me again.
10        A    Okay.  Repeat the question for me one
11   more time.
12             MR. McKENNA:  Can you read it back,
13        please?
14             (The reporter read as requested.)
15        A    My concern was about the assignment.
16        Q    Why were you concerned about the
17   assignment?
18        A    I was concerned about the -- I was
19   concerned about the assignment because I didn't
20   believe that I would have received this assignment
21   if I had not been black.
22        Q    Okay.  And then you -- it says here on
23   Defendant's Exhibit 3 that you sent Mr. Kester an
24   e-mail asking him why I was required to drop
25   everything at the last minute to gather this
```

302

```
 1      information and why wasn't this the responsibility
 2      of the chairman's assistant.  Do you see that,
 3      ma'am?
 4           A     I'm sorry.  Where are we again?
 5           Q     We're at the last paragraph under
 6      November 19 in Defendant's Exhibit No. 3.
 7           A     I'm sorry.  Can you give me the date
 8      again?  What page is it?
 9           Q     It's page 1, November 19, the last
10      paragraph under November 19.  It says:  "I sent
11      Mr. Kester an e-mail asking him why I was required
12      to drop everything at the last minute to gather this
13      information and why this isn't the responsibility of
14      the chairman's assistant."  Do you see that, ma'am?
15           A     Yes, sir.
16           Q     Okay.  Did you say anything else in that
17      e-mail?
18           A     I believe so.  But without looking at the
19      e-mail, I can't be exact about the other things that
20      we talked about.  This paragraph is just a summary
21      of what was discussed in the e-mail.  In no way is
22      it word for word.
23           Q     So as we sit here today, do you recall
24      anything else that was in that e-mail?
25           A     Other than the documents that I've
```

303

```
 1    already provided you with in discovery and my
 2    answers to the interrogatories, I cannot think of
 3    anything else, and the things that we've discussed.
 4    I can't think of anything else right now.
 5              MR. McKENNA:  I'm going to move to
 6         strike as nonresponsive to the question.
 7    BY MR. McKENNA:
 8         Q    The question is, is as we sit here today,
 9    do you recall anything else that was in that e-mail
10    that's referenced in the November 19 entry in
11    Defendant's Exhibit 3?
12         A    As I sit here today, I cannot think of
13    anything off the top of my head from that --
14    anything else from that e-mail that's in Exhibit 3
15    or that may be in any of the other documents that I
16    might have given to you.
17              MR. McKENNA:  Again I'm going to move to
18         strike as nonresponsive to the question.
19         A    I am response -- I am responding.
20              MR. THOMPSON:  In what way was that one
21         not responsive?
22              MR. McKENNA:  Well, I just want to know
23         if she can remember anything, not what's in
24         the documents, not what may be somewhere else,
25         but what's in her mind right now.  Can she
```

304

```
 1      remember anything else --
 2              MR. THOMPSON:  And she answered that she
 3      couldn't --
 4              THE WITNESS:  Please stop.
 5              MR. THOMPSON:  -- but there may be
 6      something in the documents.  That was
 7      responsive.
 8              MR. McKENNA:  I'm not sure she said
 9      that.  But if she wants to say that, I'll move
10      on.
11              MR. THOMPSON:  Okay.
12    BY MR. McKENNA:
13      Q    Do you understand the question, ma'am?
14      A    I didn't even hear what you just said.
15      Q    Okay.  As we sit here right now --
16      A    Can you stop for a second?
17              THE WITNESS:  Can you just repeat --
18      Q    No, ma'am.  I'll rephrase the question.
19    Now, as we sit here right now, can you think of
20    anything -- not something that's in other documents
21    or anywhere else, but can you remember anything in
22    your mind that was in that e-mail other than what's
23    listed on Defendant's Exhibit 3?
24      A    I need to see the e-mail.  Why don't you
25    just show me the e-mail.  I'm sure you have it.
```

305

```
1              MR. ISLER:  Jim, you really need to
2       instruct your client to answer this question.
3              MR. THOMPSON:  What he's asking you is
4       if you remember what else is in the e-mail.
5              MR. ISLER:  If you don't remember, you
6       just say --
7       A      Other than what --
8              MR. ISLER:  -- "I don't recall."
9       A      Other than the things that you've
10      referred to in Exhibit 3 and the other documents, I
11      told you as I sit here I don't.  I -- and you
12      mentioned Exhibit 3.  You mentioned these other
13      documents.  And then when I go to refer to the
14      documents you're like:  No, no, no, don't talk about
15      the documents.  You make answering questions so
16      difficult.
17      Q      Now, then the next day -- well, let me
18      back up for a minute.  Why do you believe that you
19      would not have received the assignment but for the
20      fact that you are black?
21      A      Can you repeat that question, please?
22      Q      Sure.
23             MR. McKENNA:  You can read that one
24      back.
25             (The reporter read as requested.)
```

306

```
1            A      Because of the fact that Terry wouldn't
2     let Suzann do it.  And when I asked him about it, he
3     seemed very upset with me that I questioned my
4     employer's discriminatory practices.
5            Q      Anything --
6            A      And he -- I tried to understand what he
7     was doing.  I tried, but he just said, "Because I
8     told you so."  And, you know, he just was so -- he
9     was so mean and demeaning and -- I was very, very
10    concerned about the assignment.
11           Q      Any other reason why you believe you
12    received that assignment because you're black?
13           A      Can you repeat the question, Mr. McKenna?
14                  MR. McKENNA:  You can read it back.
15                  (The reporter read as requested.)
16           A      Mr. McKenna, that's my answer.  And you
17    continuously ask me the same question over and over
18    and you just move a word or two around and -- you
19    know, my answer isn't going to change.  It's
20    essentially the same question that you just asked me
21    a few moments ago.  And my answer is what it is.
22           Q      So there is no other reasons why you
23    believe you were given the assignment because you're
24    black other than what you just told me.  Is that
25    right?
```

307

```
 1       A    I --
 2       Q    Are you going to answer the question,
 3  ma'am?
 4       A    I'm sorry, I'm just having a problem
 5  concentrating.  Yes, I am going to answer the
 6  question.  I just need some time to think about it.
 7  What was the question before your last question?
 8       Q    My question was:  So it's your
 9  testimony -- so you've already told us all the
10  reasons why you believe that you were given the
11  assignment because you're black?
12       A    No, I -- I want you to repeat the
13  question.
14       Q    That was the question.
15       A    I think another possible -- repeat the
16  question again.
17            MR. McKENNA:  Read it back.
18            (The reporter read as requested.)
19       A    Other than the things that we've
20  discussed and the information contained in the
21  documents that I've given you and my answer to your
22  interrogatories, I don't have anything else to add.
23            And, Mr. McKenna, I am exhausted from
24  questions and I'm very -- this process is really
25  straining to me.  And if this is a good time to
```

308

```
 1    stop, then --
 2              MR. THOMPSON:  Is that a good time for
 3         you?  We're going to have to reconvene anyway,
 4         so --
 5         A    I've got to go to church tonight, and I
 6    really, really need to see Pastor Henry.
 7              MR. McKENNA:  Sure, why not.
 8              MR. ISLER:  Okay.
 9              MR. THOMPSON:  Want to just put in a
10         notice -- just send the notice?  We already
11         have the 26th open.  We've got that reserved.
12              MR. ISLER:  So we're going to reconvene
13         the deposition on Monday, the 26th?
14              MR. THOMPSON:  Yeah.
15              MR. ISLER:  I'd really like us to start
16         at 9:30 if we could.  We've got --
17              MR. McKENNA:  Do you want to start
18         earlier?
19              THE WITNESS:  Why don't we start at 8
20         o'clock.  I don't know why you all --
21              MR. THOMPSON:  No, no, I don't want to
22         start at 8 o'clock.  9:30 is fine.
23              MR. ISLER:  Or nine is fine with me.
24              MR. THOMPSON:  Nine is fine as well.
25              THE WITNESS:  Ten o'clock is late.
```

309

```
1          MR. THOMPSON:  Do you want to start at
2     nine?
3          MR. ISLER:  Let's start at nine because
4     I really want to -- I want to crank through,
5     and we -- this is a very slow process.
6          MR. THOMPSON:  Okay.  All right.  So
7     we're -- just go ahead and do --
8          MR. ISLER:  We're adjourned until nine
9     o'clock on the 26th.
10          (At 4:35 p.m., the deposition was
11      adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
☐

# EXHIBIT FF

312

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


NADIA NAFFE,

     Plaintiff,

                  CASE NO:
                  8:04-cv-01916-JDW-TGW

vs.


REPUBLICAN PARTY OF FLORIDA,
et al.,

     Defendant.
             /




          VOLUME 3 (pp. 312 - 394)

CONTINUED
VIDEOTAPED
DEPOSITION OF:    NADIA NAFFE

TAKEN BY:      Counsel for Defendant Republican
         Party of Florida

DATE:        September 26, 2005

TIME:      9:58 a.m.

PLACE:       Ford & Harrison LLP
        101 East Kennedy Boulevard
        Suite 900
        Tampa, Florida

REPORTED BY:    Natalie W. Breaux, RPR, CRR
        Notary Public
        State of Florida at Large

RICHARD LEE REPORTING
(813) 229-1588
TAMPA:     email: rlr@richardleereporting.comST. PETERSBURG:
100 North Tampa Street, Suite 2060      535 Central Avenue
Tampa, Florida  33602        St. Petersburg, Florida  33701

313

APPEARANCES:

JAMES MOTEN THOMPSON, ESQUIRE
Nelson Bisconti & Thompson, LLC
718 West Dr. Martin Luther King Jr. Boulevard
Suite 200
Tampa, Florida 33603-3104
    Appeared for Plaintiff;

EDMUND J. McKENNA, ESQUIRE
  - and -
DAWN SILER-NIXON, ESQUIRE
Ford & Harrison LLP
101 East Kennedy Boulevard
Suite 900
Tampa, Florida 33602-5133
  - and -
CHRISTINA M. SHEPPARD, ESQUIRE
420 East Jefferson Street
Tallahassee, Florida 32301
    Appeared for Defendant Republican Party
    of Florida;

EDWARD LEE ISLER, ESQUIRE
Ray & Isler, P.C.
1919 Gallows Road
Suite 320
Tysons Corner
Vienna, Virginia 22182
    Appeared for Republican National Committee
    and Bush/Cheney '04.

ALSO PRESENT:

Mel Byrd, Videographer

I N D E X
PAGE

Examination by Mr. McKenna      318

314

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 23 | 11/19/03 e-mail | 322 |
| 24 | 11/19/03 fax | 331 |
| 25 | 10/8/03 proposal to Allison DeFoor | 343 |
| 26 | 3/10/04 e-mail to Sechen from Sheppard | 372 |
| 27 | 3/10/04 e-mail to Sechen from Sheppard | 374 |
| 28 | 1/19/04 e-mail from Terry Kester | 381 |

315

1          The continued videotaped deposition, upon
2     oral examination, of NADIA NAFFE, taken on the 26th
3     day of September, 2005, taken by Counsel for
4     Defendant Republican Party of Florida, at the
5     offices of Ford & Harrison LLP, 101 East Kennedy
6     Boulevard, Suite 900, Tampa, Florida, beginning at
7     9:58 a.m., reported by Natalie W. Breaux, Registered
8     Professional Reporter, Certified Realtime Reporter,
9     and Notary Public in and for the State of Florida at
10    Large.
11                    * * * * * *
12          MR. THOMPSON:  We are in about -- we've
13    done about eight hours' worth of depositions.
14    It's over the seven-hour allotment.  In order,
15    you know, to try to avoid any kind of
16    potential discovery dispute, you know, I am
17    consenting to a little bit more time for
18    Mr. McKenna.
19          I wrote him last week -- or the week
20    before last asking how much more time he was
21    going to be taking, and I did not get a
22    response.  What I want to avoid is consenting
23    to more time in order to avoid a discovery
24    dispute and then still have a discovery
25    dispute later on.  I'd like to know how much

316

1    more time you think you need.
2        MR. McKENNA:  Well, I can tell you what
3    topics I still want to cover, and I intend to
4    cover the complaints that she made and her
5    allegations of harassment retaliation.  Now,
6    how long that's going to take, given where
7    we've been, I don't know.  There still may be
8    discovery disputes, though, Jim.  There still
9    may be disputes about whether she's answered
10    questions, about whether I've gotten all the
11    documents that I'm entitled to, you know.  And
12    we've got correspondence going back and forth
13    on the fact.  So I'm not going to agree that
14    there aren't going to be any discovery
15    disputes.
16        MR. THOMPSON:  All right.  I'm just
17    going to let you know in advance.  At some
18    point I'm going to say, "Enough is enough."
19    And if you want to go to the judge, you can
20    certainly go to the judge and ask for more
21    time, but I'm not going to let this thing just
22    be a never-ending, ongoing deposition -- it's
23    already in its third day -- where it just
24    continues in perpetuity and then not be able
25    to take depositions of defendant's witnesses

317

1   because defense counsel isn't consenting to
2   dates because he hasn't completed Ms. Naffe's.
3        MR. McKENNA:  I've already given you
4   dates for the other depositions you've asked
5   for.
6        MR. THOMPSON:  No.  No.  No.  And we're
7   trying to work on those.  What I'm talking
8   about is I couldn't even start getting
9   depositions until Ms. Naffe's was over.  So
10   it's just a short amount of time.
11        MR. McKENNA:  I don't understand that
12   one.  You've gotten dates before her
13   deposition was over for the people you've
14   asked for.
15        MR. THOMPSON:  I understand.  We have
16   dates that you've given.  I don't think that
17   most of those dates are working on my
18   calendar.
19        MR. McKENNA:  Okay.  Well, I don't
20   know.  You haven't responded.
21        MR. THOMPSON:  I believe that my
22   secretary, Grace, has responded to your
23   secretary or someone.
24        MR. McKENNA:  Not that I'm aware of.  I
25   haven't heard anything on the dates.

320

318

1       THE VIDEOGRAPHER:  Are you ready to
2    proceed with the videotape?
3       MR. THOMPSON:  Yes.
4       THE VIDEOGRAPHER:  Going on videotape.
5    Standby.  Five seconds.  This is the beginning
6    of No. 1.  We are on the videotape record at
7    10:04 a.m., September 26th of 2005.  This is
8    the continuation of the deposition of
9    Ms. Naffe.
10           EXAMINATION
11   BY MR. McKENNA:
12      Q    Ma'am, you understand you're still under
13   oath?
14      A    Yes, sir.
15      Q    Do you need to go over the rules again
16   for depositions?
17      A    I don't think so.
18      Q    Is there any reason why you're not going
19   to be able to answer the questions I ask you today
20   accurately, completely and truthfully?
21      A    What do you mean by that?
22      Q    Is there any reason why you would not be
23   able to answer the questions I ask you today
24   completely?
25      A    Well, after our last deposition, the very

319

1    next day I had an appointment with my psychiatrist,
2    Dr. Pinard, and she said it is possible that I may
3    not be able to give accurate answers because of my
4    medicine; and because I was so distraught after that
5    deposition, she's changed my medicine, and I'm on a
6    lot heavier medicines now.
7              So, you know, again, I'm not a doctor,
8    but my doctor did say that it is possible that I
9    can't give accurate answers.  And just thinking back
10   to the deposition, I remember you asking me the
11   names of my roommates.  And I couldn't concentrate
12   during the deposition.  I had severe headaches.
13   If you recall, I asked you and your staff to give me
14   some aspirin.  Between the hours of ten and four, I
15   took six aspirin for my headaches.  And I couldn't
16   even remember the names of my roommates, and I see
17   them every single day.  I only got one out of three
18   of their names correct.
19             So to answer your question, that was -- I
20   told Dr. Pinard what you had asked me, and she said
21   that basically you should not have asked me that,
22   because I'm not a doctor and I can't give a medical
23   opinion, and you know that.
24             MR. McKENNA:  What do you want to do,
25     Jim?

320

1    MR. THOMPSON:  I think the answer is
2    going to stand.  I don't know -- as long as
3    she's required to be on this medication --
4    it's her doctor's opinion that the medication
5    may affect how she testifies.  I don't know
6    how to proceed under that.  She can't go off
7    the medication.
8    MR. McKENNA:  Why not?
9    MR. THOMPSON:  She survives with that
10   medication.  She was almost --
11   BY MR. McKENNA:
12   Q    What medication are you on?
13   A    I'm taking a hundred milligrams of
14   Lamaticol, 25 milligrams of Seroquel, and I'm
15   still taking 20 milligrams of Prozac.
16   MR. McKENNA:  Well, I don't see how I
17   can do a deposition if she's not going to be
18   able to answer the questions accurately,
19   completely and truthfully.  So I don't know
20   what we do at this point.
21   THE WITNESS:  We can depose your
22   witnesses.
23   MR. THOMPSON:  Well, it's your call.  I
24   don't know what to say except she actually
25   took this question to her doctor because she

323

321

1    didn't know -- as you recall, last deposition,
2    she said she didn't know the answer because
3    she's not a doctor.  She asked her doctor, and
4    her doctor basically said -- and you can take
5    her doctor's deposition.  I don't know -- I've
6    never had this particular issue happen.  I
7    don't know how to deal with it.
8         MR. McKENNA:  Okay.  Why don't we go off
9    the record for a minute.
10         (Recess from 10:07 to 11:25 a.m.)
11   BY MR. McKENNA:
12        Q    We've had an extended off-the-record
13   discussion as to the witness' competency to testify
14   here today.  As a result of that, I'm going to ask
15   you again, ma'am:  Is there any reason that you
16   cannot answer the questions I'm going to ask you
17   today completely, accurately and truthfully?
18        A    I believe I can right now, but there are
19   times where it is difficult for me to answer your
20   questions, not because I don't want to.  I just -- I
21   can't concentrate or I can't focus.  I have
22   difficult headaches, and that happened during our
23   last deposition.  But as I sit here right now, other
24   than the headache that I have, I feel fine.
25        Q    And if you get to the point to where you

322

1   believe you cannot answer the questions I'm going to
2   ask you completely, accurately and truthfully, you
3   will so notify us?
4        A    I will let my attorney know.
5        Q    When last we spoke, we were discussing
6   the complaint you made on November to Terry Kester
7   in your amended complaint.  Do you recall that,
8   ma'am?
9        A    I vaguely recall that.
10       Q    And I believe you testified that you had
11  sent an e-mail to Mr. Kester complaining about race-
12  matched job assignments.  Is that correct?
13       A    I don't remember if those were my exact
14  words, but, suffice it to say, I did send an e-mail
15  to Terry that evening, because I was concerned and
16  -- and cc'd the chairman on the issue with the
17  assignments.
18       Q    Are you finished?
19       A    Yes.
20            (Exhibit 22 marked for identification.)
21       Q    Ma'am, I'm going to hand you what we've
22  marked for purposes of identification as Defendant's
23  Exhibit 22 and ask you if you recognize that
24  document.
25       A    Yes, I recognize the document.

323

1   Q   And is the top page of Defendant's
2   Exhibit 22 the e-mail to which you just referenced?
3   A   I am not a hundred percent sure on that,
4   because I wrote him an original e-mail.  It wasn't
5   something that I -- it wasn't a trailing -- I don't
6   remember it being a trailing e-mail like this.
7   Q   Are you finished with your answer?
8   A   No, sir.  I'll let you know when I'm
9   finished.  You know what?  This could not -- I don't
10  think that this is the e-mail.  The e-mail that --
11  I'm not certain that this is the e-mail, because I'm
12  thinking -- because I remember going home, typing an
13  e-mail, and he responded to the e-mail, and it said
14  to call the office, and I don't see anything in here
15  about calling the office.
16      There's a lot of other things in here but
17  not about calling the office, so this might have
18  been one of the e-mails where we went back and forth
19  and talked about this event, but -- but I don't see
20  his response.  It looks like -- okay.  There is
21  one.  There is two.  There is one, and there is
22  two.  There's three.
23      I don't see his response saying, "Nadia,
24  call the office at 11 a.m."  So I'm thinking that
25  this is maybe one of the other e-mails that -- where

326

324

1  we talked about it.
2      Q    What did you say in the e-mail to
3  Mr. Kester?
4      A    I don't remember off the top of my head,
5  sir, but if you showed me the e-mail, I could read
6  it to you.
7          MR. McKENNA:  Move to strike as
8      nonresponsive to the answer -- to the
9      question.
10  BY MR. McKENNA:
11      Q    What did you say in the e-mail to
12  Mr. Kester?
13      A    I said something to the effect of,
14  "Terry, I don't understand why I was given this
15  project.  This is sort of Suzann's territory."  And
16  just the e-mail basically explained my confusion
17  about getting the -- having to do this the way --
18  just having to do this whole thing.
19          It didn't make any sense to me, and I saw
20  no reason why I needed -- why I would be getting
21  this assignment and why not Suzann, because that's
22  her main job to coordinate the chairman's schedule
23  and the events that she attends.  And those aren't
24  all the things that I said.  That's what I remember
25  right now, and that's just sort of a summary of the

325

1 theme of the e-mail.
2    Q    Do you recall, as we sit here today,
3 anything else that you said in that e-mail?
4    A    I'm sure there were other things that I
5 said in the e-mail.  If I saw the e-mail, it would
6 help my recollection a lot.
7        MR. McKENNA:  Move to strike as
8    nonresponsive to the answer.
9 BY MR. McKENNA:
10    Q    Do you recall --
11    A    I am responding.
12    Q    -- as we -- as we sit here today, do you
13 specifically recall anything else that was in the
14 e-mail?
15    A    Can you maybe ask that question in a
16 different way, sir?
17    Q    As we sit here at this table today, do
18 you have any specific recollection of anything else
19 that you said in the e-mail to Mr. Kester?
20    A    Other than my previous answer, I can't
21 think of anything else as I sit here right now.
22    Q    Do you have a copy of that e-mail?
23    A    No, sir, I do not have a copy of the
24 e-mail.  Your client has a copy of the e-mail.
25    Q    Now, turning back to Defendant's 22, the

326

1    original message at the bottom is from Suzann
2    Guimond to you, copied to Terry Kester.  Is that
3    correct?
4        A    Yes.
5        Q    And it's dated Wednesday, November 19,
6    2003, 4:07 p.m.  Correct?
7        A    Yes, sir.
8        Q    And it's sent with high importance.  Is
9    that correct?
10       A    Yes, sir.
11       Q    And the text of the message says,
12    "Nadia:
13            In follow up to our earlier
14    conversation."  Do you see that, ma'am?
15       A    Yes.
16       Q    Was there an earlier conversation between
17    you and Ms. Guimond, if I'm pronouncing that
18    correctly?
19       A    I don't remember having an earlier
20    conversation with her.  I'm not saying that we
21    didn't have a conversation, but I don't remember.
22       Q    So Ms. Guimond may have had a
23    conversation with you regarding the logistics,
24    location, times, et cetera, for the Saturday evening
25    event.  Is that correct?

327

1    A    Again --
2         MR. THOMPSON:  I'm going to object to
3    form.
4    A    Again, we may have had a conversation
5    about it, but I can't imagine that we could have
6    discussed too much, because, as I told you the last
7    time we talked about this event, I had to get the
8    invitation from someone, and I didn't get the
9    invitation until, I believe, the 19th, and I -- when
10   I got it, I faxed it to the office.  And then it
11   looks like Ms. Rice e-mailed it to me on the 19th as
12   well.  And Suzann's e-mail is dated November 19th at
13   4:07, and the e-mail that I received from Ms. Rice
14   is dated the same day, November 19th, at 5:23.
15        So when I got the e-mail, I forwarded it
16   to everybody in addition to faxing the invitation
17   that Ms. Rice sent to -- to everyone.
18   Q    Do you know whether Suzann Guimond knew
19   who the members of the Saramana Club were?
20   A    Yes, I'm sure that she knew who they
21   were.
22   Q    How do you know that?
23   A    Because Mr. -- they've had other round-
24   tables -- prior to my being hired, they had other
25   round-tables at the headquarters, and she said she

328

1    knew Johnny Hunter, and I know she knew Frances.
2            She had their contact information,
3    because she booked the vice chairman.  Originally
4    the vice chairman was supposed to be the one going
5    to this event.  The event was on the calendar for a
6    long time.
7            He was scheduled to go to this event, and
8    then at the last minute the chairman was going to
9    the event.  So she -- I mean, she had -- Terry said
10   she did have some information, because she booked
11   the vice chairman for it.
12       Q    Do you know whether other field directors
13   were also required to get similar information for
14   the chairman?
15       A    Define "similar information."
16       Q    Information about the -- something like
17   the Saturday night event that is referenced in
18   Defendant's Exhibit 22.
19       A    Saturday night event?  What Saturday
20   night event are you talking about?
21       Q    The one that's referenced in Defendant's
22   Exhibit 22.
23       A    The -- are you referring to the Saramana
24   event itself?
25       Q    The --

331

329

1      A   It wasn't a Saturday -- you're shaking
2   your head, Eddie.  It wasn't a Saturday night
3   event.  It was a lunch event.  This was a luncheon
4   event.  So that's why I'm like, "What Saturday night
5   event are you talking about?"
6      Q   So that's why you were confused?
7      A   Well, you asked me for a Saturday night
8   event, and that's why I was reading, trying to find
9   out what Saturday night event were you reading about
10  in this document.  I don't see anything about
11  Saturday night event.
12     Q   Well, if you look on the bottom of
13  page -- of Defendant's Exhibit 22.
14     A   The bottom.
15     Q   The bottom.  It says, "In follow up to
16  our earlier conversation, I need the logistics (i.e.
17  location, times, et cetera) for the Saturday night
18  event ASAP."
19     A   It doesn't say "night" anywhere.  It says
20  "Saturday event."
21     Q   All right.  The Saturday event.  Were you
22  ever asked to get similar --
23         THE WITNESS:  Now he's starting to
24  confuse me.
25         MR. ISLER:  I think -- I'm going to

330

1    interject. I think this was very simple
2    that -- that -- obviously Ed thought it was a
3    nighttime event. It may have been a daytime
4    event, but I think that the context of the
5    question was very clear.
6         We're talking about a particular event,
7    and the question that was posed and is still
8    pending was: Are you aware whether other
9    field directors have been asked to get similar
10   information about similar-type events --
11   right? -- meaning events of local groups like
12   this. You asked what the term "similar"
13   meant.
14        Had other field directors, to the best
15   of your knowledge, been asked to get
16   information about similar events for the
17   chairman? That's the question that's pending.
18   A    I would have to say no, not that I'm
19   aware of. I'm aware of county events like the
20   county executive committees, Lincoln Day Dinners and
21   things like that, but not for clubs.
22   Q    Were you ever asked to get similar
23   information for other events for the chairman?
24   A    Can you repeat the question, please?
25        MR. McKENNA: Read it back.

333

331

1       (The Reporter read as requested.)

2     A   I had not been asked to do that prior to
3  this instance.  But after this instance Terry told
4  me that this kind of thing was my job, and so after
5  that point I did.

6     Q   And you copied Defendant's Exhibit 22 to
7  a CR Carter, which is Carol Carter.  Is that
8  correct?

9     A   Correct.

10    Q   And you were informed that that was
11  inappropriate, were you not?

12    A   Terry didn't say that it was
13  inappropriate.  He asked me why I did it, and I
14  looked up the e-mail, and in fact I had did it, and
15  that was a mistake.

16     (Exhibit 23 marked for identification.)

17    Q   And the fact is you simply thought it was
18  beneath you to have to get an invitation for the
19  chairman, didn't you?

20    A   No.

21     MR. THOMPSON:  Object to the form.

22    A   Not at all.

23    Q   So you didn't have any problem with the
24  assignment.  Is that correct?

25    A   I did have a problem with the assignment.

334

332

1    Q    Let me hand you what we've marked for
2    purposes as Defendant's Exhibit 23 and ask you if
3    you recognize that document.
4    A    Yes, I do.
5    Q    And is that the facsimile copy of the
6    transmittal cover sheet where you sent the
7    invitation to the Republican Party?
8    A    Yes, sir.
9    Q    Now, you testified that you had a
10   conversation with Mr. Kester the next day on the
11   telephone where you complained about the
12   assignment.  Is that correct?
13   A    Yes, sir.
14   Q    I'm going to hand you what we've already
15   marked for purposes of identification as Defendant's
16   Exhibit 3 and ask you to please look at the entry on
17   the first page for --
18   A    Mr. McKenna, before you ask your
19   question, I need to take a break.
20        MR. ISLER:  Okay.  Let's go off the
21   record.
22        (Recess from 11:45 to 11:56 a.m.)
23        MR. McKENNA:  We just had a stipulation
24   off the record.  We're going to remark the
25   first exhibit that we used today, which is the

335

333

1     Wednesday, November 19, 2003 series of
2     e-mails, as Exhibit 23, and the fax, which is
3     Bates numbered 000202, as Exhibit 24.  Is that
4     correct, Counsel?
5         MR. THOMPSON:  Yes.
6   BY MR. McKENNA:
7     Q    Now, going back for a minute, ma'am, to
8   23, which is now marked as 23, that is the same
9   event that we discussed last time, isn't it, that
10   you contend you complained about?
11     A    That is the event.
12     Q    Okay.  Now, you indicated that on the
13   next day you had a telephone conference with
14   Mr. Kester where you also complained about that
15   event.  Is that right?
16     A    I complained about the event, and Terry
17   told me to call the office the next day.
18     Q    That would have been November 20, 2003.
19   Correct?
20     A    Yes.
21     Q    And on Exhibit 3 that you have in front
22   of you, we have an entry for November 20, 2003.  Do
23   you see that, ma'am?
24     A    Yes.
25     Q    And is that a true and accurate

334

1    representation of the conversation that you had with
2    Mr. Kester on that date?
3         A    It's an excerpt of the conversation.
4         Q    What else was in the conversation?
5         A    As I told you before, Mr. McKenna, this
6    document is excerpts from notes I wrote to counsel,
7    and it doesn't include every single thing that
8    happened on that day.
9         Q    Well, tell me every single thing that
10   occurred in that conversation with Mr. Kester.
11        A    I don't remember every single word that
12   was said in that conversation.
13        Q    Tell me what you do remember.
14        A    The theme of the conversation was this:
15   He told me to call the office. I called the office,
16   and he was outraged that I questioned why I had the
17   assignment. And I didn't really understand why he
18   was so outraged, but he was. And he was even more
19   upset that the matter had been discussed and --
20   while the chairman was in the car with me and that I
21   had cc'd her on the e-mail. And he wanted to know
22   why I cc'd her, and I told him because she -- I told
23   Kester because she told me to. And he asked about
24   Carol Carter as well, and I explained to him, you
25   know, that she was in the car, too, the chairman

335

1  included her in the conversation, and that it was a
2  mistake to cc her on the e-mail.
3       And I -- I went on to explain to him --
4  since he was so upset why I had sent the e-mail -- I
5  was confused about the assignment.  I didn't
6  understand why I had to do it and wasn't this more
7  of Suzann's responsibility.
8       And basically his response was:  "You do
9  have to do it.  It is your job."  And he said it's
10  my job because he said so.  And he was upset.  He
11  was hostile.  He was argumentative, and he -- he
12  told me that, you know, he really -- he didn't want
13  me telling the chairman -- he was mad that I told
14  the chairman about it.  He was mad that I had
15  complained to her about the discrimination as well.
16       And he said several times, "Let me make
17  this clear to you.  You report to me and Christina.
18  You report to me and Christina" each time in a
19  louder voice and just -- just very angry and upset
20  with me for trying to find out why I got this
21  race-matched job assignment.
22       And let me see -- what else do I
23  remember.  There may be other things included in the
24  narratives that I've already provided to you
25  regarding this conversation; but as I sit here right

336

1  now, I don't recall anything else that I haven't
2  already told you or given to you.
3      Q    Is the excerpt in Defendant's Exhibit 3 a
4  true and accurate excerpt of that conversation?
5      A    It's true and accurate.  The only thing I
6  wanted to add was is that it is an excerpt.
7      Q    Now, you said that you complained about
8  the discrimination to the chairman --
9      A    Well -- I'm sorry.
10     Q    Let me ask my question.
11     A    Yeah.  I'm sorry.
12     Q    Is that where you cc'd Carole Jean Jordan
13  on Defendant's Exhibit 23?
14     A    Yes and no.  We talked about it in the
15  car and about why isn't Suzann doing this.  And as a
16  matter of fact, I remember the chairman telling me
17  that Suzann had coordinated another event for her
18  with this club the first -- when she chartered the
19  club, so Suzann did know all the people that she
20  needed to contact, and for some reason Terry wasn't
21  allowing her to do it.  He was forcing me to do it.
22  And so then that would have been the 18th, I guess,
23  and then I did cc the chairman on the e-mail.
24     Q    Did you say anything -- did you have any
25  other conversation with the chairman in the car

339

337

1   regarding this assignment?
2       A    We just talked about it that day when she
3   was in the car.  We -- I'm sorry.  Ask the question
4   again, please.
5       Q    Did you -- do you recall anything else
6   that was said between you and the chairman about
7   this assignment that day in the car?
8       A    Not as I sit here I don't.
9       Q    Do you --
10      A    Not other than what I've already told you
11  and what's in the material that we've provided.
12      Q    Why do you believe the request from
13  Kester involved a race-matched job assignment?
14      A    Because as a field director, my
15  responsibility is to coordinate the campaign's
16  activities for the County, and I saw no -- I didn't
17  understand why he was involving me with the -- with
18  this kind of thing with a club.  There wasn't any
19  reason for it.  And it wasn't protocol, and it just
20  didn't -- I just didn't see any reason for it.  The
21  only reason I could see was that I was black and he
22  didn't want to deal with them or he felt
23  uncomfortable dealing with them, and he didn't want
24  Suzann to deal with them.  I just -- can you repeat
25  the question again?

340

338

1      MR. McKENNA:  Would you read it back?
2        (The Reporter read as requested.)
3      A    In addition to what I already said, I
4    thought it was a race-matched job assignment because
5    it wasn't the first time that this had happened.
6    The vice chairman asked me to help these folks out,
7    and then I had to go to the African-American
8    round-table, and, you know, I had -- I had, you
9    know, met with Johnny Hunter several times.  I had
10   listened to him.  I told him about my experiences as
11   a club chairman.  I told him about the things that
12   my club used to do in the College Republicans.  I --
13   I shepherded him along, and I gave him the stuff
14   that we give county chairmans, the Grass Roots
15   Development Handbook.  I went through that with him,
16   and then I went through the Grass Roots Leadership
17   Book with him.
18        And then I'm getting more and more
19   dragged into the minutia of a club, and I just saw
20   no reason for it, and it kept happening over and
21   over again.  Just one problem after the next, and
22   every time they had a problem, whether it was his --
23   their expenses or an event that they were supposed
24   to go to or whatever, wherever it was, they were
25   coming to get me, and I just did not want to be

341

339

1  professionally associated with that.
2      Q    Any other reason why you believe that it
3  was a race-matched job assignment?
4      A    There is lots of reasons, but the main
5  one was the way that the situation was handled, the
6  way that Terry did not want to communicate with the
7  group at all.  He wouldn't allow Chris -- Suzann to
8  communicate with the group, and I guess he thought I
9  was the only one who could talk to them because I'm
10  black.  And I saw no reason for him -- for them to
11  get me involved with something that is always
12  Suzann's responsibility.
13      Q    Any other reasons?
14      A    I'm finished.
15      Q    Are there any other reasons?
16      A    I've given you all the reasons that I can
17  think of as I sit here today.  I'm finished.
18      Q    Do you know who Morland Warner Harrell
19  is?
20      A    Yes.
21      Q    Was she not involved with the Young
22  Republican Club?
23      A    She was involved with the Young
24  Republicans.  She is a young Republican.
25      Q    And she was involved in the Young

340

1  Republican Club as part of her responsibilities as a
2  field director.  Isn't that true?
3     A    No, that's not true.
4     Q    Not true.  Wasn't --
5     A    I think --
6     Q    Wasn't that lady also involved with the
7  Teenage Republican Club?
8     A    Well, it was the Teenage Republicans that
9  she was involved with, not the College Republicans.
10    Q    And she wrote their charter, didn't she?
11    A    Yes, she did.
12    Q    As part of her assignment as a field
13 director, didn't she?
14    A    No.  Actually, Morland's title was field
15 director/youth director.
16    Q    How do you know that?
17    A    That's what's on her business card, and
18 it was on our website under her title.
19    Q    Now, as far as the Saramana event that
20 you were opposed to dealing with, you were actually
21 speaking at that event, weren't you?
22    A    The Saramana event in November?
23    Q    Yes, ma'am.
24    A    No.  I never spoke at the event.
25    Q    Would you like to look at Exhibit 23 and

343

341

1  look at the last time slot on the event?
2      A    I see that.  I don't know why that's
3  here, but I was never supposed to speak at the
4  event.
5      Q    But the schedule has you listed as a
6  speaker, doesn't it?
7      A    It doesn't have me listed as a speaker.
8  It says to thank the members.
9      Q    Could you thank the members without
10  speaking?
11      A    Well, I suppose maybe they wanted me to
12  come up on the stage or -- I don't exact -- I don't
13  exactly know, but -- hold on a second.
14          This is wrong.  It's got a lot of
15  inaccuracies in it.  Katherine Harris wasn't even at
16  the event.  I didn't -- and she didn't -- Ms. Harris
17  didn't speak at the event.  I didn't speak and
18  wasn't planning on speaking.
19          And the vice chairman is nowhere on this
20  thing, and he had originally been -- he was on the
21  actual itinerary, the program for the event.  And
22  then instead of him coming, the chairman came and
23  spoke, but he's not even on here.
24          And I don't know.  It looks like
25  somebody's -- like she tinkered with it.  And I

342

1  didn't -- I didn't really inspect this before I
2  forwarded it to the office.  I just -- I got it.  I
3  had been waiting on it.  I forwarded it to the
4  office; and as soon as I got Mrs. Rice's fax, I
5  forwarded that to the office as they demanded.
6      Q    Are you in the habit of sending things --
7  forwarding things to the Republican Party of Florida
8  without reading them first?
9      A    Repeat the --
10     Q    Were you in a habit of forwarding things
11 to the Republican Party of Florida without reading
12 them first?
13     A    That's not what I said, Mr. McKenna.
14 This is apparently the time line that Suzann had
15 been e-mailing about.  And, you know, it's their
16 event; and, you know, I guess, you know, they can
17 have it any way they want, but, you know, I can't
18 control -- I can't control what they put down as
19 their time line.  And I really -- you know, I can't
20 answer for people.
21     Q    I didn't ask about other people.  I asked
22 you if you were in the habit of forwarding things to
23 the Republican Party of Florida that you had not
24 read first.
25     A    Not usually.

345

343

1    Q   Now, isn't it true, ma'am, that you
2  wanted to do African-American outreach at the
3  Republican Party of Florida?
4    A   No, that's not true.
5    Q   You did not present a proposal in which
6  you requested to do minority outreach to the
7  Republican Party of Florida?
8    A   Which proposals are you talking about?
9    Q   Isn't it true that you made a proposal to
10  the Republican Party of Florida in which you asked
11  to do African-American outreach on behalf of the
12  party?
13    A   I never asked to do African-American
14  outreach on behalf of the party.
15      (Exhibit 25 marked for identification.)
16    Q   I'm going to hand you what we've marked
17  for purposes of identification as Exhibit 25 and ask
18  you if you recognize that document.
19    A   Uh-huh.  I sure do.
20    Q   And is that not your proposal for the
21  creation of a minority outreach department in the
22  Republican Party of Florida?
23    A   This is a proposal that I worked on, but
24  there is not one word or sentence in here that says
25  that I, Nadia Naffe, wanted to do this.

344

1    Q   I see.  So you didn't want to do it.  Is
2  that your testimony?
3    A   I'm answering your question.
4    Q   I'm asking you a question.  Is that your
5  testimony, that you did not want to do minority
6  outreach with the Republican Party of Florida?
7    A   I didn't want to be pigeonholed to work
8  exclusively with black Republicans.  I wanted to
9  work with all the Republicans in Florida, and that's
10  why I didn't want to work for one specific
11  candidate.  I wanted to work with all the
12  candidates, and that's why I wanted to work for
13  RPOF.
14    Q   So you wanted to do some minority
15  outreach with African-Americans but not
16  exclusively.  Is that your testimony?
17    A   No, that's not -- that's not what I
18  meant.  I don't want you to misunderstand me to say
19  I dislike working with African-Americans, because
20  that's not what I'm trying to say at all.
21       What I'm trying to say is, is that I was
22  interested in the job that Jamie Miller presented in
23  his e-mail to me working within my territory, with
24  my counties as a field director, working on grass
25  roots projects, voter registration drives, campaign

345

1  events, voter integrity programs.  Those were the
2  types of things that attracted me to the position in
3  the first place, and those were the types of things
4  that I expected to be doing.
5          Florida is a diverse state, and I didn't
6  want to be stuck working with one group of people,
7  and -- I didn't want to be stuck working with one
8  group of people.  I wanted to work with all the
9  Republicans in Florida.
10     Q    So you wanted to work with the African
11  Americans as well as the whites.  Is that correct?
12     A    I didn't say that, Mr. McKenna.  In fact,
13  on the very first page it says, "I fully believe
14  that Minority Outreach should include all
15  minorities."
16          "All minorities" are women, Hispanics,
17  and that's Mexicans, Latinos.  That's Teenage
18  Republicans.  That's College Republicans, and the
19  only people that aren't exclusive to technically
20  minorities are white males, such as yourself.  But I
21  wanted to work with all the Republicans in Florida.
22     Q    Are you finished with your answer?
23     A    Yes, sir.
24     Q    Okay.  The very first line of the second
25  paragraph states "that there are nearly 1 million

348

346

1    black voters here in Florida."  Do you see that,
2    ma'am?
3        A    Yes.
4        Q    Do you reference women anywhere in there?
5        A    Well --
6        Q    Do you reference women anywhere in there?
7        A    Explain what you mean by "women."
8        Q    Do you have the word "women" in the
9    second paragraph of Exhibit 25?
10       A    Women are included in the 1 million black
11   voters.  Myself and your colleague, Ms. Siler-Nixon,
12   would be included in that 1 million, and it's not
13   exclusive.  You know, African-American people come
14   in two types, male and female.
15       Q    Do you reference Hispanics anywhere in
16   there?
17       A    Hispanics are -- I don't reference the
18   different minority groups by name, but, as I said
19   again, I said in the last paragraph, "I fully
20   believe that Minority Outreach should include all
21   minorities."  And the vice chairman is educated
22   enough to know what "all minorities" are, and he's
23   also intelligent enough to know that 1 million black
24   voters doesn't just mean men, it means black voters.
25       Q    But you ignored the first part of that

347

1    sentence, ma'am.  It says, "This proposal is
2    somewhat exclusive to African-Americans," doesn't
3    it?
4        A    Yes, it says that.
5        Q    Now, if you turn to the second page, it
6    starts off referencing "African-Americans represent
7    13 percent of" the Florida "population."  Do you see
8    that, ma'am?
9        A    Yes, sir.
10       Q    Did you research that?
11       A    I got that from materials I got from
12   RPOF.
13       Q    So you researched it?
14       A    Well, no.  I just assumed that the
15   materials that they gave me were correct.
16       Q    Okay.  And then in the second paragraph
17   you reference the black vote, don't you, on several
18   occasions?
19       A    The second paragraph is statistics from
20   the last -- from 2000 -- from the 2000 election and
21   the 1996 election.
22       Q    And you reference black voters, don't
23   you?
24       A    Yes.
25       Q    Twice?

348

1    A    The word "blacks" or "black voted" is in
2  here twice.
3    Q    Okay.  And your next paragraph leads off
4  with, "African-Americans traditionally vote
5  overwhelmingly for Democratic candidates."  Is that
6  correct?
7    A    Yes.
8    Q    Then going down to the third paragraph,
9  you said you proposed the creation of a new
10  department within the RPOF.  Do you see that, ma'am?
11    A   Yes, I see it.
12    Q    And who did you -- go ahead.
13    A    I'm just trying to separate --
14    Q    Are you finished with your answer?
15    A    No.  Ask your question again.
16    Q    Yes.  Do you see where it says, "I
17  propose the creation of a new department within the
18  RPOF"?  Do you see that?
19    A    Yes, sir.
20    Q    Good.  Now, who did you propose would be
21  within that department?
22    A    Well, I didn't actually propose it.  I
23  didn't write that part.  Johnny Hunter wrote that
24  part.
25    Q    Who did you expect would be within that

349

1   new department within the RPOF?
2       A      Johnny Hunter.
3       Q      Anybody else?
4       A      The folks in Johnny Hunter's club,
5   because it was the clubs who were developing other
6   clubs, and that was the -- the chairman and the vice
7   chairman wanted to use the same model that she had
8   used as head of the Florida Federation of Republican
9   Women.
10          The chairman and the vice chairman
11  thought the best way to build a coalition of black
12  Republicans was to use the club method that her
13  club -- that her organization had always used, so
14  they appointed Johnny Hunter to do that, and they
15  gave him a seat on our board.  And then it became
16  his responsibility, and, you know, his club was
17  working with him to develop these other clubs.
18      Q      Are you finished?
19      A      Yes, sir.
20      Q      And it's your sworn testimony under
21  penalty of perjury that you had no interest in
22  working in this new department.  Is that correct?
23      A      Repeat the question again.
24      Q      Sure.
25          MR. McKENNA:  Read it back.

352

350

1          (The Reporter read as requested.)
2      A    Mr. McKenna, I want to be very clear
3   about my answer.  I do not dislike working with
4   African-Americans at all.  This wasn't a
5   situation -- this was not a situation where the
6   field directors took turns going to the African-
7   American round-table.  This wasn't a situation where
8   all the field directors took turns with these
9   assignments or with the issues that came up with the
10  black Republicans.
11          I got stuck with it all the time, and I
12  didn't want -- I wanted my career to be on the same
13  professional track as the other field directors, and
14  I saw having to be involved with the minutia that
15  went -- with these clubs, I saw it almost as a
16  demotion really, because instead of me doing my
17  county-wide work, I had to be stuck baby-sitting
18  this club and their issues and their problems and
19  making sure people showed up on time at the African-
20  American round-table and all this other stuff, and I
21  did not want to do that.
22          And I just want to -- I want to be very
23  clear because, you know, I sort of feel like you're
24  trying to push me to say that I dislike working with
25  black people, and that is not it at all.  I didn't

351

1   want to be pigeonholed. I -- all my other
2   colleagues in their respective territories have gone
3   on and -- or they're still in their positions or
4   they've gotten better political jobs.
5       Nobody, none of them, wanted to go to
6   these African-American round-tables. In January I
7   tried to get somebody to switch with me to go to one
8   of these African-American round-tables. Nobody
9   wanted to go. None of them wanted to be stuck with
10   it. We had several different meetings. We had
11   credentials. We had budget. We had constitutional
12   and technology committees, you know, and the other
13   field directors got to rotate off which committee
14   meeting they went to at each board meeting.
15       I got stuck with the same mess. Every
16   time it was the same mess, and I didn't want to be
17   -- I didn't want to be associated with the problems
18   and the issues of this group. Not to say that I
19   dislike working with African-Americans, because I
20   don't. You know, I think if the RPOF wants to do
21   outreach, you know, more power to them, but I don't
22   want to be -- I don't want -- I didn't want my
23   career to be held back because I was stuck doing
24   this kind of thing. I didn't want to be known as,
25   you know, "Go to Nadia, the field director -- the

352

1    black field director over here when, you know, you
2    have a problem with, you know, one of these black
3    Republican clubs or if you want one of these black
4    Republican clubs to do something for you."
5            I wanted to be known as the field
6    director who did a great job coordinating a
7    presidential rally for my own intellectual
8    capabilities, not to baby-sit this mess, and that's
9    the way I saw it.  I saw this as just -- it was one
10   thing after the other, and it was just a big mess,
11   and I didn't appreciate the mess being dumped in my
12   lap.
13       Q    Are you finished?
14       A    Yes.
15       Q    Is it your sworn testimony under penalty
16   of perjury that you had no interest in working in
17   this new department of minority outreach that you
18   proposed for the RPOF?
19       A    No, I worked in it when they told me to,
20   and I did the projects that -- that I was told to
21   do.  And that's -- that was part of what the
22   conversation with Terry was about, and he made it
23   very clear, "This is your responsibility to do
24   this.  This -- you're going to do it because I told
25   you to."  And --

353

1          MR. McKENNA:  Move to strike as
2     nonresponsive to the answer.
3  BY MR. McKENNA:
4     Q    Ma'am, the question is this.  Did you
5  want to work at all in the new department that you
6  proposed for the RPOF?
7          MR. THOMPSON:  Object to the form.
8          MR. McKENNA:  What's wrong with it?
9          MR. THOMPSON:  Presupposes that she's
10    the one who proposed it.  She's testified
11    differently.
12         THE WITNESS:  And --
13         MR. McKENNA:  Fine.
14         THE WITNESS:  -- I have a problem with
15    your question.  I wish you would ask it a
16    different way.  I told you before --
17  BY MR. McKENNA:
18    Q    Okay.  What don't you understand about my
19  question?
20    A    Well, what Jim said.  And, I mean, I
21  already told you before, you know, no, I did it when
22  they told me to do it.  I already told you that
23  there ain't a sentence in here anywhere that says,
24  "I, Nadia Naffe, wanted to do it."  This is a work
25  assignment, and it's, you know -- this talks about,

356

354

1  you know, matching facts with issues and talking
2  points for the clubs.
3          This is all about stuff for the clubs to
4  do, you know.  And, you know, my understanding was
5  the whole reason why the chairman appointed Johnny
6  Hunter and gave him all these responsibilities was
7  because she wanted him to -- him and his clubs,
8  since they were doing a good job on their own, to
9  help develop the other clubs.
10         And then when they start having issues
11 and problems with him and his club, then they
12 started pulling me into all this other stuff.  And,
13 you know, like I said before, you know, if they want
14 to -- if they want to do minority outreach, I think
15 that that's great, but, you know --
16     Q    Are you finished?
17     A    -- don't -- when I'm finished, sir, I
18 will let you know -- don't -- don't drag me into
19 your problems, you know.  I really believe that
20 Terry had a huge issue dealing with Johnny Hunter at
21 peer level.  He just -- just did not want to deal
22 with the guy.  And I don't know if he was
23 intimidated by the guy or -- I -- I don't know what
24 it was, but it seemed to me -- and I never had
25 really any difficulties dealing with Johnny Hunter

355

1  at all or the folks in his club.  You know, they're
2  nice folks.  I'm done.
3        MR. ISLER:  I'm going to interject
4     here.  Jim, I would encourage you -- and if
5     you want to take a break and talk with your
6     client, that's fine.
7        Mr. McKenna has asked the same question
8     three times.  It's a very simple question,
9     which is with regard to this proposal -- which
10     she has called "my proposal" in the very first
11     sentence of it -- to create a minority
12     outreach department within the RPOF.
13        The question that is still pending is:
14     Is she testifying under oath that she did not
15     have any interest in being a part of this
16     department.  That's the only question that's
17     been pending for the last ten minutes.
18        MR. McKENNA:  More than that.
19        MR. ISLER:  And it's been asked three
20     times, and your client has not answered the
21     question.  It's a simple question.  Did she
22     want to be a part of this department or not?
23        THE WITNESS:  Every single time I said
24     no and then I followed it up with other
25     comments, and that's the way you told me that

356

1       you wanted me to answer.
2    BY MR. McKENNA:
3        Q    So your answer -- so your sworn testimony
4    is that you had no interest in being a part of the
5    minority outreach department within the RPOF.  Is
6    that correct?
7        A    Can you ask your question a different
8    way?
9            MR. McKENNA:  Can you read it back?
10           (The Reporter read as requested.)
11       A    No, I did not want to be a part of the
12   department, because I was happy doing what I was
13   doing as a field director.  And in addition to that,
14   I'll state again for the record, I wanted to work
15   with all the Republicans in Florida no matter what
16   color they are.  I wanted to -- or gender they are.
17   I wanted to work with all the Republicans in
18   Florida.  I didn't want to have my work assignments
19   pigeonholed, and I can't imagine how clearer I can
20   be than that.
21           And I do want to take a break now.
22   That's the end of my answer.
23           (Recess from 12:36 to 12:54 p.m.)
24   BY MR. McKENNA:
25       Q    Now, do I understand you to say, ma'am,

357

1  that your proposal, Defendant's Exhibit 25, was an

2  assignment?

3     A   Yes.

4     Q   From whom?

5     A   It was actually something that Hilda was

6  working on before she got fired.  And apparently

7  when she left, she took mostly everything with her,

8  and -- well, I'm finished.

9     Q   The question, ma'am, was:  Who gave you

10  the assignment?

11     A   I was working on it originally with

12  Hilda.

13     Q   Who gave you the assignment?

14     A   I just told you Hilda Stringer.

15     Q   And what was her position?

16     A   She had Christina's position.  She was

17  deputy director of party development, and --

18     Q   When you -- go ahead.

19     A   I'm not going to say anything else.

20     Q   And when you said "when she left she took

21  almost everything with her," what did you mean by

22  that?

23     A   Well, that's what Geoffrey and Steven

24  said, that they were trying -- that there was things

25  up in the air and -- but that Hilda took it all with

360

358

1   her; that they couldn't find any of the stuff,
2   and -- so right around the time of the -- right
3   around the time of the round-table on November 7th,
4   none of the folks from the Black Republicans had
5   gotten any invitations or notice of the event, and
6   Hilda had always -- Hilda had always done that.
7          She had always sent them invitations to
8   our quarterlies and stuff like that, so that's why
9   Johnny Hunter was writing letters of complaint to
10  Terry, because in the past the RPOF -- there was a
11  precedent.  Hilda had always sent out these notices
12  and all of this other stuff; and when she left, it
13  stopped happening.
14      Q    Did she take something with her related
15  to Exhibit 25?
16      A    Exhibit 25?
17      Q    Your proposal.
18      A    No.  The proposal wasn't finished when
19  she left.
20      Q    Okay.  You finished the proposal?
21      A    Well, what -- basically I just started
22  from scratch, because nobody -- I mean, I knew the
23  types of things -- she had a list of things that she
24  was going to put in the proposal.  She -- after each
25  one of these African-American round-tables she would

359

1  do minutes of the round-table. And basically what I
2  did to recreate it was I just went down her notes.
3  I just sort of followed her notes. And I got input
4  from Johnny Hunter as well, but she -- they were
5  like two or three sets of minutes from these
6  African-American round-table that Hilda took, and I
7  just sort of followed what she was thinking there.
8      Q    What race was Hilda Stringer?
9      A    She was Hispanic.
10     Q    How do you know that?
11     A    Because she told me -- A, because she
12  told me; B, because she spoke Spanish, and I think
13  she -- I think she was Cuban, because even though
14  she was my boss, she still had to cover Miami/Dade.
15     Q    Can you turn to page 3 of your proposal
16  for me, please?
17     A    Yes, sir.
18     Q    It refers to in the first paragraph, "One
19  of the most crucial steps in this process is to have
20  black Republicans talk to other blacks." Do you see
21  that, ma'am?
22     A    I see it.
23     Q    And do you believe that's a true
24  statement?
25     A    Well, I didn't write that. Johnny Hunter

362

360

1   wrote that part, and I can't -- I can't really
2   testify for other people.
3       Q    I'm not asking you to testify for other
4   people. I'm asking you what you think.  Do you
5   think that --
6       A    I'm not here to give opinions.
7       Q    Do you think that's a true statement?
8       A    I'm not here to give opinions, and I'm
9   not going to give opinions.
10      Q    Are you refusing to answer the question?
11      A    No.  I told you that I am not here to
12   give opinions.
13      Q    Okay.
14          MR. THOMPSON:  Ms. Naffe, he can ask an
15      opinion question if he wants.
16      A    Well, repeat your question.
17          MR. McKENNA:  Read it back, please.
18          (The Reporter read as requested.)
19      A    Is what a true statement?
20      Q    That "One of the most crucial steps in
21   this process is to have black Republicans talk to
22   other blacks."
23      A    No, I don't think that that's the most
24   crucial step in the process.
25      Q    I didn't say it was the most crucial

363

361

1    step.
2       A    That was your question.
3       Q    I said it was "One of the most crucial
4    steps in this process is to have black Republicans
5    talk to other blacks."  Do you believe that to be a
6    true statement or not?
7       A    I would have to say no.  It depends a lot
8    on the person and their personality, because I feel
9    comfortable talking to just about anybody.  I
10   mean -- and it's like I feel comfortable talking to
11   Eddie Isler.  I feel comfortable talking to Hilda.
12   I feel comfortable talking to your colleague, Dawn.
13   I feel comfortable talking to my attorney, and their
14   race doesn't matter to me.
15           I would talk to them just the same, you
16   know, if there was a specific issue or -- if there
17   was a specific issue that I was campaigning to get
18   someone to support, it wouldn't really matter to me,
19   you know.  I'm receptive to hearing all different
20   types of viewpoints.  That's my opinion.
21      Q    Are you finished?
22      A    Yes.
23      Q    So you put something into your proposal
24   that you didn't agree with?
25           MR. THOMPSON:  I'm going to object to

362

```
1    form.
2         A    Well, I told you, you know, Johnny Hunter
3    wrote that part.  And, see, the thing is, this is
4    all really his bailiwick, you know.  He's the chair.
5    The party, you know, gave him an appointment, and,
6    you know, it's really -- and then he's the chairman
7    of the Florida Federation of Black Republicans.  So
8    he really oversees what the clubs do and how they
9    communicate with black Republicans in the community;
10   and if he feels that way, then that's the way he
11   feels, and that's the way he's going to, you know,
12   run his program.
13        And that's -- that's, I think, one of the
14   reasons why he didn't want to work for the RPOF.  He
15   told them that he didn't want a salary for anything
16   that he was doing.  He said all he wanted was to
17   have his expenses reimbursed.
18        And later on I asked Johnny why he didn't
19   want to get paid for all the work he was doing, and
20   he said because he didn't want the RPOF telling him
21   what to do.  And this is probably an example of
22   that; but, you know, I didn't -- I wasn't going to
23   sensor the guy.  I really didn't think that that was
24   my role, and I'll tell you the parts that I worked
25   on.
```

365

363

1          I worked on all the political parts.  I
2   worked on the statistics and stuff like that, that
3   stuff that I got from documents the RPOF gave to me
4   or some of the -- we've got handouts from the RNC as
5   well.  The facts with issues, I did that.  I think I
6   did the talking points.
7          So all the political stuff and the
8   statistical stuff is stuff that I did.  The rest of
9   this stuff, you know, I can give you opinions about
10  it, but I can't really speak to, you know -- you
11  know, I can't give testimony for another person.  I
12  don't know what he was thinking.
13     Q    So you took credit for Mr. Hunter's work?
14     A    No, I -- I didn't take credit for
15  Mr. Hunter's work.
16     Q    Is it submitted from you and him?
17     A    Well, yes and no.  I e-mailed it to the
18  vice chairman, but he's actually the one who
19  presented it to the vice chairman.
20     Q    Is Mr. Hunter's name in here anywhere?
21     A    Yes.  I cc'd him on it.
22     Q    Is he indicated as an author?
23     A    What do you mean?  Well -- well, not --
24  the document is actually in two parts.  The first
25  part of the document is a letter, and then the

364

1   document itself -- you know, I didn't footnote it or
2   anything like that, because the stuff that I used to
3   write it with was all our internal stuff.
4          So I didn't feel like I was plagiarizing
5   or anything like that, because it was all internal
6   stuff, and none of the stuff I used said that, you
7   know, a certain author researched certain specific
8   facts or certain specific statistics.  So, I mean, I
9   guess on page 5 I could have footnoted and said --
10  but you know what?  I just did this real quick, and
11  I didn't really go through all that effort.
12     Q    On the first page it says, "Please find
13  attached my proposal," doesn't it?
14     A    Yes, sir, it does.
15     Q    It doesn't say, "Please find attached
16  mine and Johnny Hunter's proposal," does it?
17          MR. THOMPSON:  Object to the form.
18     A    That's -- no, sir, it doesn't.  That's
19  just my phraseology.  It was, you know, a letter
20  that I typed up really quick and -- but it does --
21  it does discuss in great detail Johnny Hunter in the
22  context of his club, his -- I mean, it -- it is
23  because of his club really cultivating the
24  chairman's attention and it's because of their
25  efforts that the RPOF wanted to move forward with

365

1    this.
2          And it talks about the Black Republican
3    Clubs, and we talk about our commitment to reaching
4    out to all Floridians, which was always my goal to
5    reach out to all Floridians.  And it talks about the
6    African-American round-tables, and he chairs that.
7    And, you know, it says very clearly that this is
8    just a road map, you know.  It's just, you know, a
9    road map; and whatever they wanted to do, you know,
10   however they wanted to do it, you know, more power
11   to them.  But the RPOF thought -- the chairman and
12   the vice chairman thought the club method, which was
13   the tried-and-true method of recruiting people into
14   the party, would be the best way to recruit black
15   Republicans into the party.
16        Q    Are you finished?
17        A    Yes.
18        Q    Turn to page 3 again.  It says that
19   "Blacks are more likely to feel comfortable
20   discussing the issues with another person of color
21   than anyone else."  Do you see that, ma'am?
22        A    Yes, sir.
23        Q    Do you agree with that statement?
24        A    Again, I did not write this -- I did not
25   write that part, because I don't -- I don't like to

366

1    write like that.  I like to write things that are
2    like facts.  And that's why, if you see, that
3    there's a difference in the way that this part is
4    written and the examples of matching facts with
5    issues.  You know, I'm much more succinct and I
6    just, you know, pulled specific things out of RPOF
7    and RNC handouts that we already had, material that
8    we were already using.
9           You know, this kind of stuff I would say
10   Johnny Hunter has from his own personal experience,
11   which is going to be different than mine, because he
12   grew up during a different time than I did.  You
13   know, he grew up during a segregated time, and, you
14   know, maybe -- maybe he feels that way, and, you
15   know, maybe folks in his age group feel that way.
16   Q     Are you finished?
17   A     Yes, sir.
18   Q     Do you agree with the statement, "Blacks
19   are more likely to feel comfortable discussing the
20   issues with another person of color than anyone
21   else"?
22   A     Yes and no.  I don't really know how to
23   make you understand, but it depends on what the
24   issue is.  I would say issues like healthcare,
25   social security, national defense -- I think those

367

1   issues are pretty colorblind.  And, you know, I
2   would say that a white person -- a white American
3   and a Hispanic American and a black American would
4   all agree that we need to defend our country.  And a
5   black person wouldn't necessarily need to talk to
6   another black American to have that point come
7   across.
8          I think that across the board, you know,
9   different races of people would agree that we need
10  to defend our country.  Now, how we go about
11  defending our country is another story, but I don't
12  think that that sub-issue is necessarily a race-
13  related issue either.
14          Now, if you are talking about economic
15  development in a poor black neighborhood, which is
16  the case in Johnny Hunter's community, he -- his
17  office is around the corner from a project home.
18  You know, the folks in that project home -- if he's
19  trying to reach out to those folks, you know, those
20  folks, you know, they -- they're around other black
21  people all the time, so maybe those folks would only
22  feel comfortable talking to another black person.
23          I don't know.  Everybody is different.
24  Everybody has a different vantage point.  But, you
25  know, I could -- I'd talk to whoever and debate the

370

368

1    issues.  You know, it doesn't -- it doesn't matter
2    to me.  And, you know, it maybe has a lot to do with
3    upbringing and, you know, a lot of other things,
4    but -- I know this is a long answer to your
5    question, but the answer is yes and no.
6        Q    Do you agree with the statement that
7    "Blacks are more likely to visit the polls and vote
8    Republican if encouraged to do so by another black
9    person"?
10       A    I don't agree with that.
11       Q    Why not?
12       A    Well, I can speak from my own
13   experience.  The person who encouraged me to vote
14   Republican wasn't black.  They just presented things
15   in a way that I agreed with, and it has a lot to do
16   with presentation.  I think if any person reached
17   out to another person and told them to vote a
18   certain way, they would listen.  It's not something
19   that people do a lot.  In fact, that's in our Grass
20   Roots Development Book.  It's in RPOF's Grass Roots
21   Development Book, you know, just -- personal contact
22   is the No. 1 reason why someone's going to go to the
23   polls.
24           It's just like going to church.  Pastor
25   Witten says it every week; you know, "Invite your

371

369

1   neighbors to church.  Invite your co-workers,
2   colleagues to church."  People are more likely to go
3   to church if it's someone that they know inviting
4   them.
5       It doesn't necessarily have to be a black
6   person or a person of the same color as you.  And I
7   think it would be pretty narrow-minded to say that,
8   you know, the only way you're going to do something
9   is if somebody of your same race is going to ask you
10  or somehow persuade you to do something.
11      Q    Did you tell Johnny Hunter you disagreed
12  with these statements?
13      A    No.
14      Q    Why not?
15      A    Because I didn't really think it was, you
16  know, my place.  I thought that, you know, it was --
17  I thought it was -- what's the word I'm looking
18  for?  I think it's -- it's perceptual, you know.  I
19  don't think it's -- you know, I just thought it was
20  something that if he wanted to pursue -- if he
21  wanted to pursue developing the clubs that way, I
22  thought, you know, there's lots of different
23  management styles and leadership styles, you know.
24  You probably have a different style than Jim, and he
25  probably has a different style than -- I don't

370

1  know -- Rhea Law or Lash Harrison; somebody like
2  that.
3          And that's the way he wants to do it, you
4  know.  And I saw no reason why, you know, I should,
5  you know, stand in his way, you know, if that's the
6  way, you know, he's always done it or whatever.  And
7  nobody at RPOF disagreed with the way that he was
8  doing it.
9      Q    Did you complain about having a proposal
10  submitted under your name that had those statements
11  in them?
12      A    No.
13      Q    Why not?
14      A    Well, I told you before:  If that's the
15  way that -- if that's going to be the way that --
16  it's Johnny Hunter's responsibility to develop the
17  clubs.  That's what the chairman -- and unite the
18  clubs under one organization.
19          The chairman didn't say he had to do it a
20  specific way.  He was just appointed to do that, and
21  there's a lot of different ways to do it.  And he
22  had been pretty successful doing it just like that,
23  so if, you know -- if that works for him, you know,
24  more power to him.
25      Q    Now, you submitted this proposal on

373

371

1    October 8, 2003.  Is that correct?
2        A    That's the day that it's dated, but I'm
3    not certain which day I e-mailed it.
4        Q    Was it close to that day?
5        A    I believe so.
6        Q    It was in a day or two?
7        A    I think so.
8        Q    Did you present the -- well, let me
9    strike that.
10            So you sent the copy of it to Carole Jean
11   Jordan, Geoffrey Becker, Steven Shiver, Carol Carter
12   and Johnny Hunter.  Correct?
13       A    Okay.  I'll tell you who I remember
14   sending it to, and I'll tell you who I don't
15   remember sending it to.  I think I sent it -- I'm
16   sure I sent it to the chairman.  I don't see the
17   vice chairman's name on here, but I'm sure I sent it
18   to the vice chairman, because he was really the main
19   one with this thing.  And Johnny already had a copy
20   of it because he was working on parts of it.  So I
21   think there is -- well, my answer is I'm not sure.
22       Q    Okay.  Did you ever send it to other
23   people?
24       A    Maybe.
25       Q    Do you recall sending it to anybody else?

372

1     A    I may have.  It was a long time ago.  I
2  don't remember.
3     Q    You don't remember as we sit here today
4  whether you sent it to anybody else.  Is that your
5  testimony?
6     A    I just told you I might have, but I don't
7  remember.
8     Q    Okay.
9          (Recess from 1:18 to 2:09 p.m.)
10         (Exhibit 26 marked for identification.)
11  BY MR. McKENNA:
12     Q    I'm going to hand you what's been marked
13  for purposes of identification as Defendant's
14  Exhibit 26 and ask you if you recognize that
15  document.
16     A    Yes, sir, I recognize the document.
17     Q    It's your e-mail to Carole Jean Jordan.
18  It begins, "Chairman,
19          "I don't know if Jamie" -- and that's
20  Jamie Shiver?
21     A    Jamie Miller.
22     Q    Jamie Miller -- "ever told you of my
23  interest to work on Minority Outreach projects."  Do
24  you see that, ma'am?
25     A    Yes.

373

1    Q   So you did have an interest in working on
2  Minority Outreach projects with the Republican Party
3  of Florida.  Isn't that true?
4    A   Yes.  As I told you before, Mr. McKenna,
5  I wanted to work --
6    Q   You only have to say yes.  That's all you
7  really have to say.
8    A   You are not going to control my answers.
9  You said in your instructions that if I want to add
10  more information to a statement to answer yes or no
11  first and then add the rest of the information on
12  the back.  So don't try to control my answers.  I'm
13  going to give you the answer, and your question was
14  did I say that, and it's right there.  I did say
15  that.
16      And what I was going to add was I told
17  you that I don't -- it's not that I don't like
18  working with African-Americans.  I didn't want to
19  get pigeonholed with having these projects over and
20  over and over again.
21      I told you that I wanted to work with all
22  the Republicans in Florida regardless of their
23  color.  And it says, "Minority Outreach projects."
24  It doesn't say anything about a Minority Outreach
25  department.  And, you know, that's -- that's the

374

1   language of your questions before we went on break,
2   and -- that's the end.
3        (Exhibit 27 marked for identification.)
4        Q    I'm going to hand you what's been marked
5   for purposes of identification as Defendant's
6   Exhibit 27 and ask you if you recognize that
7   document.
8        A    Yes, sir, I recognize the document.
9        Q    And it's another e-mail from you to
10  Geoffrey Becker indicating that you wanted to share
11  this, being your Minority Outreach program --
12  proposal -- with him.  Is that correct?
13       A    No, that's not exactly what it says.
14  It's not another e-mail about it.  This is -- this
15  is actually -- this is the e-mail that I sent when I
16  sent the -- when I cc'd him the proposal itself.
17  And it says:  "I wanted to share this with you, some
18  ideas" and "It is obviously something near and dear
19  in my heart" that -- you know, like I said it is.
20       Q    Anybody who read it would have assumed
21  you wanted to do Minority Outreach, wouldn't they?
22            MR. THOMPSON:  Object to the form.
23       A    That's not what I said.
24       Q    That's my question, ma'am.
25            MR. THOMPSON:  Object to the form.

377

375

1    A    No, it doesn't say that anywhere in
2    there.  It says "some ideas."  These are just ideas.
3    Q    It says, does it not, that it's something
4    near and dear to your heart?
5    A    Yes.
6    Q    Yes.  And so someone reading that could
7    certainly conclude that you wanted to do Minority
8    Outreach, couldn't they?
9         MR. THOMPSON:  Object to the form.
10   A    Well, that depends on what the meaning of
11   "is" is.
12   Q    Bill Clinton.
13   A    I think I'm finished, unless you have
14   another question about this.
15   Q    On January 23, 2004 you contend that you
16   complained to Christina Sheppard about the African-
17   American round-table.  Is that correct?
18   A    She is among the people I complained to.
19   Q    To -- well, we've already had this
20   discussion, ma'am, and we had determined that we had
21   listed all of your complaints to the RPOF.  So whom
22   else did you --
23   A    No.  No.  No.  No.  No.  No.  No.  The
24   last time we talked about this you said something
25   about six complaints, and I stopped you right then

378

376

1  and there because I -- I am not agreeing with you
2  that there were six complaints; and, no, we did not
3  discuss this or agree on this.
4      Q    To whom else did you complain about your
5  -- about the RPOF?
6      A    On January 23rd?
7      Q    No.  Ever.  Ever.  Are you refusing to
8  answer the question, ma'am?
9      A    No.  You haven't given me enough time to
10  answer it.  I'm thinking about your question.
11  Whom -- can you say the question again in a
12  different way?
13      Q    Who did you complain to about the RPOF?
14      A    About discrimination, you mean?
15      Q    Yes, ma'am.
16      A    I complained to Terry first and the
17  chairman and Christina and Geoffrey, and I wrote
18  Robert a letter about it, and I told Robert about it
19  when he called me, and Andy Palmer.  I told Andy
20  about it.  I talked to Johnny Hunter about it.  I
21  talked to Reverend Thomas about it.  I talked to two
22  of my county chairmen about it.
23      Q    Who?
24      A    Paul Bedinghaus, Bob Starr.  I talked
25  to -- do I have to include like pastors --

377

1    Q    Everybody.
2    A    -- attorneys and everybody?
3    Q    Everybody.
4        MR. THOMPSON:  Not attorneys.
5        MR. McKENNA:  The fact that she talked
6    to them?
7        MR. THOMPSON:  About it, no.  I'm going
8    to instruct you not to answer about anything
9    you discussed with your attorneys.
10        THE WITNESS:  Okay.
11        MR. THOMPSON:  That's a subject-matter
12    issue, Mr. McKenna, and you know it is.
13    A    I'm sure there's other people I talked
14    to.  As I sit here right now, I can't remember
15    anybody else off the top of my head, but there may
16    be others.
17    Q    Now, on January 23, 2004, you contend
18    that you complained to Christina Sheppard.  Is that
19    correct?
20    A    Among others, yes.
21    Q    On just January 23?
22    A    Not -- okay.  I'm -- okay.  Can you back
23    up a minute?  What was the question -- what is the
24    question?
25    Q    On January 23, 2004, you contend that you

378

1  complained to Christina Sheppard.  Is that correct?
2      A    Yes.
3      Q    Do you contend you complained to anybody
4  else on January 23, 2004?
5      A    Yes.  I --
6      Q    Who?
7      A    -- complained to two other people.
8      Q    Who?
9      A    Geoffrey Becker and Terry Kester.
10      Q    And when did you complain to
11  Ms. Sheppard?
12      A    I complained to Christina first, I think,
13  because I was trying to see if I could get out of
14  the --
15          MR. McKENNA:  Move to strike as
16      nonresponsive.
17  BY MR. McKENNA:
18      Q    When did you speak to Ms. Sheppard?
19      A    That day.
20      Q    When?  What time of the day?
21          MR. THOMPSON:  Mr. McKenna, she is
22      answering the question.
23          MR. McKENNA:  She is not answering the
24      question.
25          MR. THOMPSON:  Absolutely.

379

1        MR. McKENNA:  "When" is clearly related
2    to time.  It has nothing to do with how she
3    did it or when she did it or why she did it.
4        It's simply a matter of time.
5    BY MR. McKENNA:
6        Q    When did you complain to Christina
7    Sheppard?
8        A    It was during the day.  It was before the
9    African-American round-table.
10       Q    Shortly before?
11       A    At some time before the African-American
12   round-table.
13       Q    Minutes before?
14       A    I -- Mr. McKenna, please.  I told you it
15   was before the African-American round-table.
16       Q    Right.  And the question is:  How long
17   before?
18       A    I don't remember exactly how long, but it
19   was before -- some time before.
20       Q    After lunch?
21       A    Mr. McKenna, I don't remember the exact
22   time of the African-American round-table to tell you
23   exactly what time.
24       Q    I'm not asking exactly what time.  I'm
25   asking you if you know whether it was after lunch or

380

1    not.
2        A    I don't remember if it was --
3        Q    All right.  And what did you say to
4    Ms. Sheppard?
5        A    I told -- I asked Christina first if I
6    could switch my staff assignment, if I could switch
7    with one of the other field directors and have one
8    of the other field directors go to the African-
9    American round-table and maybe I go to one of the
10   other committee meetings like technology committee
11   or credentials or something other than -- something
12   other than the African-American round-table.
13       Q    Okay.  What did Ms. Sheppard say?
14       A    She -- she was -- she said -- one of the
15   things she said was, "Why would you want to go
16   anywhere else other than the African-American
17   round-table."  And then -- I can't remember -- I
18   can't exactly remember what she said, but she didn't
19   -- she wanted me to go to the African-American
20   round-table.
21           And she was getting mad with me that I
22   wanted to not go to the African-American round
23   -table, and I told her during our conversation that I
24   didn't want to be pigeonholed.  And I asked her,
25   "Why do I always have to go?"

383

381

1       And she said, "Well, you are pigeonholed,
2   so just deal with it."
3       And that really got my attention.  I
4   asked her, "Why am I pigeonholed"?
5       And I looked for Terry, but I didn't see
6   Terry --
7     Q    I didn't ask anything about Terry,
8   ma'am.  I asked you what you said to Ms. Sheppard.
9     A    Well, I've told you everything that I can
10  remember as I sit here.
11    Q    Fine.  Now, did you speak to anybody
12  prior to speaking to Ms. Sheppard?
13    A    I don't believe so.
14    Q    Okay.  So you spoke to Mr. Kester and
15  Mr. Becker after you spoke to Ms. Sheppard.  Is that
16  correct?
17    A    I spoke to Becker then Kester.
18    Q    All right.
19      (Exhibit 28 marked for identification.)
20    Q    I'm going to hand you what's been marked
21  for purposes of identification as Defendant's
22  Exhibit 28.  Do you recognize that document, ma'am?
23    A    Yes.
24    Q    And is that an e-mail that contains an
25  attachment that is the assignments for the RPOF

382

1   staff at the annual meeting?
2       A    It doesn't look familiar.
3       Q    Do you dispute that it is the assignments
4   for the RPOF staff annual meeting?
5       A    I remember getting something for the
6   annual meeting.  I just don't remember it being this
7   long or in this form.
8       Q    Do you dispute whether this is the
9   assignments for the RPOF staff that you received on
10  Monday, January 19 from Terry Kester?
11      A    Can you repeat the question, please?
12      Q    What don't you understand?
13      A    The part about this being from Terry
14  Kester, because it's not from Terry Kester.
15      Q    Did you receive this e-mail from Terry
16  Kester with the assignments for the RPOF staff on
17  Monday, January 19, 2004?
18      A    It's possible.
19      Q    So you don't --
20      A    I don't recognize it.
21      Q    You don't remember one way or the other?
22      A    That's not what I said.  I mean --
23      Q    Do you --
24      A    Let me answer the question.  And when I'm
25  finished, I will let you know.

385

383

```
 1      Q    Thank you.
 2      A    This -- the top of this e-mail says,
 3   "Robert Neaves," and it doesn't say, "Terry Kester,"
 4   who the e-mail says it's from.  So I'm -- I'm
 5   wondering what this is.  What -- I'm -- I mean, I
 6   receive a lot of -- I receive a lot of e-mails from
 7   a lot of people.
 8           I told you, you know, I got -- this
 9   format is the format that Terry would send out every
10   week for our weekly conference call, our RPOF
11   conference call, but the document doesn't look
12   familiar.  Now, not to say that this isn't the
13   document, but I can't recall from memory if this is
14   the one he sent.
15      Q    So you don't know one way or the other.
16   Is that right?
17      A    I didn't say that.
18      Q    Well, then I don't understand what you're
19   saying.  You either remember it or you don't
20   remember it.
21      A    Well, I mean, I'm trying to remember if I
22   know somebody named Robert Neaves so I can remember
23   when I might have gotten this e-mail, if I can
24   remember something more about it, but I don't even
25   know who the heck that is.
```

384

1         MR. ISLER:  We'll stipulate on the
2 record that the name of the person -- of
3 anybody who's ever printed out an e-mail in a
4 Microsoft Outlook format knows that the name
5 of the person above the line to the left is
6 simply the name of the person who printed out
7 that particular e-mail.
8         In other words, it was printed off of
9 that computer, and it may or may not have
10 anything to do with the content of the message
11 which is set forth in the body of the message
12 beginning with the word, "From."  So with that
13 stipulation, can we continue the questions,
14 please?
15 BY MR. McKENNA:
16     Q    Do you remember whether or not you got
17 this e-mail and this attachment?
18     A    No, Mr. McKenna.  I -- I got an e-mail
19 with the assignments on it, but I don't remember if
20 this is the one.
21     Q    All right.  Do you dispute that this may
22 have been the e-mail and the assignments that you
23 got from Terry Kester on Monday, January 19, 2004?
24         MR. THOMPSON:  Object to the form.
25     A    I can't agree or dispute.

387

385

1   Q   Okay.  Now, if you turn to the
2   assignments, it indicates on Friday, January 23, you
3   were on the registration desk from 9 a.m. -- I'm
4   sorry -- from 2 p.m. to 5 p.m.  Do you see that,
5   ma'am?
6       A   Yes.  That's not accurate.
7       Q   Okay.  Then if you turn to the next page,
8   it indicates, The African-American round-table was
9   from 1 p.m. to 2 p.m.  Do you see that, ma'am?
10      A   Yes.
11      Q   Was that accurate?
12      A   Yes.  The African-American round-table
13  was from then to then.
14      Q   Was from one to two?
15      A   Yes, sir.
16      Q   All right.  So how long prior to the
17  African-American round-table did you speak to
18  Ms. Sheppard?
19      A   Well, I was actually -- I didn't work --
20  well, I worked it pretty much all day, but I started
21  working the registration table around nine, and then
22  I left the registration table to go to the
23  African-American round-table.  And then after the
24  African-American round-table I went back to the
25  registration table.  So it was sometime before one

386

1   o'clock.

2      Q   Okay.  Closer to one o'clock or closer to
3  nine o'clock?

4      A   Closer to one o'clock.

5      Q   All right.  Do you know -- after looking
6  at this, does this help refresh your recollection as
7  to whether it was after lunch or not that you spoke
8  to Ms. Sheppard?

9      A   It was at some point before lunch --
10  before one o'clock, and I don't know if it was
11  before or after.  I'm assuming when you say "lunch,"
12  you mean noontime.  I mean, I can't -- I can't give
13  you any more than I have.  I'm sorry.

14      Q   Okay.

15      A   And I'm trying.  I'm really trying.

16      Q   So on Monday, January 19, 2004, you knew
17  what your assignments were at the annual meeting.
18  Is that correct?

19      A   Can you repeat that, please?

20      Q   On Monday, January 19, 2004, you knew
21  what your assignment was going to be at the annual
22  meeting.  Correct?

23      A   I don't -- okay.  I've really got to
24  stop.  I really can't -- I can't focus.  I can't
25  hold a thought in my head, and this is getting hard

387

1   for me now, so --
2       Q    You can't answer the pending question?
3       A    What's your question?
4           MR. THOMPSON:  I don't think she's
5   understanding the pending question.
6           MR. McKENNA:  That on Monday, January --
7           MR. THOMPSON:  That's part of the
8   problem here.
9           MR. McKENNA:  -- 19, 2004, she knew what
10      her assignments were going to be at the annual
11      meeting.  That's a very simple question.
12          MR. THOMPSON:  It's not that simple.
13          THE WITNESS:  Yes and no.  Well --
14          MR. ISLER:  Let her finish.  Go ahead.
15      A    Your sound effects, Mr. McKenna, are
16  killing me.  Yes and no.  They would come out with
17  these -- for instance, like right here it says I'm
18  supposed to be at the registration table from two to
19  five.  Well, these -- some of these times are not
20  tentative -- I mean, they're tentative.  They're not
21  what it's actually going to be.
22          I mean, this isn't -- this isn't really
23  -- this is more tentative than anything.  And what I
24  remember getting -- something that was like one-page
25  long is what I remember.  And, I mean, I knew I was

388

1  going to be at the registration desk and other
2  stuff, but I don't remember this big, long thing.
3      Q    You knew you were going to be at the
4  African-American round-table.  Right?
5      A    What was your question again?
6      Q    And you knew you were going to be at the
7  African-American round-table?
8      A    I didn't want to go to the
9  African-American round-table.
10     Q    That wasn't the question.  But you knew
11  on January 19, 2004, that you were scheduled to go,
12  didn't you?
13     A    No, I didn't know that I was scheduled to
14  go to the African-American round-table.  I don't --
15  I don't remember that.  I told you I don't
16  remember --
17         MR. ISLER:  Why don't we take a brief
18     break.  Why don't you take your client out and
19     give her a brief break from this and walk
20     around.  And let's try to keep on going, but
21     she can take breaks every half hour, if she
22     needs to, to clear her head.
23         MR. THOMPSON:  If she's starting to get
24     into the fog, it's going to be on that caveat.
25         MR. ISLER:  She's not getting into a

389

1    fog, as best I can tell.
2         MR. THOMPSON:  Well, okay.
3         Mr. ISLER:  She's frustrated because she
4    and Ed are not communicating well together.
5    And if she needs to take a break to clear her
6    head, then that's fine.  But if she tells you
7    that she is medically impaired, then that's
8    fine, we will take that up.  You guys can go
9    have that conversation, and you can come back
10    and let us know whether --
11        MR. THOMPSON:  I understand you don't
12   think -- you believe you know what's in her
13   head.  I'll talk to her about it.
14        MR. ISLER:  That would be fine.  We're
15   off the record.
16         (Recess from 2:33 to 2:45 p.m.)
17        MR. THOMPSON:  It's my client's
18   understanding the Lamaticol that she takes in
19   the morning is what -- that medication is to
20   keep her coherent, but it's a morning
21   medication.  I don't know whether it's running
22   its course at this point.  But she has
23   indicated to me that she's starting to get in
24   that haze that she was in before, so her answer
25   to whether she can accurately -- I mean,

392

390

1   truthfully no problem, but accurately might
2   be --
3       MR. McKENNA:  And completely.
4       MR. THOMPSON:  -- and completely might
5   be an issue at that point.  It's something we
6   all discussed at the onset of this, and I
7   don't know what to say except if you want to
8   take her doctor's deposition and find out
9   whether there's any validity to it, you know,
10   that's great.
11       I would suggest that if we continue it,
12   we continue it in conjunction with another
13   depo that's down here, so that way you don't
14   have to make another trip.  I would hate to
15   have you make another trip.
16       MR. ISLER:  I appreciate it.  Do we have
17   any other depositions scheduled for Tampa
18   yet?
19       MR. McKENNA:  Not yet.
20       MR. ISLER:  Isn't most everybody else in
21   Tallahassee?
22       MR. McKENNA:  Uh-huh, the ones we've
23   been talking about.
24       MR. ISLER:  Is there anyone else down
25   here that we're going to be deposing in this

391

1    matter?
2         THE WITNESS:  My doctor.
3         MR. THOMPSON:  Her doctor.  You guys
4    indicated that you want to take that
5    deposition?
6         MR. McKENNA:  May be some other ones I
7    want to take, but I haven't really got that
8    far yet.
9         MR. THOMPSON:  So that's certainly one
10   right there that I'm sure that you're going to
11   want to take.
12        MR. ISLER:  Is it possible for your
13   client to call and to ask whether she can
14   switch her days off from Wednesday to Tuesday
15   and just flip-flop the next two days, because
16   she indicated that she had Wednesday off, I
17   believe.  Is that correct?
18        THE WITNESS:  No.
19        MR. ISLER:  You said Wednesday was no
20   problem?
21        MR. THOMPSON:  No.  She said she would
22   be able to take Wednesday.  She could probably
23   get Wednesday is what you said.  Right?
24        THE WITNESS:  Wednesday is my day off,
25   but, no, I'm not going to ask for it.  I

392

1    just --
2         MR. THOMPSON:  It's too -- she just got
3    this job again.  The last -- I'm not going to
4    have her lose her job.  I do want to try to
5    make it so you don't have to make a special
6    flight down, you know, and that's what I'll --
7    I'll certainly do my best to work on that,
8    Eddie.  I don't know --
9         MR. McKENNA:  We don't have to do this
10   on the record.
11        MR. THOMPSON:  Okay.  Yeah.  Let's go
12   off the record for this.
13        MR. McKENNA:  Wait a minute.  You said
14   that she can't -- she does not feel she can go
15   forward medically?
16        MR. THOMPSON:  Yes.
17        MR. McKENNA:  So we don't have a choice
18   at that point.
19        MR. THOMPSON:  Yes.
20        (At 2:48 p.m., the deposition was
21   adjourned.)
22
23
24
25□
TAMPA:204803.1

# EXHIBIT PP

**Document Selection Menu**

Select the document you wish to view.

**Document Number: 75**          20 pages          0.7 mb

| Attachment | Description | | |
|---|---|---|---|
| 2 | Exhibit A | 158 pages | 308 kb |
| 3 | Exhibit B | 149 pages | 280 kb |
| 4 | Exhibit C | 82 pages | 207 kb |

View All  or  Download All          409 pages          1.5 mb

Electronic Case Filing | U.S. District Court - Middle District of Florida  https://ecf.flmd.uscourts.gov/doc1/04702499953